LAW OFFICES OF

**PAVONE & FONNER, LLP**

BENJAMIN PAVONE, ESQ.
STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA 92108
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

THE LAW OFFICES OF

**BURNS & SCHALDENBRAND**

EDWARD BURNS, ESQ., STATE BAR NO. 201913
FREDERIK SPIESS, ESQ., STATE BAR NO. 221421
509 NORTH COAST HIGHWAY
OCEANSIDE, CALIFORNIA 92054
TELEPHONE: 760 453 2189
FACSIMILE: 760 453 2194
BURNS EMAIL: ewburns@bsrlawyers.com
SPIESS EMAIL: frederik.spiess@bsrlawyers.com

THE LAW OFFICES OF

**AFFELD GRIVAKES ZUCKER LLP**

GREGG ZUCKER, ESQ., STATE BAR NO. 166692
VICTORIA NIEWRZOL, STATE BAR NO. 282889
2049 CENTURY PARK EAST, SUITE 2460
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310 979 8700
FACSIMILE: 310 979 8701
ZUCKER EMAIL: gz@agzlaw.com
NIEWRZOL EMAIL: vn@agzlaw.com

THE LAW OFFICES OF

**DAVID ELLIOT, ESQ.**

STATE BAR NUMBER 270381
110 WEST A STREET, SUITE 750
SAN DIEGO, CALIFORNIA 92101
TELEPHONE: 858 228 7997
FACSIMILE: 619 255 1856
EMAIL: elliot.david@hotmail.com

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

ALTAMIRANO, MARLON;
AUBREY, DERRICO;
BANKS, MYRICK;
BLEVINS, PAUL;
BRODIS, ANTONE;
BROWN, DERICK;
CABALLERO, LARRY;
CAMPBELL, COREY;
CHANEY, CLIFFORD;
CHAVEZ, JOSE;
CONSUEGRA, EBERT;
COOK, BARRY;
DELEON, ELMOR;
DOSS, ROY;
DUNHAM, DENNIS;
ESCOTO, GONZALO;
FELDER, JEROME;
FERRIS, JOSEPH;

**CASE NO: ________________**

**COMPLAINT**

**I. VIOLATION OF 42 U.S.C. § 1983**

**(CRUEL AND UNUSUAL PUNISHMENT PROHIBITED BY THE 8TH AMENDMENT)**

**II. NEGLIGENCE**

**III. REQUEST FOR DECLARATORY RELIEF**

**DEMAND FOR JURY TRIAL**

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

FOSTER, ANDRA;
FRANKLIN, STEPHEN;
GAETA, RUBEN;
GALLOWAY, AUBREY;
GAMBOA, MANUEL;
GARRETT, JUSTIN
GUZMAN, LUIS;
HERCULES, SINOHE;
HERRERA, VICTOR;
JACKSON, CURTIS;
JOHNSON, MANDAZ;
JONES, EDWARD;
LEE, ALBERT;
LEINWEBER, MIKHIEL;
LEWIS, CLEOFAS;
MADEIRA, MICHAEL;
MAESHACK, ROBERT;
MASUSHIGE, DANIEL;
MELLON, ENRICO;
NGUYEN, LICH;
ORTEGA, JAMES;
PAGE, MACK;
PARKER, TYEJAHN
PIERCE, MARVIN;
QUINTANILLA, CARLOS;
RANDLE, EARL;
ROACH, JAY;
ROBINSON, DAVID
ROBLES, ANTONIO;
RODRIGUEZ, ANTHONY;
SANCHEZ, JOHNNY;
SANDERS, TYRONE;
SEPULVEDA, ADRIAN;
SINGLETON, CHARLES;
TEJEDA, MANUEL;
WELLS, MICHAEL;
WILLIAMS, CARTER LEE;
WIMBLEY, FINLEY; and
WOODARD, RICHARD,

PLAINTIFFS,

v.

ARNOLD SCHWARZENEGGER,
FORMER GOVERNER OF THE
STATE OF CALIFORNIA;

JEFFREY BEARD, SECRETARY CALIFORNIA DEPT. OF CORRECTIONS AND REHABILITATION;

PAUL BRAZELTON, FORMER WARDEN, PLEASANT VALLEY STATE PRISON;

MATTHEW CATE, FORMER SECRETARY OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION;

FRAUENHEIM, SCOTT, CURRENT WARDEN OF PLEASANT VALLEY STATE PRISON;

JAMES HARTLEY, FORMER WARDEN AVENAL STATE PRISON;

SUSAN L. HUBBARD, FORMER DIRECTOR, DIVISION OF ADULT OPERATIONS;

DEBORAH HYSEN, CHIEF DEPUTY SECRETARY, FACILITIES PLANNING, CONSTRUCTION & MANAGEMENT;

DR. FELIX IGBINOSA, MEDICAL DIRECTOR, PLEASANT VALLEY STATE PRISON;

SCOTT KERNAN, FORMER CHIEF DEPUTY SECRETARY OF ADULT INSTITUTIONS;

CHRIS MEYER, SENIOR CHIEF, FACILITIES PLANNING, CONSTRUCTION & MANAGEMENT;

TANYA ROTHCHILD, FORMER CHIEF OF THE CLASSIFICATION SERVICES UNIT;

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

TERESA SCHWARTZ, FORMER DIRECTOR, DIVISION OF ADULT INSTITUTIONS;

DWIGHT WINSLOW, M.D., FORMER MEDICAL DIRECTOR, CDCR;

CARL WOFFORD, CURRENT WARDEN AVENAL STATE PRISON;

JAMES A. YATES, FORMER WARDEN OF PLEASANT VALLEY STATE PRISON; and

UNKNOWN DEFENDANTS 1-50,

---

J. CLARK KELSO, RECEIVER, CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES,

IN HIS OFFICIAL CAPACITY,

DEFENDANTS.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

## I.

## JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to Title 28 U.S.C. §§ 1331 and 1343. The individual defendants are persons who caused the Plaintiffs to contract Valley Fever, a lifelong crippling disease. Infliction of that disease constitutes Cruel and Unusual Punishment in violation of the Eighth Amendment to the United States Constitution, by depriving plaintiffs of a federally-guaranteed right under color of state law in contravention of Title 42 U.S.C § 1983.

2. Venue is properly in this Court, pursuant to Title 28 U.S.C § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, including exposure to spores that cause Valley Fever, and the Court has ruled that Plaintiffs should proceed in this judicial district.

3. Plaintiffs make the following allegations upon personal knowledge as to those assertions concerning themselves and, as to all other matters, upon the investigation of counsel, which includes, without limitation: a) review and analysis of public documents published by the State of California, Department of Corrections and Rehabilitation (CDCR) and other public agencies; b) review and analysis of public filings, press releases and other publications by certain of the defendants and other non-parties; c) review of news articles, medical and other reference sources, as well as postings on the State of California CDCR and correctional facility websites concerning the issues described herein; and d) review of other available information concerning CDCR's operations, the medical conditions and treatment described herein, and the individual defendants.

## II.

## SUMMARY OF THIS CASE

4. The American system of justice requires that state correctional authorities carry out the exact sentence determined by the judicial process – no more

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

and no less. Instead, defendants imposed on plaintiffs a lifelong, crippling, and sometimes fatal disease in addition to their judicial sentences.

5. The disease, called Coccidioidomycosis, “Valley Fever,” or “VF,” is carried by a fungus-like organism that lives and reproduces in the soils in certain limited geographic areas. It produces spores that can infect humans. To those infected, it can be debilitating, disfiguring, intensely painful, and if it is not treated quickly, accurately and indefinitely, may be fatal. Over 30 prisoners have already died from the disease and many more live with serious medical complications from it.

6. For some who come in contact with the spores, the disease rapidly spreads throughout the lungs or to other parts of the body; this is referred to as the “disseminated” disease.

7. Disseminated coccidioidomycosis attacks multiple organ systems including the skin, lungs, eyes, bones, joints, nervous system and brain. Victims of the disseminated form require lifelong treatment and may lose limbs to amputation, require sections of bone or whole organs to be removed, may suffer disfiguring skin lesions, and if the disease attacks the brain, victims may suffer permanent brain damage or die from coccidioidal meningitis.

8. Those in certain ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as persons who are immune-compromised or immune-suppressed from taking medication for chronic arthritis and other diseases, are more susceptible to developing the aggressive, disseminated form of Valley Fever.

9. Plaintiffs in this action are inmates and former inmates of the state correctional system who contracted Valley Fever as a result of Defendants’ recklessness. Plaintiffs were required to serve their lawful sentences. They did not also deserve, a life-long debilitating illness as a result of Defendants’ deliberate indifference.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

10. Defendants knew that placing inmates in prisons where the prevalence of spore-laden soils was a known hazard – where Valley Fever was already occurring at epidemic rates – posed an unacceptable risk of irreparable harm. Yet, they not only placed Plaintiffs in harm's way, they also failed to implement even the few simple measures recommended by the correctional authority's own medical experts to protect Plaintiffs from the disease.

11. Defendants could have diverted or transferred Plaintiffs away from hyper-endemic prisons, either by formal policy or on a case-by-case basis at the facility level, in order to reduce the rate at which inmates were infected with the virus.

12. Defendants could have also implemented simple environmental measures that CDCR's own staff experts repeatedly recommended at the prisons to reduce inmate exposure: basic precautions such as paving, landscaping, and soil stabilization.

13. California state authorities repeatedly recommended that the prison ventilation systems be improved, that the existing ventilation systems be properly maintained to protect inmates against indoor exposure to the spores, and that inmates be offered respiratory protection and cautioned to stay indoors during high wind conditions to avoid outdoor exposure.

14. Defendants took none of these actions.

15. Instead, Defendants continued to transfer high-risk and all other inmates into these hyper-endemic prisons, failed to take even the simplest protective measures, and allowed major construction, which churns the soil and throws the spores into the air, to take place on site and immediately adjacent to one of the most dangerously infectious prisons, Pleasant Valley.

16. Defendants knowingly exposed each Plaintiff to serious disease risks and demonstrated a reckless indifference to Plaintiffs' safety, health, and constitutional right to be free of excessive punishment.

17. Plaintiffs have sought to resolve this matter through administrative remedies, to no avail.

18. Plaintiffs seek adequate medical care and other damages as appropriate to their injuries.

## III.

## THE DEFENDANT PARTIES

19. Defendant Paul D. Brazelton acted as warden of Pleasant Valley State Prison (PVSP) from early 2012 through the Fall of 2013. He presided over PVSP, the most adversely affected prison, during this period. Mr. Brazelton is believed to reside in Coalinga, California, County of Fresno.

20. Defendant Jeffrey Beard is the current Secretary of the CDCR. He was appointed as Secretary by Governor Edmond G. Brown, Jr., on December 27, 2012. Beard has overseen prison policy since his appointment.

21. Defendant Matthew Cate was the Secretary of the CDCR from 2008-2012. Secretary Cate supervised and was responsible for the housing of inmates at prisons where they contracted Valley Fever. Cate resides in Sacramento County, California.

22. Defendant Scott Frauenheim is the current warden of Pleasant Valley State Prison. He was appointed acting warden during 2013 and became warden in 2014. He resides in Kings County, California.

23. Defendant James D. Hartley is the former warden of Avenal State Prison. He acted in that position from 2007-2014. He is believed to reside in Fresno County.

24. Defendant Dr. Susan L. Hubbard is the former director of the Division of Adult Operations. She is an author of the 2007 CDCR "exclusion" policy that resulted in highly-susceptible inmates continuing to be housed at hyper-endemic prisons. Hubbard resides in Carmichael, Sacramento County, California.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

25. Defendant Deborah Hysen is the current Director of CDCR's Office of Facility Planning, Construction and Management (FPCM). Hysen was the Chief Deputy Secretary of FPCM from at least 2006 until 2014, during which time CDCR failed to implement any of the recommended remedial measures to reduce infection rates. Hysen resides in Sacramento, California.

26. Defendant Dr. Felix Igbinosa was the medical director of Pleasant Valley State Prison, having served in that capacity from approximately 2005-2014. Dr. Igbinosa resides in Clovis, California.

27. Defendant J. Clark Kelso is currently serving as the Receiver of the California Correctional Health Care Services agency (CCHCS).[1] Mr. Kelso is believed to reside in Elk Grove, California, Sacramento County.

28. Defendant Scott Kernan is the former head of the Department of Adult Institutions (DAI), titled Chief Deputy Secretary at that time, and served in that position until 2014. He was head of DAI at the time the 2007 exclusion policy was implemented. On information and belief, he resides within or is otherwise subject to the jurisdiction of this federal court.

29. Defendant Chris Meyer was the Senior Chief of Facility Planning, Construction and Management from 2009 to 2014, succeeded by Defendant Hysen as head of that office. It was Meyer's responsibility to employ best practices at the prisons to ensure their safety. Plaintiffs are informed and believe that Meyer resides in Sacramento, California, and are seeking to verify that address through his counsel.

30. Defendant Tanya Rothchild is the former Chief of CDCR's Classification Services Unit (CSU), the agency department in charge of transferring

[1] CCHCS is the California state agency that has been responsible for health care in the state prison system since October 3, 2005, after the *Plata* court determined that the then-existing prison health care system violated the Eighth Amendment. *Plata v. Brown*, Case No. 01-1351 [Northern District of California]. The *Plata* court ordered CCHCS to take over prison healthcare; it has since been legally responsible for overseeing 7,000 staff addressing health care in California state prisons.

inmates to specific prisons. Rothchild resides within or is otherwise subject to the jurisdiction of this federal court.

31. Defendant Teresa Schwartz is a former deputy director of Adult Institutions at CDCR. She was deputy director of DAI at the time the 2007 exclusion policy was initiated. Schwartz resides within or is otherwise subject to the jurisdiction of this federal court.

32. Defendant Arnold Schwarzenegger is the former Governor of California, having acted in that position from 2003 through 2011. Schwarzenegger resides in Los Angeles County, California.

33. Defendant Dwight Winslow, M.D. is the former Statewide Medical Director for CDCR. He co-authored the 2007 exclusion policy. Winslow resides in Sacramento, California.

34. Defendant Carl Wofford is the current warden of Avenal State Prison. He was appointed acting warden during 2013 and became warden on or about December 20, 2013. He resides in Los Angeles County, California.

35. Defendant James A. Yates is the former warden of Pleasant Valley State Prison and is believed to have occupied that position from at least 2005 until 2011. During this time a large number of inmates contracted Valley Fever at PVSP. Yates is believed to reside in Corcoran, Kings County, California.

36. The true names and capacities, whether individual, corporate, associate, governmental or otherwise of some of the Defendants herein are presently unknown to Plaintiffs.

37. Plaintiffs will seek leave of the Court to amend this Complaint to show the true names and capacities of such Defendants if and when these are ascertained by Plaintiffs.

38. Unknown Defendants 1-50 are one or more state officials of the California Department of Corrections and Rehabilitations, each of whom were aware

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

of the increased risk faced by Plaintiffs and had the authority, ability and means to reduce those risks but failed to act to do so.

## IV.

## FACTUAL ALLEGATIONS

### A. The Effect of Coccidioidomycosis Infection

39. Coccidioidomycosis is a parasitic disease caused by exposure to airborne fungal spores of Coccidioides organisms found in the soil in certain locations in the southwestern United States including California.

40. When a human inhales the Coccidioides fungal spores, those spores may lodge in various locations in the respiratory system. The spores then grow and transform into large tissue-invasive parasitic spherules. The spherules divide, enlarge, and rupture, each releasing as many as thousands of new "endospores" that can invade surrounding tissue or can migrate through the blood to other tissues and organs, where they repeat the process and continue to multiply in the body.

41. The developing endospores grow on host body tissue, dissolving some of that tissue in the process. Depending on the site of the disseminated infection, this may lead to disfiguring skin lesions, destruction of soft tissue, erosion of bones, joints, and eyes, ulcers penetrating into the pleura in the lungs, and the colonization of other organs including the brain. Lesions may occur in every organ in the body.[2]

42. Coccidioides replicates so quickly that it is considered the most virulent fungal parasite known to man.[3] The Coccidioides fungus was at one time listed as a "Select Agent" – a potential weapon of biological warfare or bioterrorism – in the Antiterrorism and Effective Death Penalty Act of 1996 and the Public Health and

[2] Smith, Pappagianis, et al, *Human Coccidioidomycosis*, Bacteriology Reviews (September, 1961), 25(3), pp. 310-320, at p. 311.

[3] Dixon, *Coccidioides Immitis as a Select Agent of Bioterrorism*, Journal of Applied Microbiology (October 2001), 91(4):602-5.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

Security and Bioterrorism Preparedness and Response Act of 2002.[4] The Centers for Disease Control (CDC) requires scientists handling Coccidioides spores to use protective protocols just one level below that required for handling the hemorrhagic fever Ebola virus.[5]

43. In the general population, 40% of those exposed will show symptoms of a respiratory illness resembling the flu that may last weeks or months.[6]

44. In a segment of that 40%, however, which varies depending on the ethnicity and medical status of the individual, the infections will cause severe, life-threatening pneumonia or blood-borne spread of the fungus from the lungs to other parts of the body, which is referred to as a disseminated infection.[7]

45. Disseminated infection commonly involves skin and soft tissues, bones, and the central nervous system. Both the spore-provoked pneumonia and the disseminated infection, especially if it reaches the brain and causes meningitis, can be fatal.[8]

46. Per Filip, who authored a leading book on Valley Fever: "Valley Fever can kill, but it can also affect its survivors for a lifetime. It can disseminate to the eyes

---

[4] Filip & Filip, Valley Fever Epidemic, Golden Phoenix Books (2008), p. 2 (hereinafter "Filip"). Published in 2008, this reference summarized 268 published medical studies, professional journal articles, and other authoritative material concerning Coccidioidomycosis.

[5] "*Biosafety in Microbiological and Biomedical Laboratories*," U.S. Department of Health and Human Services Public Health Service Centers for Disease Control and Prevention National Institutes of Health, (2009, 5th Edition).

[6] Dec. John Galgiani, ¶ 7 (April 25, 2013, Docket 2598 in *Plata* Eastern District case), Valley Fever expert.

[7] Galgiani, ¶ 7.

[8] *Id*.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

where it can cause blindness and possibly require the removal of an infected eye. Valley Fever can attack any organ or limb in the body to cause lesions, chronic pain, and to require amputations. Some cases can necessitate surgical removal of an infected lung…." Valley Fever can cause facial lesions that leave permanent scarring and disfigurement. In the most lethal varieties of the disease it can attack the lining of the brain (meninges), [leading to] permanent brain damage. Valley Fever can infect the bones and joints, causing chronic debilitation, pain, and resulting in the need for joint fusions or amputations ... people with Valley Fever have become wheelchair bound as a result of disseminated spinal lesions . . . ."[9]

47. Once the disease is established in the disseminated form, there is no cure. The disease is treated with antifungal drugs which can have severe side effects and must be taken for a lifetime. These drugs do not cure the disease, however, since they only reduce but do not eliminate the population of infectious spores. Continuous treatment with oral anti-fungal medication may keep the disease partially and temporarily at bay, but the disease remains within an infected person for his or her lifetime, and repeated debilitating relapses may be expected. As many as 75% of patients who stop taking the drugs will relapse into the life-threatening disease within a year.[10]

48. Treatment of Valley Fever is expensive, for the patients and for the public health system. As of 2006, "The cost of antifungal medication is high, in the range of $5,000 to $20,000 per year of treatment. For managing critically ill patients with coccidioidomycosis, there are considerable additional costs including intensive

[9] Filip, at pp. 63-65.

[10] *See, e.g.*, Filip, p. 40; Kanan, Renee, M.D., "*Valley Fever*," Dept of Corrections Memo to Health Care Managers November 5, 2004 [hereinafter "Kanan" or "Kanan Memo"], p. 4; Galgiani, John, et al., *Practice Guidelines for the Treatment of Coccidioidomycosis*, Oxford Journals (2000).

care support for many days or weeks."[11] Some patients require repeated hospitalization for the disseminated disease. As of 2011, the cost for such treatment was in the range of $55,000 per hospitalization on average.

49. Plaintiffs in this case, who have had Valley Fever for relatively short amounts of time, have already reported one or more of the following symptoms: skin lesions; fever; shortness of breath and wheezing; chronic and severe coughing including coughing up blood; chest pain; uncontrollable chills and night sweats; nausea; rapid weight loss; rashes; burning sensations in various body parts (feet, joints, etc.); chronic exhaustion; joint and bone pain, stiffness and swelling; swelling of the legs, ankles, and feet; sensitivity to light; vision problems; neurologic symptoms including inability to concentrate; foot drop and partial paralysis; and excruciating head and neck pain.

50. Over thirty inmates have already died from exposure to the disease within the prison system from 2005 to the present, and more are expected to die prematurely, while hundreds or perhaps thousands will live with grave consequences of the disease.

**B. Defendants, as Prison Officials and Medical Experts, Were Aware of the Increased Risk of Valley Fever at These Prisons**

51. California health officials have known about the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the disease's acute risks to inmate health for over (50) years.[12]

52. By the late 1960's, employers were being warned that "the importation of any susceptible labor force into the endemic areas carries with it the responsibility

[11] Galgiani, *Practice Guidelines*, at p. 659.

[12] *See, e.g.*, Smith, C. E.: *The Epidemiology of Acute Coccidioidomycosis With Erythema Nodosum ("San Joaquin" or "Valley Fever")*, American Journal of Public Health 30, at p. 600 (June 1940).



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

for reducing the rate and severity of infection through whatever dust control measures are possible and for providing a vigorous program of medical surveillance."[13]

53. Despite this, between 1987 and 1997, the CDCR built eight prisons within the hyper-endemic regions of San Joaquin Valley: Avenal State Prison; California Correctional Institution; California State Prison-Corcoran; Wasco State Prison; North Kern State Prison; Pleasant Valley State Prison; California Substance Abuse Treatment Facility and State Prison, both at Corcoran; and Kern Valley State Prison.

54. Locating these prisons in these hyper-endemic region of the Central Valley, significantly overcrowding them, housing inmates at risk or at increased risk from Valley Fever there, and failing to implement any of the remedial measures recommended to reduce inmate exposure to cocci has had drastic repercussions on the health and welfare of California's inmate population.[14]

55. Though all of these prisons presented a potentially elevated risk of exposing inmates to Valley Fever, there are two – ASP and PVSP – at which these risks are acutely amplified, and one in particular, PVSP, which by 2006 was known to be extraordinarily dangerous.

56. Pleasant Valley State Prison (PVSP) is located in Coalinga, California. The prison provides long-term housing and services for minimum, medium and maximum custody inmates. It was opened in November 1994, covers 640 acres and was designed to house 3,000 inmates. Today, there are approximately 730 staff and 5,188 prisoner beds.

---

[13] Schmelzer and Tabershaw, *Exposure Factors In Occupational Coccidioidomycosis,* American Journal of Public Health and the Nations Health, January 1968: Vol. 58, No. 1, p. 111.

[14] *Coccidioidomycosis in California's Adult Prisons 2006-2010*, California Correctional Health Care Services; April 16, 2012.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

57. The soil surrounding and at PVSP and other hyperendemic prisons is known to be contaminated with the Coccidioides fungus.

58. In November 2004, before the drastic rise in incidence rates at PVSP, Defendant Renee Kanan, M.D., Deputy Director of Health Care Services at CDCR, wrote a memorandum to all health care managers, staff members, and other officials within CDCR regarding Valley Fever and its origin in soil fungus.

59. Known as the Kanan Memo, it included a three-page overview of Valley Fever, its cause, diagnosis, symptoms and treatment. The memorandum admitted that: (a) the Central Valley prisons are located within areas which host the dangerous cocci fungus in the soil (b) Valley Fever has "potential lethality" for people exposed to the fungus; (i) "winds and construction activity may cause the organism to be blown into the air where it can be inhaled and pneumonia can occur"; (ii) "[a] percentage of individuals exposed to coccidioides immitis … will progress to frank, generally patchy pneumonia (the incubation period is up to four (4) weeks), or to disseminated disease"; (iii) "[t]he risk and incidence of disseminated disease are highest in American Indians, Asians, Blacks and immuno-compromised individuals"; (iv) "[d]issemination usually occurs to the skin, bones and meninges, although any part of the body can be involved"; (v) bone lesions, back pain and paraplegia may result from Valley Fever; (vi) skin lesions "imply a poor prognosis and often herald widespread dissemination"; (vii) "[m]eningeal involvement eventually leads to a severe, unremitting headache" and (vii) "[t]reatment must be continued for life to maintain control of symptoms; there is no cure for coccidiodal meningitis at this time."

60. Dr. Kanan's memo was and continues to be widely available to state officials, including the Defendants, after it was initially distributed to CDCR officials.[15]

---

[15] The Kanan Memo was addressed to Nadim Khoury, M.D. (Assistant Deputy Director (A), Clinical Policy and Programs Branch, Health Care Services Division of Department of Corrections); Donald Smilovitz, M.D. (Physician and Surgeon,

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

61. Beginning in 2005, after the Kanan memo was distributed, Pleasant Valley State Prison (PVSP) began to experience an epidemic of Valley Fever, including multiple deaths from the disease.

62. Infection rates at PVSP during this time were as much as 1,000 times the rate seen in the general population, yet state officials continued to transfer susceptible and high-risk inmates to this prison.

63. An internal CDCR memorandum dated October 27, 2006 to all administrative personnel, apparently generated at the request of Sacramento government officials, described the epidemic infection rates:

> "The Cocci information requested by [California government officials in] Sacramento is as follows:
>
> 2001 – 42 inmates
> 2002 – 38 inmates
> 2003 – 80 inmates
> 2004 – 66 inmates 1 death
> 2005 – 187 inmates 5 deaths
> 2006 – 1145 inmates 8 deaths
>
> The above information is an approximation of the number of inmates with positive Cocci lab results."[16]

64. This memo showed that Valley Fever incidence rates increased at PVSP by more than 445% between 2001 and 2005, and by over 2,500% by 2006. In 2006

---

Infection Control Department, CMC); Anita Mitchell, M.D. (Chief Medical Officer, Clinical Standards & Services (CSS), HCSD); and Tim Rougeux (Project Director, Medical Programs Implementation) and then available, and on information and belief, read widely throughout CDCR.

[16] Durst, Karen, "Coccidioidomycosis (Cocci) Report," [CRCR memorandum dated October 27, 2006 to Administrative Personnel].

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

(through mid-August), the California prison system accounted for 30% of all Valley Fever cases reported to the State Department of Health Services.

65. An August 3, 2006 internal memorandum confirmed that CDCR officials knew that they were exposing inmates to elevated risk of Valley Fever.[17]

66. During 2006-2010, rates of Valley Fever in the hyper-endemic area prisons worsened. The rates at Pleasant Valley State Prison, Avenal State Prison, Wasco State Prison, and North Kern State Prison, were each significantly higher than rates in the counties in which they are located. In comparison with the rate in California (7/100,000), the rate at PVSP was 1,001 times higher (7011/100,000), the rate at ASP was 189 times higher (1326/100,000) and the rate at WSP was 114 times higher (800/100,000).

67. Between 2006 and 2012, approximately 1,800 inmates became infected with Valley Fever at PVSP.[18]

68. The rates at PVSP, ASP, and WSP were also much higher than the rate in Kern County, the county with the highest rate of cocci in California (135/100,000). An April, 2012 retrospective study found that the infection rate at PVSP was approximately 7,011 cases for every 100,000 people, or 7 out of every 100.

69. Of the 27 CDCR inmates who died of Valley Fever between 2006 and 2010, eighteen (or 68 percent) were African-Americans, according to the report. The rate of death due to Valley Fever among African-Americans was twice that among non-black inmates.

70. Following the Kanan Memo, which warned that construction activity was associated with the increased exposure to the spores that cause Valley Fever,

[17] *See* Dovey & Farber-Szekrenyi, "*Inmate Patients at High Risk of Valley Fever Excluded from Specific Central Valley Institutions*," p. 1 [CDCR Memo August 3, 2006, hereinafter "Dovey"].

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

some experts observed that the probable cause of the rapid and continuing increase in Valley Fever cases at PVSP that began in 2005/2006 was the construction of a new state facility immediately adjacent to the prison. The excavation and construction churned up and broadcast Coccidioides spores through the air and on to bare soil and surfaces throughout the prison, where they took root to become an ongoing source of infection.[19] Those spores spawned cocci colonies that pose an ongoing threat of Valley Fever infection at the prison currently and into the future.

71. Dr. Pappagianis' report confirms "the influence of 'new construction' (including excavation)" on PVSP's Valley Fever rates as follows: "Construction began in late Summer to early Fall [2005] and soon the number of cases increased. … It was evident that PVSP had a higher rate of infections than other institutions some of which had comparable numbers of inmates. By mid-August 2006, PVSP had 300 new cases recognized, far exceeding those recognized at (51) [at] Avenal, the next highest represented. We calculated incidence of 3,000/100,000 for PVSP in 2005; and in 2006 up to mid-August the rate was 6,000/100,000. For comparison, the highest incidence rate of [Valley Fever] was 572/100,000 for Kern County during the epidemic year 1993."[20]

72. After evidence of the epidemic became unmistakable, California Corrections Health Care Services (CCHCS) requested assistance from the California Department of Public Health (CDPH) in assessing the magnitude of the problem.

73. CDPH reported that the rate of cases at PVSP was 38 times the rate in residents of Coalinga, and 600 times the rate in Fresno County and confirmed that at

[19] *See* Winslow D, Khoury N, Snyder N, Bick J, Hawthorne K, Chapnick R, et al., 2007; "*Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California*," p. 4, June, 2007 [hereinafter "Winslow Recommendations"].

[20] Kanan Memo [Attachment 3, p. 4].

least 29 persons had had to be hospitalized and 4 deaths had resulted. CDPH reported that risk of disease was associated with increased outdoor time, pre-existing health conditions, and African-American race.

74. CDPH's report included specific recommendations for reducing Valley Fever at the hyper-endemic prisons.

75. Based on the CDPH report, CCHCS issued recommendations in June, 2007, which included: (i) proceeding with environmental mitigation in the prisons through landscaping with ground cover, and placing concrete and other dust reducing materials on the grounds; (ii) continue the diversion and relocation of inmates at high risk for coccidioidomycosis (which in reality was everyone); (iii) reinstate the public health system in prisons; (iv) notify the local health departments of new cases identified by prison providers; (v) expand epidemiologic research around cocci; (vi) support vaccine research; (vii) do not expand prison beds in the hyper-endemic area, especially at Pleasant Valley State Prison.

76. In November, 2007, Defendants Hubbard and Winslow amended the 2006 exclusion policy, which on information and belief was ratified by Defendants Schwartz, Kernan, Cate and Schwarzenegger. That policy protected only persons with certain identified medical conditions. It failed to protect any other inmates including those in the identified high-risk racial and ethnic groups, although risks to persons in those groups were already well-known to Defendants.

77. Predictably, the wholly inadequate 2007 policy failed to stem the epidemic of Valley Fever.

78. From 2007 through 2010, the rate in PVSP was 6 times higher than the rate among residents of the adjacent state mental health facility built in 2005.[21]

[21] "*Coccidioidomycosis in California Department of Corrections and Rehabilitation Institutions,*" p. 2 [CDCR Report, October 10, 2012].



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

79. During 2009, CDCR first requested, and then without explanation, terminated a project by the leading federal health agencies to assist the California prison system with the Valley Fever epidemic.

80. In December 2009, after California officials had canceled the project, two officials at the Centers for Disease Control (CDC) and its National Institute for Occupational Safety and Health (NIOSH), wrote to Nikki Baumrind, Ph.D, M.P.H., Chief of the Occupational and Public Health Section of the California Department of Corrections and Rehabilitation. This letter made it clear that the CDC and NIOSH had ceased their work on the project due to the CDCR's "lack of support" in assisting with the federal agencies' investigation.

81. The NIOSH officials reminded CDCR that "[p]eople at greater risk for developing disseminated infection include people of African American; Asian or Filipino descent; … and immunocompromised persons".[22]

**C. Defendants Knew Certain Groups Were Particularly Susceptible.**

82. It is commonly and widely-known among prison officials and medical personnel that certain groups are much more susceptible than others to the aggressive and disseminated form of Valley Fever.

83. The scientific literature acknowledged the exceptional susceptibility of African-Americans and Filipinos over 80 years ago.[23]

84. An article in the journal *Military Medicine* in June 2003 observed that "Filipinos and African-Americans have been shown to have up to a 200-fold increased risk of disseminated disease and an increased mortality rate."[24]

[22] Letter from NIOSH to CDCR, December 4, 2009, p. 2.

[23] *See* Smith, Pappagianis, et al, *Human Coccidioidomycosis*, Bacteriology Reviews (September, 1961), 25(3), pp. 314, 318, fns. 5, 27.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

85. California's Department of Health Services referenced the exceptionally high-risk groups in a letter dated March 16, 2006 from Duc Vugia, M.D., M.P.H. of the California Department of Health Services to Bernard Henderson, an inmate at PVSP, citing an article in a contemporaneous medical journal.[25]

86. In addition to the higher-risk racial and ethnic groups, anyone with a compromised or suppressed immune system also has an increased risk of developing disseminated Valley Fever.[26]

87. A compromised immune system may be caused by any of several chronic diseases including diabetes, HIV, lung disease, organ transplant, or taking TNF inhibitors as medication for arthritis.

88. Individuals over the age of 55 have also been found to be at increased risk, if exposed, of developing the severe disseminated disease.[27]

89. California's Department of Public Health informed the CDCR in its January 11, 2007, "Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California" that "[p]revious studies have suggested that the risk for extrapulmonary complications is increased for persons of African or Filipino descent, [and] the risk is even higher for heavily immunosuppressed patients." The

---

[24] David Filip, Valley Fever Epidemic, (2008) p. 29, citing Crum NF, Lederman ER, Hale BR, Lim ML, Wallace MR. "*A Cluster of Disseminated Coccidioidomycosis Cases at a US Military Hospital*, Mil Med. (June 2003), 168(6), pp. 460-464.

[25] *See* Letter from Duc Vugia, M.D., citing Galgiani article (March 16, 2006)]; Galgiani, John et al., *Coccidioidomycosis*, 41 Clinical Infectious Diseases Journal 1217-1218 ["several-fold higher for persons of African or Filipino ancestry (possibly also for persons of Asian, Hispanic, or Native American ancestry), and as high as 30%-50% of infections for heavily immunosuppressed patients"].

[26] *See, e.g.*, American Thoracic Society, "*Patient Information Series*," American Journal of Respiratory Care Medicine, Vol. 184, p. 6.

[27] Clinical Infectious Diseases Journal (March 2001) 1:32(5), 708-15. The 2011 Thoracic Society also supports this conclusion, p. 5.

DPH in 2007 therefore concluded that exclusion of all of these high-risk inmates was "the most effective method to decrease risk [of Valley Fever infections]."[28]

90. CDCR's inmate mortality figures bear this out. In analyzing reports from the Receiver's medical staff, Dr. Galgiani noted that "African-American prisoners [in the Central Valley state prisons] died with Valley Fever at a higher rate than the general inmate population, and at much higher rates than African-American men in California."[29] In fact, African-American prisoners comprised 71% of the 34 Valley Fever deaths in CDCR prisons between 2006 and 2011.[30]

91. A 2012 study in the journal Emerging Infectious Diseases found the rate of hospitalization from disseminated cocci among blacks in California was 8.8 times higher than for whites.

92. After CDCR failed to act to address the risks to the susceptible racial and ethnic groups, the Receiver finally took steps to force CDCR to relocate the omitted higher-risk inmates. Joyce Hayhoe, a spokeswoman for the Receiver's office, disclosed that, "The State of California has known since 2006 that segments of the inmate population were at a greater risk for contracting Valley Fever, and mitigation efforts undertaken by CDCR to date have proven ineffective." She stated that, "as a result, the Receiver has decided that immediate steps are necessary to prevent further loss of life."

### D. Each Defendant Knew the Risks to Inmates But Chose to Disregard Those Risks.

[28] CCHCS Report dated April 16, 2012 relating recommendations in Jan, 2007, p. 8, Box 2.

[29] Galgiani Declaration, April 25, 2013 [Docket 2598], ¶ 10.

[30] *Id*.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

93. Each of the named Defendants was aware that housing inmates at the hyper-endemic prisons posed a greatly elevated risk to those inmates of contracting Valley Fever and that failure to control exposure to the cocci-containing soil at those locations (such as by construction activity) increased that risk significantly.

94. The 2004 Kanan Memo was circulated to a number of specific health care professionals inside the prison system and was intended to be circulated to all health care managers within the Department of Corrections, for general circulation to all health care professionals in the system. On information and belief, at a minimum Defendants Schwarzenegger, Cate, Kelso, Winslow, Hubbard, and Igbinosa knew of and were familiar with the substantive contents of that memo and its ramifications while they held positions, since 2004, in the state government and state prison system.

95. In 2005, the prisoners' rights group Prison Movement sent an informational briefing packet directly to then-Governor Schwarzenegger describing the threat posed by Valley Fever, and especially its threat to susceptible groups including African-Americans, Filipinos, elderly inmates and the immune-compromised.

96. Beginning in 2006-2007, and continuing yearly thereafter, a Fresno County Grand Jury undertook the task of evaluating inmate issues at PVSP and made a series of recommendations.

97. Beginning in 2007, the Grand Jury issued periodic public reports concerning Valley Fever incidence at PVSP. It observed that "[l]ocal prison officials are well aware of this health crisis. . ." and stated that inmates and staff continue to be at risk from Valley Fever.

98. The Grand Jury issued these reports, starting in 2007 and continuing each year thereafter, directly to Defendants Brazelton, Yates, and Cate, and to Mr. Kelso of the California Correctional Health Service, as well as to other CDCR officials, while they held office within, and oversaw, the state prison system.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

99. In these reports, the Grand Jury required Defendants Yates, Cate, and Brazelton at a minimum to respond directly to the Grand Jury regarding these findings, under the authority of California Penal Code Section 919(b). Defendant Yates also sent copies of his response at a minimum to Defendant Cate, to Kelso, and other CDCR officials.

100. The Grand Jury found, consistent with common medical knowledge regarding the disease, that disease rates for all groups at the prison had increased dramatically since 2004 and that African Americans, Hispanics, Filipinos, and other Asians were at far greater risk from the disease than other ethnicities.

101. In addition to the other sources of information available to them, some of which are discussed further below, the Fresno Grand Jury findings informed Defendants Yates, Cate, Brazelton, each year from 2007 on, during the period each Defendant was employed in the state prison system, that inmates like Plaintiffs were at increased risk from Valley Fever and susceptible to potentially fatal health consequences as a result, if they were housed at or remained at PVSP.

102. Despite his personal knowledge of the threat of Valley Fever, including on information and belief, the information provided to him about the risks of increased exposure to the spores that cause Valley Fever by construction activity, in September 2007 then-Governor Schwarzenegger proposed that the state construct new dormitories at PVSP to expand by 600 the number of beds located and prisoners housed there.

103. At a press conference called to announce the expansion plans, Governor Schwarzenegger responded to questions about the fact that the proposed expansion would inevitably expose more prisoners to the disease. Defendant Schwarzenegger indicated he would deliberately disregard the risk of exposing large numbers of additional prisoners to Valley Fever, stating: “We will go ahead and build.”

104. On information and belief, as described herein, by the time of the press conference Defendant Schwarzenegger was fully informed that inmates housed at

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

PVSP, and at the hyper-endemic prisons in general, were at a greatly increased risk of contracting Valley Fever, that racial and ethnic minorities were particularly susceptible to these risks, and that preventative measures such as ground cover to control spores were recommended but not implemented, and that the risks would be increased by the construction. Governor Schwarzenegger's comments at the press conference evidenced his deliberate indifference to those risks.

105. Further, CDCR publishes and distributes an Orientation Manual for all medical personnel. The Manual discusses the coccidioides epidemic in detail and specifically notes that African Americans, Filipinos, and those with compromised immune systems or chronic diseases are at greatly increased risk for contracting Valley Fever in its most deadly form.[31]

106. The orientation manual is authorized and promulgated by Defendant Winslow, the Chief Physician Executive at CDCR. Winslow clearly knew of the increased risks but took no other steps to prevent Plaintiffs' infection.

107. All medical personnel and facility management at CDCR were aware of the information in the Orientation Manual and its implications for inmates housed at hyper-endemic prisons.

108. Defendants were provided with numerous others sources of information that further confirmed and reinforced the risk to inmates including Plaintiffs.

109. In 2006 the California Department of Public Health, Center for Infectious Disease conducted an epidemiological study of Valley Fever in California prisons (the "Study"). The Study was published in January 2007.

110. The Study found that the number of cases of Valley Fever reported at PVSP in 2005 was at least 3 times that of the entire rest of Fresno County combined. The Study reported that any persons with suppressed immune systems as a result of

---

[31] Imai & Winslow, M.D.'s, Department of Correctional Healthcare Services, "*Letter from the Chief Physician Executive*, January 23, 2008.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

disease or medications which are immune-suppressive, such as those for chronic arthritis, are at risk of the deadliest form of Valley Fever, as are African-Americans, Hispanics, Filipinos and other Asians.

111. The Study recommended that CDCR evaluate relocating the highest risk groups to areas that are not hyper-endemic to Coccidioides, and at a minimum, to take steps at the prisons to minimize exposure, including ventilation, respiratory protection, and dust suppression and soil control.

112. On information and belief, each of the Defendants was at all relevant times aware of the CDPH Study and familiar with its conclusions regarding inmates, Valley Fever, and suggested mitigation measures.

113. Further, CDCR published general-circulation policy memos in both 2006 and 2007 regarding Valley Fever at PVSP and other hyper-endemic prisons.

114. On information and belief, each of the Defendants other than Defendant Schwarzenegger received copies of these particular memos, and in the normal course of their duties was expected to read and understand both the memos and the underlying information available to CDCR staff regarding Valley Fever at PVSP and the other hyper-endemic prisons.

115. In 2007, CDCR Facilities Department Senior Management officials including Defendant Hysen stated that they were preparing to implement measures to reduce the risk to inmates of contracting Valley Fever at PVSP.

116. The planned remedial actions included extensive measures to control inmates' exposure to contaminated soils outside buildings and greatly improved ventilation systems to prevent exposure inside buildings.

117. Not a single element of this remedial plan was implemented until six *years* later, and only after two contested court orders forced the agency to act. CDCR management asserted that they supposedly considered the remedial plan "too expensive." The comprehensive planned remedial program was estimated to cost $750,000; one of the options, which was considered capable of reducing inmates' risk

of infection significantly, cost only $110,000.[32] Defendants failed to implement even that limited-cost option.

118. CDCR now spends approximately $23 million each year treating inmates infected with Valley Fever.

119. The New York Times quoted Defendant Yates in 2007 regarding the Valley Fever epidemic at his prison, PVSP, in a story on Valley Fever at California prisons. Yates surmised to the Times that inmates and staff at PVSP contracted the disease by breathing in spores from the air as they "walk around out there."[33]

120. Defendant Yates was clearly aware of the risks and the exposure pathways subjecting inmates at PVSP to Valley Fever certainly no later than 2007, and almost positively in the years before.

121. In June 2007, the California Department of Health Services (CDHS) offered specific recommendations for reducing Valley Fever incidence among CDCR inmates. CDHS recommended that CDCR consider relocating all inmates "from this institution [PVSP] to institutions with rates of cocci equal to or better than their local community rates."[34]

122. Further, in August 2007, the Prison Legal News (PLN), a specialty periodical of extensive circulation in the prison community, ran as its cover story an investigation of Valley Fever at California prisons.[35] The PLN cover story described

---

[32] January 2007 Memorandum from Yates to Schwartz, re: remedial measures at PVSP.

[33] "*Infection Hits a California Prison Hard*," New York Times, December 30, 2007. Yates reported that 26 PVSP staff members had filed workers compensation cases based on Valley Fever.

[34] *Winslow Recommendations*, June, 2007.

[35] "*California Prison Beset by Deadly Valley Fever Epidemic*," Prison Legal News (June, 2008), Vol. 19, p. 22.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

in detail the source, exposure pathways, prognosis, and risk factors for the disease and its endemic presence in the subject California prisons.

123. Despite their actual knowledge of the risk and the appropriate remedial actions, Defendants took little to no action to address the greatly increased risks to inmates at these prisons or to keep inmates away from the risk.

124. In April, 2012, the California Correctional Health Care Services (CCHCS) released a report titled, "*Coccidioidomycosis in California Adult Prisons, 2006-2010*." The Report received general circulation among CDCR staff including specifically Wardens and Unit Managers and executives.

125. The CCHCS Report found that CDCR had done nothing between 2006 and 2010 that had any effect on cocci incidence rates at PVSP and ASP. This failure to act continued for years and confirms Defendants' deliberate indifference.

126. The Report reiterated that Valley Fever incidence rates at the hyper-endemic prisons were drastically elevated, and that African-Americans in particular were at increased risk from Valley Fever and of suffering its lethal form. The Report found that African-American inmate men died from cocci at far higher rates than unincarcerated African-Americans in California and much higher rates than the general inmate population.

127. The CCHCS Report found that PVSP in particular had extensive areas of unstabilized soil on its grounds, posing an extreme risk of spore release, transport, and infection and noted that simply "…planting lawns and paving roads reduced the rate of coccidiodal infection by one-half to two-thirds," based on results at a military installation that had been studied.

128. The Report concluded that "the incarceration of individuals . . . in prisons within the endemic areas will continue to provide a stream of challenging and costly cases of coccidioidomycosis."

129. In addition to the massive numbers of inmates infected with Valley Fever, over 80 CDCR facility staff members have contracted Valley Fever to date, and at least one CDCR corrections officer has died from the disease.

130. Each Defendant at all relevant times possessed sufficient information, common throughout the organization, that exposure to spore-infested soils at the eight California hyper-endemic prisons posed an unacceptably high risk of life-long Valley Fever infection, illness, and death, to inmates located at the hyper-endemic prisons.

131. At all times, all Defendants have had ready access to information concerning an inmate's racial and ethnic composition as part of his central file; classification and facility management are required to consider each inmate's racial make-up for purposes of appropriate housing determinations. Defendants nevertheless took no action, either to exclude at-risk inmates from the hyper-endemic prisons or to make those prisons safer.

### E. Defendants Had the Power to Assign or Transfer Every Susceptible Inmate Away from the Danger.

132. Defendants had the ability to divert all at-risk inmates away from the high-risk prisons in the initial facility assignment process.

133. At all relevant times, CDCR had robust, systematic procedures to match inmates to facilities but Defendants failed to use or to adapt those procedures to identify at-risk inmates or prevent their assignment to the hyper-endemic prisons.

134. The classification scoring system that drives CDCR's housing placement decisions under Title 15, § 3375(b), allowed Defendants to consider environmental risk to an inmate's health, allowing consideration of an inmate's "needs, interests and desires, his/her behavior and placement score in keeping with the Department and institution's/ facility's program and security missions and public safety."

135. When new inmates first enter the custody of CDCR, they undergo an initial review process designed to assign the inmate to an appropriate long-term custodial facility.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

136. CDCR refers to the initial review as the "Reception and Classification Process" (RCP). Inmates are housed at a temporary custody facility during the RCP, which may take as much as four months.

137. The RCP includes direct observation of the inmate and a review of an inmate's relevant personal history and personal factors, including the age of the inmate, the nature of the offense, prior incarceration history if any, and other relevant personal factors

138. At the end of the RCP, an inmate is given a classification score. The inmate then participates in a classification committee review, after which the inmate is recommended for placement at a specific institution based on their score and the committee findings. An inmate's geographical preference may but is not required to be taken into account in the assignment, for example for family proximity.

139. The inmate's classification security score generally dictates the security level of the institution the inmate is assigned to. Facilities are designated as Level I (lowest security) through Level IV (highest security.)

140. Level I Facilities generally are open dormitories with a low-security perimeter. Level II Facilities are open dormitories with a secure perimeter which may include armed guarding. Level III Facilities have a secure perimeter with armed coverage; housing units or cells may be adjacent to exterior walls. Level IV Facilities have a secure perimeter with internal and external armed guarding and cell block housing separated from exterior walls.

141. After an inmate receives the classification committee's initial assignment to an institution, an official in a separate office within CDCR must approve the assignment. This official is referred to as the Classification Staff Representative (CSR).

142. After a final review of the inmate's case factors, the CSR reviews and approves the inmate's assignment to a specific institution. This process is called "endorsement."

143. Endorsement to an institution may take an additional 45-60 days. The inmate may also have to wait for a bed to be available at the endorsed institution, which may take additional time.

144. Finally, a separate committee at the destination facility called the Unit Classification Committee (UCC) reviews initial program assignments, as well as all transfers at the facility. The UCC is composed of three staff members and is chaired by an official at the level of Facility Captain or Correctional Captain.

### F. Defendants Had the Power to Prevent Plaintiffs from Being Assigned to Hyper-Endemic Prisons.

145. At any point during CDCR's redundant, protracted, multi-level and multi-factor inmate classification, assignment and review process, Defendants had the ability to screen out inmates at risk for Valley Fever and to divert those individuals from hyper-endemic prisons.

146. CDCR's inmate classification and assignment process uses standardized forms and procedures to review numerous personal factors regarding each inmate, ostensibly in order to assign inmates only to suitable facilities.

147. At any of numerous points in this process, Defendants could have implemented simple procedures to identify African-American, Asian, Hispanic, and older inmates who were particularly susceptible to Valley Fever and divert these from hyper-endemic prisons.

148. Between September 2010 and December 2011, Defendants Cate and Rothchild supervised a "comprehensive" evaluation of the inmate classification system (ICS).[36]

---

[36] Expert Panel Study Of The Inmate Classification Score System, State of California Department of Corrections and Rehabilitation, Office of Research, Research and Evaluation Branch, December 2011; and see Decl. of Tanya Rothchild in Supp. Defs.' Resp. to Apr. 11, 2013 Order, Case No. 2:90-cv-00520.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

149. Although an Expert Panel conducted the review, Defendants Cate and Rothchild determined the scope of that review and excluded from that scope any consideration of the risk to inmates of contracting Valley Fever. Both Cate and Rothchild knew of those risks but deliberately chose to ignore them in revising the process of inmate classification. Cate and Rothchild reviewed draft and final copies of the Expert Panel's study report and were fully aware that Valley Fever was entirely absent from that review. Neither took any action to include in the CDCR's Classification System or in the review of that classification system the known risk to inmates of contracting Valley Fever should they be classified and endorsed to PVSP, ASP, or any of the other hyper-endemic prisons.

150. Cate was clearly aware of the risks of Valley Fever to inmates endorsed to hyper-endemic prisons – he was receiving and responding to Fresno County Grand Jury reports on those risks before and during this time. Yet Cate did not implement risk-based screening of inmates or an exclusion policy that would have prevented all of the Plaintiffs from being housed at hyper-endemic prisons.

151. Although Cate and Rothchild knew by 2006 at the latest that these individuals were in substantial danger, they failed to incorporate a screen for the known higher-risk groups for Valley Fever into the RCP or assignment processes to divert susceptible inmates to locations where they would not be exposed to increased risk of the disease.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

**G. Defendants Could Have Used the Routine Periodic Review Process to Transfer Plaintiffs to Safer Facilities.**

152. Under CDCR policy, each inmate also has a periodic review, typically on an annual basis, to assess the continued suitability of the current custodial facility for that inmate.

153. An annual review is performed for each inmate by a facility staff member, typically a counselor, to determine if an inmate meets standard criteria to have his or her placement score changed.

154. In addition, a staff committee called the Unit Classification Committee (UCC) periodically reviews the status of every inmate at every institution. Inmates appear personally before the UCC, typically on an annual basis, to adjust their classification score and re-evaluate their housing status.

155. During the periodic review, aspects of an inmate's status at a facility, including program participation, work groups, custody designation, and the advisability of transfer out of the facility, are reviewed by the Counselor and the UCC.

156. Defendants had the ability to incorporate procedures into the periodic facility-level Counselor's or UCC review to identify African-American, Asian, Hispanic or older inmates susceptible to Valley Fever and to designate these individuals for urgent transfer.

157. Defendants declined to take even these simple steps to protect these individuals from the known elevated risks they faced.

**H. Defendants Could Have Transferred At-Risk Inmates to Safer Prisons.**

158. Once identified, susceptible individuals already resident at hyper-endemic prisons could have been transferred out of danger using CDCR's existing transfer processes.

159. Defendants could have arranged for Plaintiffs to be transferred from hyper-endemic prisons facilities to other California facilities, either state or federal, or to out-of-state facilities.

BURNS | ELLIOT | B. PAVONE| M. PAVONE | SPIESS | ZUCKER

160. CDCR has established formal regulations and procedures for the transfer of inmates between correctional facilities, pursuant to Title 15, § 3379 of the California Code of Regulations.

161. CDCR "routinely transfers hundreds or thousands of inmates on a weekly basis" using these regulations and established procedures.[37]

162. Defendants' procedures include provisions for voluntary and involuntary transfers and for transfers both within and outside CCDR. Inmates can be transferred not only to other CDCR correctional facilities, but can also be transferred to out-of-state correctional facilities, or to federal facilities in California, under established CDCR transfer procedures set forth in Title 15, §§ 3379(a)(6), (a)(7)

163. Every male inmate is potentially eligible for transfer to an out-of-state facility, either voluntarily or involuntarily. The transfer procedure even allows for temporary placement of inmates in facilities or levels for which they are not endorsed, due to medical conditions, and includes provisions for resolving any pending disciplinary issues prior to transfer.[38]

164. Inmate transfers may be ordered by CDCR executive or administrative staff or can be initiated at the facility level. At the facility level, either a Warden or the UCC committee at a facility may on their own initiative arrange for inmate transfers.

165. Further, any warden or supervisor can temporarily suspend a pending inbound transfer.[39]

166. Defendants, including any warden or supervisor at the hyper-endemic prisons, could therefore at any time have initiated procedures to transfer at-risk

---

[37] *Plata* Order at p. 5, fn. 3 [Docket 2661].

[38] *See* §§ 3379(b), 3379(c).

[39] Title 15, § 3379(a)(4).

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

inmates away from the high-risk facilities, and also could have suspended the in-bound transfer of any more at-risk inmates into the hyper-endemic prisons.

167. The transfer procedure uses standardized forms and checklists for determining the eligibility and suitability for transfer of any inmate to any particular facility.[40] These forms allow for easy analysis of an inmate's suitability for transfer to any given CCDR facility.

168. Defendants, having the ability to transfer Plaintiffs away from the danger of the hyper-endemic prisons, failed to take this step to prevent Plaintiffs' exposure or to remove Plaintiffs from the danger.

### I. At-Risk Inmates Could Have Been Transferred To Out-of-State Facilities.

169. Former Governor Schwarzenegger's 2006 Proclamation, and subsequent passage of Assembly Bill (AB) 900, the Public Safety and Offender Rehabilitation Services Act of 2007, provided the authority for CDCR to transfer inmates to private prison facilities in other states. CDCR began to transfer inmates to out-of-state facilities under this authority in October 2006.

170. CDCR maintains a separate office called the Contract Beds Unit (CBU) to administer the already-substantial volume of inmates CDCR transfers to out-of-state facilities. Between 2006 and 2009, CDCR announced the transfer of thousands of inmates to out-of-state correctional facilities to relieve prison over-crowding.

171. CDCR put out numerous press releases celebrating its successes with out-of-state transfers during this time, including:

- *"Governor Uses Executive Authority to Relieve Prison Overcrowding, Proclaims Emergency to Allow Inmate Transfer"* (10/04/06)
- *"CDCR Resumes Temporary Out of State Inmate Transfers"* (6/4/07)
- *"CDCR Continues Temporary Out of State Inmate Transfers"* (7/20/07)

[40] See, e.g., CCDR Forms 839, 840, 841.

- *"CDCR Contracts for Additional Out of State Beds to Reduce Overcrowding"* (10/05/07)
- *"Moving Inmates Out-Of-State Reduces Prison Overcrowding"* (4/21/08); and
- *"CDCR Amends Contract to House More Inmates Outside of California"* (11/2/09).

172. Under existing regulatory procedures and contractual arrangements, the CDCR can place California inmates in one of four different out-of-state correctional facilities: two in Arizona, one in Oklahoma, and one in Mississippi.

173. These out-of-state facilities are capable of housing inmates with any security classification level, including higher-custody levels that are not eligible for low-security facilities.

174. CDCR has already arranged to house at these four out-of-state facilities over 10,000 inmates transferred out of California prisons.

175. In 2009, as part of the ongoing plan to reduce prison overcrowding, CDCR amended its existing agreement with the Corrections Corporation of America (CCA) to expand the capacity for transfers of inmates out of state. The 2009 addendum allowed CDCR to add an additional 2,336 out-of-state beds for California inmates, for a total of 10,468 beds.

176. Scott Kernan, CDCR Undersecretary for Operations, stated that, "[o]ur ability to place offenders out-of-state offers us much needed flexibility in placement of offenders that ultimately creates a safer environment for inmates, our staff and for the public."

177. CDCR's "ability to place offenders out-of-state" could just as easily have been utilized to transfer at-risk inmates away from the known dangers of Valley Fever at hyper-endemic prisons.

178. CDCR had existing mechanisms, procedures, and capacity to remove every at-risk inmate away from the known danger of contracting Valley Fever.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

179. Although Defendants knew by no later than 2006 that inmates including African–Americans, Filipinos, and older inmates were at extreme risk of contracting Valley Fever at hyper-endemic prisons, Defendants did not attempt to transfer these at-risk inmates away from this known danger, and did not modify CDCR's procedures to prevent additional inmates, high-risk or otherwise, from being transferred in to and housed at these facilities, until forced by court order in 2013 as to some.

180. Knowing of this acute danger, and knowing that inmates at hyper-endemic prisons were powerless to protect themselves from exposure to Valley Fever, Defendants chose instead to "post laminated signs" about the "signs and symptoms" of the disease in facility medical clinics and inmate housing units. *Plata, supra*. Defendants did nothing to divert or to remove at-risk inmates from the facilities where they were in mortal danger.

### J. Defendants Also Failed to Implement Remedial Measures Recommended by Their Own Experts to Reduce the Risk of Infection at the Prisons

181. Beginning in 2006, numerous experts from various organizations including the CDCR itself recommended, in addition to screening out at-risk inmates and transferring them away, designing and implementing simple, specific remedial measures at the hyper-endemic prisons in order to reduce inmates' exposure to the cocci-containing soil there. Besides the CDCR experts, the CCHCS, the CDP, the Fresno Grand Jury, and independent public health experts all recommended simple, specific remedial measures. These included landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

182. On information and belief, Defendants Brazelton, Cate, Hysen, Hubbard, Kernan, Meyer, Hartley, Kelso,[41] Igbinosa, Schwartz, Schwarzenegger, Winslow and Yates, each knew of the increased risk, knew the recommended measures could reduce that risk, and had the ability, the means and the authority to implement these measures throughout their respective tenures specified in the section entitled "THE DEFENDANT PARTIES." None did so.

183. Defendants Hysen, Meyer, Yates, and Schwartz announced in 2006 that a program of such remedial measures would be implemented and calculated the costs for the recommended remedial measures at the prisons. The full program as designed would have cost an estimated $750,000. A lesser option, of soil stabilization only, would have cost just $110,000 and was considered capable of significantly reducing the risk to inmates.[42] But Defendants did not implement any of these measures until five years later, in 2011 and 2013, after multiple lawsuits had been filed and federal court orders issued.

184. During this time and throughout their tenure, Defendants including Brazelton, Schwarzenegger, Hysen, Kernan, Meyer, Yates, and Cate all had access to funds sufficient to have implemented the full suite of recommended remedial measures at the prison or prisons for which they were responsible, which could have reduced Plaintiffs' exposure to and risk of Valley Fever.

185. During this same time period, Defendants budgeted, requested, allocated and spent millions of dollars on discretionary construction projects at these same prisons. For example, in 2009-2010, these Defendants allocated and caused to be

---

[41] Citation to Kelso is subject to Plaintiffs' concern that he did not have authority to implement the precautions complained about herein, pursuant to the grant of authority from the Receivership; but if he did, he is liable as indicated.

[42] Treatment of inmates afflicted with Valley Fever is estimated to cost the State of California $23 million each year.

spent over $1 million on remodeling group therapy rooms at PVSP. They caused nearly $1.5 million to be spent on upgrades to wastewater treatment plant equipment to "reduce normal wear and tear," and they budgeted $565,000 to expand and remodel staff offices at PVSP's wastewater treatment plant.[43] These Defendants requested $565,000 for nicer offices but would not spend $110,000 to reduce the known risk that inmates including Plaintiffs would contract Valley Fever and suffer devastating consequences.

## V.

## PLAINTIFFS

### MARLON ALTAMIRANO

186. Marlon Altamirano is a 45-year-old Hispanic from Los Angeles.

187. Before he was incarcerated Mr. Altamirano worked for ten years in the field of hazardous material abatement.

188. Mr. Altamirano was transferred to PVSP in December 2011.

189. On October 22, 2013, Altamirano tested positive for Valley Fever. He was tested again on November 19, 2013 and the diagnosis was confirmed on December 4, 2013.

190. Before he was incarcerated Altamirano was strong and healthy.

191. He now gets tired quickly and has continual pain in his joints. He cannot sleep, has cold night sweats, chronic weakness, and headaches. He cannot exercise because of acute chest pain and inability to breathe.

192. A doctor at Pleasant Valley prescribed Flucanazole 200 mg.

193. Mr. Altamirano will likely not be able to resume work in his field due to physical certification requirements.

194. He filed a VCB claim on or about April 23, 2014, which was rejected on June 27, 2014.

[43] CDCR Institution Project Status Report, Pleasant Valley State Prison, 2009-2010.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

195. Altamirano brings a state and federal claim.

196. Infected at PVSP in 2013, Mr. Altamirano brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

197. These Defendants knew that inmates like Mr. Altamirano were at increased risk from Valley Fever but failed to take action to protect him from the disease.

198. Mr. Altamirano's CDCR number is V76910.

**DERRICO AUBREY**

199. Derrico Aubrey is a 36-year-old African American.

200. Prior to his incarceration, Mr. Aubrey obtained his GED and was supporting his daughter, her mother and her sister. He is a certified fork lift driver.

201. While incarcerated, Aubrey has taken college classes and continues to further his education.

202. Aubrey was transferred to PVSP in January 2009.

203. Before this Aubrey was in generally good health and was an avid athlete who enjoyed keeping in shape though he had asthma as Defendants knew.

204. Now Aubrey experiences headache, fatigue, coughing and joint pain. He has developed night sweats and early morning coughing fits which exacerbate his difficulty breathing.

205. Aubrey was unable to eat and suffered a thirty pound weight loss in three weeks, which took a severe toll on his physical and mental well-being. Because of his lost appetite and severe weight loss, Aubrey must take food supplements to survive.

206. He has developed a lower extremity rash and chronic bone and joint pain. The lesions on his legs cause severe, continuous itching and discomfort. He is no longer is able to enjoy any of the physical activities he once did and his asthma has become unmanageable.

207. Aubrey was prescribed Fluconazole which he continues to take.

208. Aubrey brings a federal claim.

209. Infected at PVSP in 2010, Mr. Aubrey brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

210. These Defendants knew that inmates like Aubrey were at increased risk from Valley Fever but failed to take action to protect him from the disease**.**

211. Mr. Aubrey's CDCR number is G36219.

**MYRICK BANKS**

212. Mr. Myrick Banks is a 38-year-old African American from Pasadena, California. He has three daughters.

213. Mr. Banks had no health concerns prior to his transfer to Pleasant Valley State Prison.

214. He was transferred to PVSP from Delano State Prison in May 2012.

215. By October 2012, Mr. Banks began to suffer from shakes, night sweats, diarrhea, and vomiting.

216. He was formally diagnosed with Valley Fever in October 2012.

217. As a result of the Valley Fever, Mr. Banks was hospitalized.

218. He continues to suffer exhaustion, rashes and constant pain in his joints.

219. Initially, Mr. Banks was treated with Albuterol, Tylenol and Robitussin.

220. Later, he was prescribed up to 600 mg of Fluconozale daily, and 400 mg doses of Itraconazole.

221. Mr. Bank brings a state and federal claim.

222. Infected at PVSP in 2012, Mr. Banks brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates

223. These Defendants knew that inmates like Banks were at increased risk from Valley Fever but failed to take action to protect him from the disease**.**

224. Mr. Bank's CDCR number is AL5009.

**PAUL BLEVINS**

225. Mr. Paul Blevins is a 35-year-old Caucasian. While incarcerated, Mr. Blevins continued his education and received numerous Certificates of Academic Achievement. He is also enrolled at Coastline Community College.

226. At the time he contracted Valley Fever, Mr. Blevins was incarcerated for a parole violation and is expected to be paroled again in early 2015.

227. Mr. Blevins suffers from asthma and Hepatitis C.

228. He was transferred to ASP in February 2013.

229. Mr. Blevins first knew something was not right with his health after his treatment for Hepatitis C in May 2014. He experienced body aches, headaches, congestion, a dry cough, and a rash that would not heal.

230. Mr. Belvins was formally diagnosed in August 2014.

231. He was treated with 200mg doses of Fluconazole.

232. Mr. Blevins continues to experience headaches and difficulty concentrating.

233. Mr. Blevins timely filed a claim with the California Victim Compensation and Government Claims Board on October 15, 2014.

234. Mr. Blevins brings a state and federal claim.

235. Infected at ASP in 2014, Mr. Blevins brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Kelso, Rothchild, Schwarzenegger, Winslow, Beard and Wofford.

236. These Defendants knew that inmates like Blevins were at increased risk from Valley Fever but failed to take action to protect him from the disease**.**

237. Mr. Blevins' CDCR Number is AI1851

**ANTONE BRODIS**

238. Mr. Antone Brodis is a 51-year-old African American from Los Angeles, California.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

239. Mr. Brodis was transferred to Avenal State Prison in November 2007.

240. He was formally diagnosed with Valley Fever in November 2013.

241. Prior to contracting Valley Fever, Mr. Brodis was in good health and exercised daily.

242. As a result of the Valley Fever, Mr. Brodis experienced weight loss, a lack of energy, achy bones, nausea, and coughing.

243. Mr. Brodis can no longer exercise because he lacks energy and quickly becomes winded.

244. He suffers aches and pain in his feet and lower back.

245. Mr. Brodis was prescribed Fluconazole.

246. Mr. Brodis brings a state and federal claim.

247. Infected at ASP in 2013, Mr. Brodis brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Wofford and Beard.

248. These Defendants knew that inmates like Brodis were at increased risk from Valley Fever but failed to take action to protect him from the disease.

249. Mr. Brodis's CDCR number is D65148.

**BROWN, DERICK**

250. Mr. Derick Brown is a 46-year-old African American from Compton, California.

251. Mr. Brown was transferred to Pleasant Valley State Prison in June 2008.

252. At the time of his transfer, he had high blood pressure but was otherwise healthy.

253. Mr. Brown was diagnosed with Valley Fever in March 2012.

254. As a result of the Valley Fever, Mr. Brown suffered from headaches, night sweats, chills, shortness of breath, bone aches, weakness and vomiting.

255. Mr. Brown suffers ongoing symptoms of exhaustion and weakness.

256. X-rays revealed spores in Mr. Brown's right lung.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

257. Mr. Brown was prescribed 200 mg of Diflucan.

258. He filed a claim with the California Victim Compensation and Government Claims Board on March 4, 2014.

259. Mr. Brown brings a state and federal claim.

260. Infected at PVSP in 2012, Mr. Brown brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

261. These Defendants knew that inmates like Brown were at increased risk from Valley Fever but failed to take action to protect him from the disease.

262. Mr. Brown's CDCR number is H75504.

## LARRY CABALLERO

263. Larry Caballero is a 48-year-old Mexican American from Norwalk, California.

264. Mr. Caballero previously worked for a roofing company. He had a son and daughter, but his daughter died in Iraq while serving for the U.S. Army.

265. Prior to contracting Valley Fever, Caballero had Hepatitis C, but he was able to exercise every day.

266. He was transferred from Calipatria State Prison to PVSP in August 2010.

267. In the fall of 2011, Mr. Caballero began experiencing difficulty breathing. He also developed blisters on his mouth and sores on his legs.

268. Mr. Caballero was formally diagnosed with Valley Fever in November 2011.

269. His Valley Fever is disseminated in his lungs and legs.

270. Mr. Caballero continues to suffer from breathing difficulty and lesions.

271. He was prescribed Diflucan.

272. Mr. Caballero brings a federal claim.

273. Infected at PVSP in 2011, Mr. Caballero brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, Winslow, and Yates.

**274.** These Defendants knew that inmates like Caballero were at increased risk from Valley Fever but failed to take action to protect him from the disease.

275. Mr. Caballero's CDCR number is E15100.

**COREY CAMPBELL**

276. Corey Maurice Campbell is a 33-year-old African American born and raised in Los Angeles, California.

277. He has three young children and received his G.E.D. in 2003 from Bakersfield College.

278. Mr. Campbell was transferred to Central Valley Modified Community Correctional Facility ("MCCF") in early 2010.

279. Located in McFarland, California, Central Valley MCCF was well known by Defendants to be a high risk location for contracting Valley Fever.

280. Before he contracted Valley Fever, Mr. Campbell was in good health, played sports and worked out.

281. Campbell suffers back pain and fatigue so extreme he is unable to walk.

282. Campbell's back pain was the result of the disseminated cocci. The disease traveled from his lungs to his lumbar spine and dissolved his vertebrae at L2 and T12. Mr. Campbell required an operation on his lumbar spine for the destroyed discs.

283. Mr. Campbell visited the doctor at Central Valley MCCF on multiple occasions but no one seemed to know what was wrong with him.

284. When he was became unable to walk in late 2010, he was sent to North Kern State Prison and later diagnosed and treated. Mr. Campbell was prescribed Vicodin, Itraconazole, Tylenol, and Morphine.

285. Campbell brings a federal claim.

286. Because he became infected at MCCF in late 2010, Campbell brings claims against Defendants Cate, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.

287. These Defendants knew that inmates like Campbell were at increased risk from Valley Fever but failed to take action to protect him from the disease.

288. Mr. Campbell's CDCR number is AT3687.

**CLIFFORD CHANEY**

289. Mr. Clifford Chaney is a 39-year-old African American born in Cleveland, Ohio.

290. He is the eldest of two boys, raised by his mother in Los Angeles, California.

291. Prior to his incarceration, Chaney was in good health.

292. He was diagnosed with Valley Fever in May, 2011 at San Joaquin Community Hospital in Bakersfield, California.

293. Corcoran State Prison, where Chaney contracted VF, was well known by Defendants to be a high risk location for contracting the disease.

294. Chaney believes he contracted VF as a result of strong winds blowing dust, in addition to breathing in the dust created by big trucks driving by and nearby construction.

295. During the end of April 2011, he began to experience shortness of breath, a hacking cough, fever, night sweats, tiredness, muscle aches and weakness. Mr. Chaney's shortness of breath was so severe that he was unable to complete a sentence without stopping to catch his breath.

296. Cheney was sent to the Emergency Room on April 25, 2011, where he was diagnosed with bilateral pneumonia and a fever.

297. Due to his shortness of breath, Chaney required high-flow oxygen.

298. Mr. Chaney was treated with Diflucan, Atrovent, Xopenex, Levaquin, Protonix, and Zosyn.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

299. His cocci case is disseminated. He continues to suffer from tremors, severe asthma and joint pain in addition to problems breathing. Mr. Chaney fears that the Valley Fever medication will destroy his organs.

300. Mr. Chaney did not receive any warnings or precautions to minimize his risk of infection.

301. Chaney brings a federal claim.

302. Because he became infected at Corcoran in 2011, Chaney brings claims against Defendants Cate, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.

303. These Defendants knew that inmates like Chaney were at increased risk from Valley Fever but failed to take action to protect him from the disease.

304. Mr. Chaney’s CDCR number is J48650.

**JOSE CHAVEZ**

305. Mr. Jose Chavez is a 32-year-old Hispanic man

306. He is expected to be released in September 2015.

307. Prior to contracting Valley Fever, Mr. Chavez's health was excellent and he was able to run, swim and bicycle regularly.

308. He was transferred from Tehachapi State Prison to ASP in January 2010.

309. He was not provided a mask when assigned to cleaning and sweeping duties.

310. In November of 2011, Mr. Chavez experienced drenching sweats, coughing with yellowish sputum, and skin lesions.

311. Mr. Chavez was diagnosed with Valley Fever in December 2011.

312. At the same time, he was diagnosed with community-acquired pneumonia and sepsis caused by the Valley Fever.

313. Mr. Chavez was initially treated with a Diflucan IV and levofloxacin.

314. He was later prescribed 200 mg dosages of Fluconazole.

315. Mr. Chavez continues to have difficulty breathing, limiting his physical activity.

316. He has difficulty running with his kids, hiking, and walking stairs.

317. Mr. Chavez brings a federal claim.

318. Infected at ASP in 2011, Mr. Chavez brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, and Winslow.

319. Mr. Chavez's CDCR number is AB0956.

**EBERT CONSUEGRA**

320. Mr. Ebert Consuegra is a 48-year-old Mexican American from Los Angeles, California.

321. He previously worked in a warehouse operating a forklift.

322. He is expected to be released from custody in 2016.

323. Mr. Consuegra is diabetic.

324. He was transferred from Centinella State Prison to PVSP in July 2007.

325. In January 2011, Mr. Consuegra experienced dehydration, cold sweats, and weakness.

326. When he first informed the doctor of his symptoms, he was told they were caused by the weather changes.

327. Mr. Consuegra was formally diagnosed with Valley Fever in May 2011.

328. Mr. Consuegra continues to have difficulty eating because his throat is so irritated, as is his upper respiratory tract.

329. He was prescribed Fluconozale and Ibuprofen.

330. Mr. Consuegra brings a federal claim.

331. Infected at PVSP in 2011, Mr. Consuegra brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, Winslow, and Yates.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

332. These Defendants knew that inmates like Consuegra were at increased risk from Valley Fever but failed to take action to protect him from the disease**.**

333. Mr. Consuegra's CDCR number is F56465.

**BARRY COOK**

334. Barry Cook is a 53-year-old African American from Los Angeles.

335. He was convicted of evading police on some sort of assault charge.

336. He was transferred to PVSP in 2011, and was diagnosed with VF in February, 2012. Cook reports that corrections officials left the door to the gym where inmates slept open to the outside air at night.

337. Cook's condition causes him trouble breathing, weakness, coughing, vomiting, and other symptoms. He was hospitalized as a result for several months.

338. Mr. Cook brings a federal claim.

339. Because he became infected at PVSP in 2012, Cook brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

340. These Defendants knew inmates like Cook were at increased risk from Valley Fever but failed to take action to protect him from the disease.

341. Mr. Cook's CDCR number is AH6418.

**ELMOR DELEON**

342. Elmor DeLeon is a 54-year-old man from Guatemala.

343. Since his incarceration, DeLeon has completed a large number of self-help programs, as part of his rehabilitation.

344. DeLeon was transferred to Avenal State Prison in 2006.

345. In May 2013, DeLeon began experiencing a persistent dry cough at night, in addition to muscle and joint pain. He made several requests to see a doctor and was never provided any relief for his pain or provided a diagnosis.

346. Mr. DeLeon's health began to deteriorate over the next few months. He became increasingly weak and lost 24 pounds in a four month span.

347. In September 2013, DeLeon became very ill at which time the medical staff believed he could have pneumonia and/or valley fever and finally tested DeLeon for Valley Fever.

348. He was diagnosed with Valley Fever in September 2013.

349. DeLeon currently suffers from coughing, weakness and extreme joint pain. His joints and bones are weakened as a result of this debilitating disease.

350. DeLeon was prescribed Fluconazole.

351. DeLeon brings a state and federal claim.

352. Because he became infected at ASP in 2013, DeLeon brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow. These Defendants knew inmates like DeLeon were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

353. Mr. DeLeon's CDCR Number is H09531.

**ROY DOSS**

354. Roy Doss is a 64-year-old African American. He was raised in Los Angeles, California.

355. Mr. Doss has 5 brothers and 2 sisters.

356. Prior to his incarceration, Mr. Doss worked for the L.A. Soap Company.

357. Mr. Doss was transferred from Folsom to ASP in 2004.

358. It was his understanding that the classification committee at Folsom was transferring him to Chuckawalla Prison.

359. However, that transfer was apparently changed at the last minute and he was sent to ASP instead.

360. Before he contracted Valley Fever, Mr. Doss was in excellent health and was not immunocompromised.

361. Mr. Doss became infected with Valley Fever in mid-late 2010.

362. Mr. Doss suffered significant weight loss, pain in his legs, headaches, blurry vision, severe headaches and aches in his legs, and a loss of strength and movement in his lower and upper body. He was unable to walk or run.

363. Mr. Doss brings a federal claim.

364. Because he became infected at ASP in 2010, Mr. Doss brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.

365. These Defendants knew that inmates like Doss were at increased risk from Valley Fever but failed to take action to protect him from the disease.

366. Mr. Doss' CDCR number is C09265.

**DENNIS DUNHAM**

367. Dennis Dunham was born in 1967. He is African American.

368. Mr. Dunham graduated from high school and was a software assembly supervisor prior to his incarceration.

369. He is a husband, father, and grandfather.

370. While serving his sentence, Mr. Dunham has completed vocational carpentry, welding and electronics training and has been in the top of his class for each.

371. Dunham was transferred to Avenal State Prison in January 2003 from PVSP, where he was housed since 1998.

372. He was diagnosed with Valley Fever in September 2011.

373. Dunham currently suffers from shortness of breath, body aches, exhaustion and problems with his mouth, skin and eyes.

374. Dunham was prescribed Fluconazole.

375. Dunham brings a federal claim.

376. Because he became infected at ASP in 2011, Dunham brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

377. These Defendants knew that inmates like Dunham were at increased risk from Valley Fever but failed to take action to protect him from the disease**.**

378. His CDC Number is P19930.

**GONZALO ESCOTO**

379. Gonzalo Escoto is a 42-year-old Hispanic male. He is a high school graduate. Prior to his incarceration he worked in construction.

380. Mr. Escoto was transferred to Avenal State Prison on August 18, 2009.

381. Prior to his diagnosis, Escoto was healthy, active and strong.

382. He was diagnosed with Valley Fever on October 18, 2011.

383. Mr. Escoto was prescribed Diflucan and has remained on this medication since his diagnosis.

384. Escoto's symptoms have not been controlled with medication. He experiences symptom flare-ups which include weakness, shortness of breath, chest pain, cough, and joint and bone pain.

385. Mr. Escoto also suffers depression due to his weakened physical state, for which he has sought mental health services.

386. Escoto brings a federal claim.

387. Infected at ASP in 2011, Mr. Escoto brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, and Winslow.

388. These Defendants knew inmates like Escoto were at increased risk from Valley Fever but failed to take action to protect him from the disease.

389. Mr. Escoto's CDCR number is K94162.

**JEROME FELDER**

390. Jerome Felder was born in 1977. He is African-American.

391. He was transferred to PVSP in August 2011.

392. Mr. Felder was diagnosed with valley fever in December 2011.

393. Mr. Felder suffers joint pain on a daily basis.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

394. Mr. Felder brings a federal claim.

395. Because he became infected at PVSP in 2011, Mr. Felder brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

396. These Defendants knew that inmates like Felder were at increased risk from Valley Fever but failed to take action to protect him from the disease**.**

397. Mr. Felder's CDCR number is K06352.

**JOSEPH FERRIS**

398. Joseph Ferris is a married 52-year-old of American Indian and Hispanic background.

399. He is the father of two children.

400. Mr. Ferris opened and operated a karate school in which he taught his daughter, who became a competitive athlete.

401. Mr. Ferris is immune-compromised because he is a diabetic and had cancer.

402. Mr. Ferris was transferred to Pleasant Valley State Prison from Folsom in 2010.

403. In a letter to James Yates in 2011, Mr. Ferris' wife described Ferris's medical condition to prison authorities.

404. In 2010, he began to experience shortness of breath, coughing, fatigue, chills, high fever, nausea, and extreme weight loss.

405. Mr. Ferris was hospitalized for 30 days and diagnosed with Valley Fever in late 2010.

406. He was prescribed Fluconazole (1000 mg).

407. Mr. Ferris suffers general weakness, constant coughing at night, night sweats and pain in his joints and muscles making walking difficult. He is constantly dizzy and suffers body tremors.

408. Mr. Ferris brings a federal claim.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

409. Because he became infected at PVSP in late 2010, Mr. Ferris brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

410. These Defendants knew that inmates like Ferris were at increased risk from Valley Fever but failed to take action to protect him from the disease.

411. Mr. Ferris's CDCR number is AB9835.

**ANDRA FOSTER**

412. Andra Foster was born in 1965. He is African American and asthmatic.

413. Mr. Foster is a father and grandfather. Before he was incarcerated, he was a glass cutter and landscaper.

414. Foster arrived at PVSP in May 2011.

415. He was diagnosed shortly thereafter with Valley Fever.

416. Mr. Foster suffers shortness of breath, intense pain in his back and joints. He also fears germs and is terrified of catching any illness as it may affect his already compromised health.

417. Foster brings a federal claim.

418. Because he became infected at PVSP in 2011, Mr. Foster brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

419. These Defendants knew inmates like Mr. Foster were at increased risk from Valley Fever but failed to take action to protect him from the disease.

420. Mr. Foster's CDCR number is K33009.

**STEPHEN FRANKLIN**

421. Stephen Franklin is a 62-year-old African American.

422. Prior to his incarceration Mr. Franklin was a martial arts teacher and worked at the Humane Society.

423. He had asthma.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

424. Franklin was transferred to PSVP in January 2009.

425. Franklin was hospitalized for three weeks and diagnosed with pneumonia and Valley Fever in August, 2010.

426. Franklin was prescribed Fluconazole and Amphotericin B.

427. He suffered an allergic reaction to the Fluconazole resulting in hair loss and an infection in his hands and feet. The Amphotericin B caused renal toxicity and was discontinued.

428. He was then prescribed Itraconazole and continued this medication for eight months with no improvement in his symptoms.

429. Franklin suffers from chronic coughing fits three to four times during the night, difficulty breathing, high fevers, and lack of appetite.

430. Franklin brings a federal claim.

431. Because he became infected at PVSP in 2010, Franklin brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

432. These Defendants knew that inmates like Franklin were at increased risk from Valley Fever but failed to take action to protect him from the disease.

433. Mr. Franklin's CDCR number is K52395.

**RUBEN GAETA**

434. Mr. Ruben Gaeta is a 55-year-old Hispanic man. He grew up in Tehachapi, California.

435. Mr. Gaeta is the father of 4 children and worked constructing houses.

436. He was transferred to Pleasant Valley State Prison on December 15, 2009 and was housed there until August 1, 2012.

437. Mr. Gaeta was physically active his whole life and did not suffer from any previous ailments.

438. He is currently incarcerated at Donovan.

439. Mr. Gaeta first began feeling ill on July 6, 2011. He experienced night sweats, shortness of breath, vomiting, loss of appetite, severe coughing, and body aches.

440. Later in the month, he had chest X-rays taken and lab work completed. He was diagnosed with Valley Fever on July 26, 2011.

441. Since then, he has experienced chest pains, shortness of breath, aches in the back and joints, dizziness, and severe headaches.

442. He was prescribed Diflucan (350 mg daily), for 3 months after his diagnosis.

443. Mr. Gaeta brings a federal claim.

444. Because he became infected in 2011 while at Pleasant Valley State Prison, Mr. Gaeta brings a claim against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothschild, Schwarzenegger, Winslow, and Yates.

445. These Defendants knew that inmates like Gaeta were at increased risk from Valley Fever but failed to take action to protect him from the disease.

446. Mr. Gaeta's CDCR number is P68605.

**AUBREY GALLOWAY**

447. Aubrey Galloway is a 36-year-old African American.

448. Prior to his incarceration, Mr. Galloway obtained his GED and was supporting his daughter, her mother and her sister. He worked as a certified fork lift driver and was an avid athlete.

449. Since he has been incarcerated, Galloway has enrolled in college classes and continues to further his education.

450. Galloway was transferred to PVSP in January 2009.

451. Galloway had asthma.

452. Galloway now suffers severe headache, fatigue, coughing and chronic bone and joint pain. He has night sweats and early morning coughing fits causing an inability to breathe.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

453. He suffered a thirty pound weight loss in three weeks, which took a severe toll on his physical and mental well-being.

454. He no longer is able to enjoy physical activities as he once did and his asthma has become unmanageable.

455. Galloway has lesions on his legs that cause severe itching. He requires food supplements to maintain weight.

456. Galloway was prescribed Fluconazole and continues to take the medication.

457. Galloway brings a federal claim.

458. Because he became infected at PVSP on or about 2010, Galloway brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

459. These Defendants knew that inmates like Galloway were at increased risk from Valley Fever but failed to take action to protect him from the disease.

460. Mr. Galloway's CDCR number is F95092.

**GAMBOA, MANUEL**

461. Manuel Gamboa is a 42-year-old Hispanic male currently incarcerated at CCI Tehachapi Prison where he was transferred in 2013.

462. Mr. Gamboa is a father to four children and a grandfather to three.

463. Gamboa has congestive heart failure and a weakened immune system.

464. He reports that he was labeled a high risk inmate because of his heart condition and compromised immune system.

465. Gamboa was reportedly supposed to be endorsed to a medical facility prison like Donovan.

466. Gamboa was instead housed at C.C.I. Tehachapi, a prison within the zone of hyper-endemic prisons.

467. The entire exercise yard at C.C.I. Tehachapi is bare dirt.

468. Gamboa had heart surgery in 2012 and had a pacemaker installed.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

469. In the latter part of 2012, he was sent out to an outside hospital for a pacemaker battery change. As a result of the procedure he became infected with MRSA. He was then sent to Long Beach Memorial Hospital as the pacemaker needed to be removed.

470. Gamboa began coughing and suffered from chills, night sweats, and body aches in 2013. He was diagnosed with pneumonia.

471. His condition continued to worsen and he started coughing up blood.

472. Gamboa was diagnosed with Valley Fever in 2013.

473. He continues to suffer constant cough, shortness of breath, loss of appetite, vomiting, and body aches.

474. He has had to make repeated health services requests for medication.

475. He has been prescribed Fluconazale but the medication causes him to retain water which is painful.

476. Gamboa brings both a state and federal claim.

477. Because he became infected at CCI in 2013, Gamboa brings claims against Defendants Cate, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.

478. These Defendants knew that inmates like Gamboa were at increased risk from Valley Fever but failed to take action to protect him from the disease**.**

479. His CDCR Number is G61615.

**JUSTIN GARRETT**

480. Mr. Justin Garrett is a 56-year-old Caucasian male. He grew up in Vallejo, California.

481. He worked as an aerospace machinest and an emergency road service provider with the American Automobile Association.

482. Garrett has his G.E.D. and started college.

483. He was transferred to Avenal State Prison on September 15, 2010 and was housed there for 2 years.

484. He previously suffered from Hepatitis C, and more recently Diabetes (diagnosed 2012) and high blood pressure.

485. Garrett was transferred to Avenal during his treatment for Hepatitis.

486. He has been incarcerated at the California Institute for Men in Chino since 2012. His expected release date is March 2016.

487. He first began noticing symptoms in September 2012. He began to experience a high fever, severe headaches, sharp pains in his chest and difficulty breathing.

488. He was hospitalized at San Joaquin Hospital and diagnosed with Valley Fever on September 28, 2012.

489. Since then, he has continued to experience fatigue, loss of strength, shortness of breath and pain in his lungs.

490. He has a mass in his right lung which has been diagnosed as residue scarring due to pneumonia which resulted from his Valley Fever.

491. He was prescribed Fluconazole (400 mg daily), which he needed to take for 7 months after his hospitalization.

492. Garrett brings a state and federal claim.

493. Because he became infected in 2012 while at Avenal, Garrett brings a claim against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothschild, Schwartz, Schwarzenegger, and Winslow.

494. These Defendants knew that inmates like Garrett were at increased risk from Valley Fever but failed to take action to protect him from the disease**.**

495. His CDC# is G20030.

**LUIS GUZMAN**

496. Mr. Luis Guzman was born in 1982. He is Mexican/Hispanic.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

497. Before he was incarcerated, Mr. Guzman grew up in Riverside California, and was interested in sports and carpentry.

498. Because of his love of sports he was in good health; he was not immune-compromised.

499. Mr. Guzman was transferred to PVSP in 2009 and is currently incarcerated at CIM - Chino.

500. Near the end of 2010, while still at PVSP, he began to experience severe stomach aches and pains, severe weight loss, night sweats, and general fatigue.

501. He was diagnosed with Valley Fever in in January 2012.

502. Since then, Mr. Guzman continues to suffer coughing, general weakness and body aches. He continues to be underweight and unable to get back to a normal weight level.

503. He has been prescribed several medications including Fluconazole as well as antibiotics for pneumonia.

504. Mr. Guzman brings a federal claim.

505. Infected at PVSP in 2012, Guzman brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

506. These Defendants knew inmates like Guzman were at increased risk from Valley Fever but failed to take action to protect him from the disease.

507. Mr. Guzman's CDCR number is V80404.

## SINOHE HERCULES

508. Sinohe Hercules is a 33-year-old Hispanic.

509. Mr. Hercules has a high school diploma and attended junior college.

510. Before he contracted Valley Fever, Hercules had asthma.

511. Hercules contracted Valley Fever at PVSP in October, 2012.

512. Mr. Hercules now feels ill all the time.

513. Hercules brings a state and federal claim.

514. Because he became infected at PVSP in 2012, Hercules brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

515. These Defendants knew that inmates like Hercules were at increased risk from Valley Fever but failed to take action to protect him from the disease**.**

516. Mr. Hercules's CDC Number is F33434.

**VICTOR HERRERA**

517. Victor Herrera is a 42-year-old Hispanic; he has a history of diabetes and hepatitis C.

518. Herrera grew up in Fresno, CA with his mother and three sisters. He obtained his GED and worked at restaurants and as a truck driver before his incarceration.

519. He was diagnosed in November 2011 at Pleasant Valley State Prison.

520. Herrera has shortness of breath, coughing, chills, body aches, and had to have a portion of his right lung removed.

521. Herrera has been prescribed Diflucan.

522. Herrera brings a federal claim.

523. Infected at PVSP in 2011, Mr. Herrera brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

524. These Defendants knew that inmates like Herrera were at increased risk from Valley Fever but failed to take action to protect him from the disease**.**

525. His CDCR Number is G46666.

**CURTIS JACKSON**

526. Curtis Jackson is a 63 year old African American.

527. He is paraplegic.

528. Mr. Jackson was raised in California, is married and has three children.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

529. He was diagnosed with Valley Fever in October 2011 at Pleasant Valley State Prison.

530. Mr. Jackson suffers from cough, loss of appetite, night sweats, fatigue, and joint pain.

531. He has been prescribed Fluconazole.

532. Mr. Jackson brings a federal claim.

533. Because he became infected at PVSP in 2011, Mr. Jackson brings claims against Defendants Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

534. These Defendants knew inmates like Mr. Jackson were at increased risk from Valley Fever but failed to take action to protect him from the disease.

535. Mr. Jackson's CDCR number is J88116

**MANDAZ JOHNSON**

536. Mandaz Johnson is a 59-year-old African American.

537. Prior to incarceration, Mr. Johnson was a certified caretaker, attendant, construction worker and landscape gardener.

538. Mr. Johnson was diagnosed with Valley Fever in October 2013 while housed at Pleasant Valley State Prison.

539. Johnson suffers from chest pain, rapid breathing, shortness of breath and fatigue.

540. He takes Fluconazole.

541. Johnson brings a state and federal claim.

542. Infected at PVSP in 2013, Johnson brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

543. These Defendants knew that inmates like Johnson were at increased risk from Valley Fever but failed to take action to protect him from the disease.

544. Mr. Johnson's CDCR number E74700.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

**JONES, EDWARD**

545. Edward Jones is a 57-year-old African American.

546. Prior to entering prison, Mr. Jones served in the Army.

547. He was transferred to PVSP in 2012 and was diagnosed with Valley Fever that year.

548. Mr. Jones suffers joint pain and severefatigue. He has trouble walking.

549. Jones has been prescribed and is currently taking Fluconazole.

550. Jones brings a state and federal claim.

551. Because he became infected at PVSP in 2012, Jones brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

552. These Defendants knew that inmates like Jones were at increased risk from Valley Fever but failed to take action to protect him from the disease.

553. Mr. Jones's CDCR number K26983.

**ALBERT LEE**

554. Albert Lee was born on September 4, 1949. He is African American.

555. Lee grew up in Los Angeles, CA. He obtained his GED and before prison he was a commercial baker. He plays the piano.

556. He was diagnosed in October 2011 while housed at Avenal State Prison.

557. Lee was diagnosed with Valley Fever in 2011 at ASP.

558. Lee now suffers from lumps on his body, extreme dry skin, and bleeding under his finger nails.

559. Lee brings a federal claim.

560. Infected at ASP in 2011, Mr. Lee brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, and Winslow.

561. These Defendants knew that inmates like Lee were at increased risk from Valley Fever but failed to take action to protect him from the disease.

562. Lee's CDC Number is C65683.

**MIKHIEL LEINWEBER**

563. Mikhiel Leinweber is a 33-year-old Caucasian man of Russian descent.

564. Mr. Leinweber was diagnosed with Valley Fever on January 5, 2011 while at PVSP.

565. Currently, Mr. Leinweber has scars on his lungs and chest pains due to the disease.

566. He has been on multiple medications.

567. Leinweber brings a federal claim.

568. Infected at PVSP in 2011, Leinweber brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

569. These Defendants knew that inmates like Leinweber were at increased risk from Valley Fever but failed to take action to protect him from the disease.

570. Mr. Leinweber's CDCR number is T58130.

**LEWIS, CLEOFAS**

571. Cleofas Lewis is a 55-year-old African American.

572. Lewis was formerly a fork lift driver and has his GED. While in prison, he completed two trade courses, in computers and electronics.

573. Lewis was transferred to PVSP in 2010.

574. He contracted Valley Fever in 2012.

575. Lewis suffers fatigue, coughing and night sweats such that he is unable to sleep, a loss of appetite,severe weight loss, and headaches.

576. Mr. Lewis has been prescribed Fluconazole.

577. Lewis brings a state and federal claim.

578. Because he became infected at PVSP in 2012, Mr. Lewis brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

579. These Defendants knew inmates like Lewis were at increased risk from Valley Fever but failed to take action to protect him from the disease.

580. Mr. Lewis's CDCR number is T23096.

**MICHAEL MADEIRA**

581. Michael Madeira, born and raised in Hawaii, is a ninth degree black belt in the Kajukenbo Martial Arts.

582. On August 31, 2012, Mr. Madeira tested positive for tuberculosis. The following month he was transferred to Avenal State Prison.

583. On August 12, 2013, Mr. Madeira was admitted to the triage and treatment area for breathing difficulties, body aches all over, chest pain, coughing, and fatigue. Chest x-rays showed left upper lobe pneumonia.

584. On August 23, 2013, Madeira was in such severe respiratory distress he had to be taken as a "code 3" to an outside hospital. His doctor at Avenal later told him he "wasn't supposed to make it that day."

585. Mr. Madeira's weight quickly dropped from 244 to 155 pounds. On August 28th he was diagnosed with disseminated cocci causing bilateral pulmonary pneumonia. He was treated with intravenous amphotericin B, which caused serious side effects. His treatment was changed to 300 mg of voriconazole twice a day.

586. On October 1, 2013 Mr. Madeira left San Joaquin Community Hospital to be treated to an outpatient housing unit at Avenal, where he continued to be treated, and sent to outside hospitals periodically, well into 2014, for symptoms including severe pulmonary disease and respiratory failure.

587. On March 20, 2014, after being admitted to CMC General Acute Care Hospital, a doctor discovered he was intolerant to voriconazole from which he had developed "severe toxicities." Because he had also had negative results from fluconazole, Mr. Madeira's medication was changed to 400 mg. of posaconozole daily. He had also been prescribed medication for severe arthralgia which is likely due to the cocci having disseminated into his joints.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

588. Mr. Madeira still suffers from COPD symptoms including chronic shortness of breath and chest pain, must take inhalers for his asthma, and now has to walk with a cane to keep from falling over due to numbness and pain all through his right side.

589. After he became infected with Valley Fever, Mr. Madeira says he felt as if he "grew real old overnight."

590. Mr. Madeira brings a state and federal claim.

591. Diagnosed at ASP in 2013, Madeira brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Beard, and Wofford.

592. These Defendants knew that inmates like Madeira were at increased risk from Valley Fever but failed to take action to protect him from the disease.

593. Mr. Madeira's CDCR number is AM0178

**ROBERT MAESHACK**

594. Robert Maeshack is a 53-year-old African-American.

595. Mr. Maeshack participates in 12-step and independent study programs.

596. Maeschack was transferred to PVSP in August 2007.

597. Prior to his transfer, Maeschack was being treated for severe complications from an animal bite.

598. On October 12, 2010, Maeshack was diagnosed with disseminated Valley Fever.

599. He suffers severe coccidioidal pneumonia, fever, chills, vomiting and head pain, in addition to mediastinal lymphadenopathy. He has pain in his bones, joints, chest, back, neck, leg, and shoulders. He suffers from memory loss and nerve damage. Maeschack was told he is terminally ill.

600. Maeschack was prescribed Fluconazole for 12 months, followed serially by four other anti-fungal medications.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

601. Due to chronic intravenous therapy with amphotericin and caspofungin, Mr. Maeschack now has chronic kidney disease secondary to his Valley Fever medication. He was also diagnosed in June 2011 with distal symmetrical peripheral neuropathy due to protracted antifungal treatment.

602. Mr. Maeshack now takes Noxifil (posaconazole) twice daily which he will have to continue to take for the rest of his life.

603. Despite his ongoing symptoms, since his diagnosis Mr. Maeschack has received four "laudatory chronos," in which he was commended for making the necessary changes in the recovery process, and for his continued willingness to learn more and to better himself.

604. Maeshack brings a federal claim.

605. Because he became infected at PVSP in 2010, Maeshack brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

606. These Defendants knew inmates like Maeshack were at increased risk from Valley Fever but failed to take action to protect him from the disease.

607. His CDC Number is C15018

**DANIEL MASUSHIGE**

608. Daniel Masushige is a 33-year-old of Hispanic and Asian descent.

609. He is blind in his left eye.

610. Masushige was diagnosed with Valley Fever in 2012 at WSP.

611. He suffers fevers, weight loss, loss of energy, headaches, coughing, coughing up blood, labored breathing, and pneumonia. He now gets tired easily, has difficulty thinking clearly and difficulty breathing.

612. His stomach hurts following each meal and his lips are dried and cracked from the medication, which causes them to bleed.

613. Masushige has been prescribed Fluconazole and has been given an inhaler to help him with his labored breathing.

614. Masushige brings a state and federal claim.

615. Because he became infected at WSP in 2012, Masushige brings claims against Defendants Cate, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.

616. These Defendants knew inmates like Masushige were at increased risk from Valley Fever but failed to take action to protect him from the disease.

617. His CDC Number is AM9233.

**ENRICO MELLON**

618. Enrico Mellon is a 58-year-old of African-American and Indian descent. Mr. Mellon has four children: two boys and two girls.

619. He is from Los Angeles where he went to National Technical College for two years; he then attended Koinonia Bible College for three years.

620. Mellon served in the Army and worked as a fast food manager for ten years.

621. Prior to his arrival at PVSP, Mr. Mellon's respiratory system was compromised from asthma and he had a history of heart attacks.

622. In January, 2012 he began to experience nausea, headaches, cold sweats, vomiting, aches, and joint pain. Mellon was diagnosed with Valley Fever at PVSP on or about March, 2012.

623. He believes he may have caught the disease because religious services he regularly attended were held outside in the yard under dusty conditions.

624. Mr. Mellon was treated with fluconazole but still experiences joint aches, breathing difficulties, headaches, and nosebleeds.

625. Mellon brings a federal claim.

626. Because he became infected at PVSP in 2012, Mellon brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

627. These Defendants knew inmates like Mellon were at increased risk from Valley Fever but failed to take action to protect him from the disease.

628. His CDC Number is G49784.

**LICH NGUYEN**

629. Lich Nguyen is a 34-year-old Vietnamese man.

630. Prior to his incarceration, Mr. Nguyen worked as a machinist. He completed high school and two years of college.

631. Nguyen was in good health and enjoyed exercising.

632. In October 2011, Mr. Nguyen began to experience severe joint pain, chills, cough, and weight loss. In November 2011 he was diagnosed with Valley Fever at PVSP.

633. He was prescribed Guaifenesin/Dextromethorphan, Chlorpheniramine Maleate, and Fluconazole.

634. Nguyen continues to suffer joint pain, poor appetite, weakness, fatigue, stress and depression. He is no longer able to exercise.

635. Mr. Nguyen brings a federal claim.

636. Infected at PVSP in 2011, Mr. Nguyen brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

637. These Defendants knew that inmates like Nguyen were at increased risk from Valley Fever but failed to take action to protect him from the disease.

638. Mr. Nguyen's CDCR number is AR6638.

**JAMES ORTEGA**

639. James Ortega is a 27-year-old of Caucasian and Hispanic descent.

640. Prior to his incarceration, Mr. Ortega was a healthy young man.

641. Ortega was transferred to PVSP from Sierra Conservation Center. He asked prison staff why he was being transferred, who responded that because he was not African American he had a lower chance of catching Valley Fever.

642. In 2012, Ortega's legs swelled up to twice their size and were covered in bumps, bruises, and a severe rash. He had intense stomach pains, headaches, poor appetite, and was unable to get of bed. He was diagnosed with Valley Fever at PVSP later that year.

643. He was prescribed Diflucan.

644. Mr. Ortega brings a federal claim.

645. Infected at PVSP in 2012, Ortega brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

646. These Defendants knew that inmates like Ortega were at increased risk from Valley Fever but failed to take action to protect him from the disease.

647. Mr. Ortega's CDCR number is G44523.

**MACK PAGE**

648. Mack Page is a 66-year-old African-American.

649. Mr. Page was transferred to PVSP in June, 2012. He was immune-compromised with a history of heart trouble and COPD.

650. Page was diagnosed with Valley Fever in August 2012 at PVSP.

651. Mr. Page suffers chills, difficulty breathing, night sweats, chest pain and coughing.

652. He now uses an inhaler to help him breath and can only walk 100 yards.

653. In August of 2013, he was transferred out of PVSP.

654. Page was given Itraconozole but was later taken off the medication.

655. Mr. Page brings a state and federal claim.

656. Infected at PVSP in 2013, Page brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

657. These Defendants knew inmates like Page were at increased risk from Valley Fever but failed to take action to protect him from the disease.

658. Mr. Page's CDCR number is J66125.

**TYEJAHN PARKER**

659. Tyejahn Parker is a 31-year-old African American. He had asthma before he was incarcerated.

660. Parker was convicted of 2nd degree robbery reportedly due to theft of a cell phone.

661. In August of 2010, Mr. Parker was transferred to Avenal State Prison.

662. In July of 2011 he was diagnosed with Valley Fever, shortly after inmates were left outside during a dust tornado.

663. Mr. Parker began to have difficulty breathing and pains on the right side of both his chest and back. When he first complained about his symptoms he was told he was fine; he later passed out and woke up in an ambulance.

664. After being hospitalized, Parker lost 60 pounds, started getting headaches, nose bleeds, and muscle spasms, got tired constantly and suffered joint pain.

665. Mr. Parker was given Diflucan, Elevelle, and Albuteral for his symptoms.

666. He is scheduled to be released on June 16, 2016.

667. Parker brings a federal claim.

668. Infected at ASP in 2011, Mr. Parker brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, and Winslow.

669. These Defendants knew that inmates like Parker were at increased risk from Valley Fever but failed to take action to protect him from the disease.

670. Mr. Parker's CDCR number is AR2709

**MARVIN PIERCE**

671. Marvin Pierce is a 54-year-old Caucasian.

672. Mr. Pierce worked in an oil refinery for twelve years and for six years as a commercial driver operating 18-wheelers.

673. Pierce was transferred to PVSP in 2010.

674. Pierce was told on July 16, 2012, that a spot on his lung was cancer.

675. He was diagnosed with Valley Fever on December 19, 2012 after a lung biopsy.

676. Pierce has suffered constant coughing, congestion, and joint pain, including in his lower back where he now has damaged nerves and discs. He now walks with a cane.

677. Pierce has lost almost 70 pounds after contracting Valley Fever. He has red rashes all over his legs and sores on his face and hands and on his feet.

678. Pierce now also has asthma, which he had not had previously.

679. The disease has made him incontinent.

680. Pierce was given Diflucan four times a day but was later cut back to three times a day.

681. Pierce brings a state and federal claim.

682. Because he became infected at PVSP in 2012, Pierce brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

683. These Defendants knew inmates like Pierce were at increased risk from Valley Fever but failed to take action to protect him from the disease.

684. Mr. Pierce's CDCR number is F68477.

## CARLOS QUINTANILLA

685. Mr. Carlos Quintanilla is a 38-year-old Hispanic male from El Salvador.

686. Prior to contracting Valley Fever, Mr. Quintanilla suffered from chronic asthma. He was otherwise in good health.

687. He was transferred from Corcoran State Prison to PVSP in June 2011.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

688. In October 2013, Mr. Quintanilla experienced flu-like symptoms. He suffered chronic pain in his joints and muscles and lost 30 lbs in 2 months. He also developed skin lesions.

689. Mr. Quintanilla was formally diagnosed with Valley Fever in November 2013.

690. He was prescribed 400 mg of Fluconazole daily, to continue indefinitely.

691. Mr. Quintanilla continues to experience shortness of breath. He is unable to exercise regularly which increases his stress levels.

692. He also suffers from severely dry and itchy skin that sometimes cracks and bleeds.

693. Mr. Quintanilla brings a state and federal claim.

694. Infected at PVSP in 2013, Mr. Quintanilla brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

695. Mr. Quintanilla's CDCR number is K86137.

**EARL RANDLE**

696. Earl Randle is a 54-year-old African American. He is from a family of nine brothers and three sisters. He is a welder and painter by trade.

697. Mr. Randle was transferred to PVSP around 2002.

698. Mr. Randle knew that when he was transferred to PVSP that he was in a higher risk group. He requested a transfer out of PVSP and continued to try to get a transfer out of PVSP for eight years without any success.

699. Before contracting Valley Fever, Mr. Randle was in good health.

700. In March 2012 he was formally diagnosed with Valley Fever.

701. Randle now suffers from symptoms including night sweats and severe weight loss.

702. Mr. Randle brings a federal claim.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

703. Because he became infected at PVSP in 2012, Mr. Randle brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

704. These Defendants knew inmates like Randle were at increased risk from Valley Fever but failed to take action to protect him from the disease.

705. His CDCR Number is P57906.

**JAY ROACH**

706. Jay Roach is a 32-year-old Caucasian.

707. Mr. Roach is originally from Illinois, where he grew up in the foster care system.

708. He has since earned his GED and is actively pursuing an education in the telecom/technology field, as well as taking community college courses.

709. Roach had asthma.

710. Mr. Roach was transferred to PVSP in June 2010 and contracted VF in or around September, 2010.

711. Roach suffers fatigue, joint aches, back aches, headaches, confusion, night sweats, and fever. He has had rashes on several parts of his body and suffered pneumonia.

712. He was treated with Fluconazole.

713. Roach's asthma has since worsened.

714. The physician(s) he sees currently will not provide him with Valley Fever medication.

715. Roach is concerned at being taken off Fluconazole and fears that his symptoms will worsen.

716. Roach brings a federal claim.

717. Because he became infected at PVSP in 2010, Roach brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

718. These Defendants knew inmates like Roach were at increased risk from Valley Fever but failed to take action to protect him from the disease.

719. Roach's CDC Number is F19402.

**DAVID ROBINSON**

720. David Robinson is a 64-year-old African-American. He came from a troubled family background but managed to graduate high school and became a dental technician.

721. Robinson was transferred to Pleasant Valley State Prison in June of 2011 and remained there until December of 2013.

722. Robinson contracted Valley Fever in 2011 at PVSP.

723. After contracting Valley Fever, Robinson suffered from nose and mouth bleeds, shortness of breath, flu-like symptoms, urinating blood, and pain in his spine. He lost 30 pounds and is now is so thin that his ribs protrude and he looks like someone from a concentration camp. The pain in his spine is so bad that he has to warm up before he can take a walk.

724. Robinson was prescribed Diflucan for a few months and then the medication was discontinued.

725. His symptoms worsened in May 2013 and he was again put on Diflucan.

726. Robinson brings a federal claim.

727. Because he became infected at PVSP in 2011, Robinson brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

728. These Defendants knew inmates like Robinson were at increased risk from Valley Fever but failed to take action to protect him from the disease.

729. Mr. Robinson's CDCR Number is F13839.

**ANTONIO ROBLES**

730. Mr. Antonio Robles is a 45-year-old Mexican American from a close-knit family in Sun Valley, California.

731. Prior to contracting Valley Fever, Mr. Robles was energetic, and exercised by playing basketball three to four times a week. He is an avid reader.

732. Mr. Robles was transferred to Pleasant Valley State Prison in 2006 from Corcoran State Prison.

733. In early 2012, Mr. Robles began experiencing flu-like symptoms every two to three weeks.

734. Mr. Robles was formally diagnosed with Valley Fever in November 2012.

735. As a result of the Valley Fever, Mr. Robles suffered high fevers, night sweats, difficulty breathing, nausea, fatigue and aches throughout his joints and body.

736. His symptoms are ongoing.

737. Mr. Robles was prescribed 200 mg of Fluconozale daily and 100 mg of Tessalon three times daily.

738. Mr. Robles brings a state and federal claim.

739. Infected at PVSP in 2012, Mr. Robles brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

740. These Defendants knew that inmates like Robles were at increased risk from Valley Fever but failed to take action to protect him from the disease.

741. Mr. Robles's CDCR number is H72405.

## ANTHONY RODRIGUEZ

742. Mr. Anthony Rodriguez is a 54-year-old Mexican American from Santa Maria, California.

743. He previously worked as a delivery driver and in restaurants.

744. Prior to contracting Valley Fever, Mr. Rodriguez was in generally good health.

745. Rodriguez was transferred from Corcoran to PVSP in 2009.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

746. In 2011, Mr. Rodriguez experienced weakness, fatigue, sharp stabbing pains, coughing and night sweats; he was formally diagnosed with Valley Fever in September 2011.

747. As a result of the Valley Fever, Mr. Rodriguez was hospitalized with pneumonia in his right lung. He suffers ongoing chest pains, shortness of breath, and loss of appetite. He often feels dizzy because he is unable to catch his breath.

748. He has been denied medication to treat the pain caused by Valley Fever.

749. Mr. Rodriguez brings a federal claim.

750. Infected at PVSP in 2011, Mr. Rodriguez brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

751. These Defendants knew that inmates like Rodriguez were at increased risk from Valley Fever but failed to take action to protect him from the disease.

752. Mr. Rodriguez's CDCR number is C34155.

**JOHNNY SANCHEZ**

753. Johnny Sanchez is a 47-year-old Mexican-American from Los Angeles, California.

754. He has a son, step-daughter, three brothers and a sister.

755. Mr. Sanchez attended high-school through his senior year and earned a GED.

756. Sanchez was transferred to PVSP in 2011.

757. Prior to his incarceration Mr. Sanchez was strong, athletic and in excellent health.

758. He started experiencing symptoms of Valley Fever in 2012 when he suffered coughing and night sweats for about three weeks.

759. Mr. Sanchez was admitted to Community Regional Medical Center for pneumonia in 2012, where he was hospitalized for about 9 days.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

760. Mr. Sanchez was ultimately diagnosed with Valley Fever in 2012. Upon discharge from the hospital he was prescribed fluconazole 200mg.

761. He has since suffered weakness, dizziness, painful coughing, reduced appetite, stomach pain, night sweats, weight loss, and a collapsed lung.

762. Sanchez will be eligible for release in 2017, upon which time he will be unable to afford appropriate medical care for his disease.

763. Sanchez brings a state and federal claim.

764. Because he became infected at PVSP in 2012, Sanchez brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

765. These Defendants knew inmates like Sanchez were at increased risk from Valley Fever but failed to take action to protect him from the disease.

766. Johnny Sanchez's CDC Number is E72914.

**TYRONE SANDERS**

767. Tyrone Sanders is a 32-year-old Hispanic-American. He has a five-year-old son.

768. Mr. Sanders was born in Boston, Massachusetts, raised in Texas, and later moved to Las Vegas, Nevada.

769. Sanders completed some college courses; his job history includes work in construction, docks and warehouses among other things.

770. Mr. Sanders was transferred to PVSP on August 19, 2011.

771. Sanders first started experiencing symptoms in 2012.

772. He suffered breathing difficulties, uncontrollable coughing, vomiting with blood, migraines and severe knee pain.

773. Sanders was diagnosed with Valley Fever in 2012.

774. He currently is prescribed fluconazole 200mg and an inhaler.

775. The disease has caused Sanders walking pneumonia, asthma, high blood pressure, erratic heartbeat, constant joint pain, daily migraines and chest pain.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

776. Aside from the physical toll the disease has taken on Mr. Sanders, he also reports that it has had a large psychological and emotional impact.

777. Sanders reports that while on the yard at PVSP he was forced to sit in the dirt next to exposed construction areas during alarms.

778. Sanders brings a state and federal claim.

779. Because he became infected at PVSP in 2012, Sanders brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

780. These Defendants knew inmates like Sanders were at increased risk from Valley Fever but failed to take action to protect him from the disease.

781. Mr. Sanders CDC Number is F20814.

**ADRIAN SEPULVEDA**

782. Adrian Sepulveda is a 43-year-old Hispanic originally from Puerto Rico.

783. Mr. Sepulveda was transferred to PVSP from Solano State Prison in May 2011.

784. Sepulveda contracted tuberculosis in 2009 while at Solano State Prison, after an outbreak of the disease there.

785. He has a compromised immune system as a result.

786. Defendants were aware of his condition.

787. Sepulveda started feeling sick in December 2011 and was diagnosed with Valley Fever in January 2012.

788. He was prescribed Diflucan and has taken the medication continuously.

789. He continues to suffer from body aches, fatigue, dizziness, chest pain, swollen legs, loss of weight, and coughing.

790. He has permanent lung damage from the disease.

791. Sepulveda brings a state and federal claim.

792. Because he became infected at PVSP in 2012, Sepulveda brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

793. These Defendants knew inmates like Sepulveda were at increased risk from Valley Fever but failed to take action to protect him from the disease.

794. His CDCR Number is K61449.

**SINGLETON, CHARLES**

795. Mr. Charles Singleton finished high school; he has 3 children. He used to be a real estate investor and also is an author.

796. Singleton had a history of TB.

797. Mr. Singleton was transferred to ASP in 2002 and housed there until 2012 when he was transferred to CMC West. He was diagnosed with Valley Fever in June of 2011.

798. Singleton used to do over 600 pushups and run 4 miles a day before he became infected with Valley Fever. He is now so weak from the disease he has trouble speaking. He has suffered weight loss, severe and frequent coughing fits up to 15 times a day, and has tremors in his hands.

799. Singleton reports that his religious observance took place outside on the dusty prison grounds.

800. He has not been given any medication for Valley Fever.

801. Mr. Singleton brings a federal claim.

802. Infected at ASP in 2011, Mr. Singleton brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, and Winslow.

803. These Defendants knew inmates like Singleton were at increased risk from Valley Fever but failed to take action to protect him from the disease.

804. Mr. Singleton's CDCR number is J45940.

**MANUEL TEJEDA**

805. Manuel Tejeda is a 48 year old Hispanic man, from Fresno, CA. He has been engaged in such occupations as farming, production work, restaurants, and canning.

806. Prior to October 2011, Mr. Tejeda was healthy, strong, and active.

807. CDCR transferred Mr. Tejeda to Pleasant Valley State Prison on or about January 22, 2011, where he was exposed to cocci.

808. In September 2011, Mr. Tejeda became ill and experience chest pain, shortness of breath, skin rash, fatigue, chills, cough, and dizziness.

809. At that time, a CDCR physician, Dr. Choate, told Mr. Tejeda that he had a common cold. This misdiagnosis delayed a proper treatment and complicated his condition. Later, Dr. Choate told Mr. Tejeda that he had pneumonia.

810. In October 2011, Dr. Choate told Mr. Tejeda that he was infected with Valley Fever.

811. After providing the Valley Fever diagnosis, CDCR treated Mr. Tejeda with Fluconazole 200 mg and triamcinolone acetonide, and naphcon eye drops. These medications have since been discontinued.

812. Mr. Tejeda continues to experience adverse effects from Valley Fever including bone and joint pain, night sweats, and fatigue. In spite of his pleas, CDCR denies Mr. Tejeda any medication for his ongoing symptoms.

813. He brings a federal claim.

814. Infected at PVSP in 2011, Plaintiff Tejeda brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

815. These Defendants knew Tejeda was at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

816. Mr. Tejeda's CDCR Number is G37662.

**MICHAEL WELLS**

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

817. Michael Wells is a 52-year-old African American male from San Francisco, California.

818. Before contracting Valley Fever, his health was good. He used to play basketball, football and be active.

819. He first started noticing something was not right with his health on or about March 14, 2012. He was having trouble breathing, getting out of bed, and eating.

820. He was diagnosed with Valley Fever on May 15, 2012 at Pleasant Valley State Prison.

821. He believes he contracted the virus when construction was going on at Pleasant Valley State Prison; the dust was coming in through the air vents.

822. His current symptoms include shortness of breath, headaches, and his back going out.

823. He was taking Iitraconazole, but it made him sick. He is now taking Diflucan.

824. He brings a federal claim.

825. Because he became infected at PVSP in 2012, Wells brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

826. These Defendants knew inmates like Wells were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

827. His CDCR Number is C68068.

**CARTER LEE WILLIAMS**

828. Carter Lee Williams is a 65-year-old African-American from Alabama.

829. Williams was transferred to PVSP in 2009.

830. Iin October, 2011, he was diagnosed with Valley Fever, after experiencing coughing, a lack of appetite, shortness of breath, weakness, and an inability to keep food down.

831. He was prescribed Fluconazole and other medications.

832. Williams brings a federal claim.

833. Infected at ASP in 2011, Mr. Williams brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, and Winslow.

834. These Defendants knew inmates like Williams were at increased risk from Valley Fever but failed to take action to protect him from the disease.

835. His CDC Number is AB2486.

**FINLEY WIMBLEY**

836. Finley Wimbley is a 44-year-old African-American.

837. Before his incarceration, Mr. Wimbley was in good health. He had diabetes but otherwise had good energy and strength and exercised regularly.

838. Wimbley was diagnosed with Valley Fever at PVSP in 2013.

839. Prison medical officials were aware of Wimbley's diagnosis but initially told him that he did not need medication.

840. Wimbley's health has deteriorated, his vision is blurred, he experiences coughing and vomiting and is unable to sleep due to his symptoms.

841. Wimbley brings a state and federal claim.

842. Infected at PVSP in 2013, Wimbley brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, Winslow, Yates, and Beard.

843. These Defendants knew that inmates like Wimbley were at increased risk from Valley Fever but failed to take action to protect him from the disease.

844. Mr. Wimbley's CDCR number is E74507.

**RICHARD WOODARD**

845. Richard Woodard is a 51-year-old Caucasian from Santa Rosa, California.

846. Mr. Woodard was diagnosed with Valley Fever in mid-2012 at PVSP.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

847. He now suffers headache, tiredness, shortness of breath, and uncontrollable sweating. He was informed that he had nodules in his lungs and he must now use an inhaler.

848. Woodard was treated with Diflucan.

849. Mr. Woodard was released on or about December, 2014.

850. Woodard brings a federal claim.

851. Because he became infected at PVSP in 2012, Woodard brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

852. These Defendants knew that inmates like Woodard were at increased risk from Valley Fever but failed to take action to protect him from the disease**.**

853. His CDCR Number is F41393.

## VI.

## DEFENDANTS' LIABILITY

### A. Allegations Against Each Defendant

### JEFFREY BEARD

854. Defendant Jeffrey Beard is the current Secretary of the CDCR. He succeeded Defendant Matthew Cate in that position on or about December 27, 2012.

855. As Secretary, Mr. Beard is responsible for all policies and practices of the organization as well as for its operational decisions and has direct supervisory authority over every CDCR employee.[44]

856. On information and belief, as of December 2012, Beard knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and

[44] CDCR Operations Manual, p. 1.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of the history of the Valley Fever epidemic, which had been ongoing at the hyper-endemic prisons for 6 years by the time he took office, the approximately $23 million in annual expenses paid by the CDCR for medical care for the victims, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

857. The sources of his knowledge include the January, 2007 California Department of Health Services memorandum, widely circulated for “the record,” which recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates which considered whether to at least relocate the high risk groups mentioned in the CDHS’ memorandum and implement the CDHS recommendation for ground cover; the annual Fresno County Grand Jury reports which discussed the Valley Fever problem, and referenced “high risk inmates”; the June 2007 “Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California,” which suggested the diversion and relocation of high risk inmates (which in reality was everyone, given the incidence rates) and contained a myriad of environmental suggestions to minimize further harm; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations.

858. Secretary Beard also had a great deal of documentary information available to him from other sources in the intervening years after 2007 and before his accession to his post in 2012, discussed herein.

859. However, despite the multiple sources of information that he received, Beard, as head of CDCR, continued to implement the 2007 exclusion policy, which left hundreds of high-risk inmates exposed to the disease. He failed to act to otherwise protect inmates from this risk other than to acquiesce to the federal court's June, 2013 Order to evacuate additional inmates from two of the hyper-endemic prisons.

860. Defendant Beard further failed to act to implement the recommended remedial measures. Beard knew at that time of his tenure as Secretary that remedial measures existed that could have been implemented at reasonable cost and that implementing those measures would reduce the risk to inmates who were housed at PVSP or any of the hyper-endemic prisons, as these recommendations had been formally tendered years before, but he continued the State's policy of inaction.

861. Mr. Beard personally participated in the failure to protect inmates from Valley Fever despite having the ability and responsibility as Secretary of CDCR to protect inmates from the unacceptable risks. Beard personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of infection, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at any of the hyper-endemic prisons from December 27, 2012 onward, including Plaintiffs as specified below.

862. Defendant Beard is liable to all Plaintiffs that contracted the disease in 2013 or later, as he took office in late 2012 and, as Secretary, became responsible for inmate well-being at all prisons as of this date.

**PAUL D. BRAZELTON**

863. Defendant Paul Brazelton was the warden of PVSP from early 2012 to the Fall of 2013. On information and belief, he occupied positions of authority at

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

PVSP in the five years before his tenure as warden and has worked at the prison since 1994.

864. As Warden, Mr. Brazelton was responsible for the policies and practices of the prison as well as for its operational decisions, and had direct authority over every CDCR employee at PVSP.

865. On information and belief, by 2007, Brazelton knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of his position and responsibilities at the time of his knowledge, including his own eyewitness observation of the problem occurring in front of him, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

866. The sources of his knowledge include the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of high-risk groups, such as African-Americans, American Indians, and Asians as well as immune-compromised/immune-suppressed individuals and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by the warden that immediately preceded him, Mr. James Yates, which considered whether to relocate the high risk groups mentioned in the CDHS'

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at the time to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations and was directed to all wardens at the time; and various lawsuits against Warden Brazelton personally from 2012 onward in which inmates described themselves as at high risk of infection due to risk factors.

867. Defendant Brazelton at a minimum received copies of the Fresno Grand Jury reports of 2012-2013, and almost certainly received or was aware of the previous annual versions of those reports.

868. However, despite the multiple sources of information that he received, Warden Brazelton, as head of PVSP, not only acquiesced to the state's narrow 2007 exclusion policy, which left hundreds of inmates exposed to the disease, he refused to exercise his independent authority as warden to transfer inmates out for their safety. Based on his independent power to transfer inmates out of PVSP, or prevent their transfer to PVSP, based on their safety needs pursuant to Title 15, sections 3379(a)(4), 3379(a)(9), 3379(a)(9)(F)(2) and 3379(a)(9)(G)(1), and to adopt policies and procedures to avoid threats to inmate safety, and his failure to implement such policies, he exhibited deliberate indifference to inmates' risk of contraction of Valley Fever.

869. On information and belief, Warden Brazelton was aware of the Valley Fever problem before he assumed the position of Warden in 2012 and he was also aware that certain groups were at higher risk of suffering more serious complications from it.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

870. Warden Brazelton had the ability to exclude inmates as they were transferred to his facility and he personally participated in the decision not to do so during his tenure as Warden from 2012-2013.

871. During this time, Warden Brazelton was named as a defendant in lawsuits by inmates, served on him personally, which further informed him that certain groups of inmates were especially susceptible Valley Fever. Yet, he continued to fail to intervene to protect inmates from the known greater risk of infection.

872. Warden Brazelton also personally participated in the decision not to install ground cover or other remedial measures at the prison. Throughout his tenure as PVSP warden, he could have installed ground cover and implemented remedial measures. He was given this power pursuant to the November 20, 2007 policy memorandum. However, like his predecessor he failed to implement remedial measures which could have reduced the risk to all inmates at PVSP including those who contracted the disease after his tenure as warden.

873. Warden Brazelton personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at PVSP from early 2012 onward, including Plaintiffs as specified below. [45]

874. Defendant Brazelton is liable to all Plaintiffs named herein that contracted Valley Fever at PVSP during his tenure from 2012-2013.

## MATTHEW CATE

875. Defendant Matthew Cate was the Secretary of the CDCR from 2008-2012.

[45] The Plaintiffs specified below are those identified in Plaintiffs' First Claim for Relief as those seeking relief from each particular Defendant. (Not all Plaintiffs seek relief from each Defendant).

876. As Secretary, Mr. Cate was responsible for the policies and practices of the organization as well as for its operational decisions, and had direct authority over every CDCR employee.[46]

877. On information and belief, as of 2007, Mr. Cate knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of Cate's position and responsibilities at the time of his knowledge, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

878. The sources of his knowledge include the January, 2007 California Department of Health Services memorandum, widely circulated for "the record," which recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates which considered whether to at least relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover;

[46] CDCR Operations Manual, P. 1.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed him to personally respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations; and numerous lawsuits against Mr. Cate personally from 2007 onward in which inmates described themselves as exposed to a significantly elevated risk of contracting Valley Fever.

879. However, despite the multiple sources of information that he received, Mr. Cate, as head of CDCR, adopted and implemented only the narrow 2007 exclusion policy, which left hundreds of inmates exposed to the disease. He failed to act to otherwise protect inmates from this risk.

880. Defendant Cate further failed to act to implement recommended remedial measures. Cate knew at that time of his tenure as Secretary that remedial measures existed that could have been implemented at reasonable cost and that implementing those measures would reduce the risk to inmates who were housed at PVSP or any of the hyper-endemic prisons.

881. However, Mr. Cate declined to adopt this recommendation and disregarded the CDH's recommendation on ground cover and other remedial measures.

882. Then-Governor Schwarzenegger, on information and belief with Cate's input, approval and consent, submitted state budgets that included line items for construction, renovation, and improvement projects at the hyper-endemic prisons, specifically including extensive work at PVSP, but failed to request funds for the remedial measures recommended to address the Valley Fever epidemic.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

883. Cate was aware of the Valley Fever problem by his receipt at the time of the 2008-2009 Grand Jury report, among other things; he was also aware that certain groups were at higher risk of suffering more serious complications from it.

884. On information and belief, Mr. Cate personally participated in the decision not to exclude inmates from hyper-endemic prisons throughout his tenure from 2008-2012. Indeed, during this interval, Mr. Cate had the authority as head of the Department of Adult Institutions to have excluded from hyper-endemic prisons all inmates at risk of infection, including the identified higher-risk groups. During this time, Mr. Cate was named as a defendant in numerous lawsuits by inmates in which they protested their contraction of Valley Fever.

885. Cate, who had the authority and means to have ordered ground cover to be installed at the hyper-endemic prisons throughout his tenure, on information and belief, also personally participated in the decisions and policy not to install ground cover and other remedial measures that would have protected all inmates.

886. Cate personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at any of the hyper-endemic prisons from 2008 onward, including Plaintiffs as specified below.

887. Former Secretary Cate is liable to all named Plaintiffs that contracted the disease based on the inadequate policies and practices of the State from 2006 forward. All plaintiffs name Defendant Cate as a defendant.

## SCOTT FRAUENHEIM

888. Defendant Scott Frauenheim was the acting warden of Pleasant Valley State Prison from the Fall of 2013 to approximately October, 2014, when he became warden. He is currently warden of PVSP. He held various positions of authority before that, including at Avenal State Prison from 2009-2013, and has worked in the California prison system since 1994.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

889. As warden, Mr. Frauenheim is responsible for the policies and practices of the prison as well as for its operational decisions, and had direct authority over every CDCR employee at PVSP.

890. On information and belief, by 2013, Frauenheim knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to all inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; (3) the significantly elevated risk to any inmate of contraction of this incurable virus given the incidence rates at PVSP; and (4) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went outside under adverse conditions. Indeed, in light of his position and responsibilities at the time of his knowledge, including his prior tenure at ASP from 2009-2013, including his own eyewitness observation of the problem occurring in front of him at ASP, and in light of the widespread information known throughout the community of individuals who served as prison officials and prison medical staff/officials about the Valley Fever problem, including detailed federal court orders specifically directed at the issue, it is virtually impossible that he would not have had this knowledge.

891. The sources of his knowledge include the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of high-risk groups, such as African-Americans, American Indians, and Asians as well as immune-compromised/immune-suppressed individuals and also recommended ground cover throughout the prison property; a January, 2007



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

memorandum written by the warden that immediately preceded him, Mr. James Yates, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at the time to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations and was directed to all wardens at the time; the October 2012 CCHCS report which assembled various reports and studies to comprehensively publicize the extent of the Valley Fever problems; the June, 2013 detailed federal court order specifically directed at PVSP and ASP; and numerous other lawsuits, media reports and other public outlets from 2009 onward in which inmates of every color and creed filed suit, and protested in the media, their contraction of the disease at Avenal and PVSP, the two prisons with the highest incidence of the disease in California.

892. However, despite the multiple sources of information that he received, Warden Frauenheim, as head of PVSP, not only continued the overly narrow exclusion policy, which by then necessarily respected a federal court order to minimally move all "high risk" inmates out of PVSP, but this still left hundreds or thousands of inmates – persons who were equally likely on average to contract the virus – to be exposed to the disease. Warden Frauenheim refused to exercise his independent authority as warden to adequately protect all inmates.

893. Based on his independent power to transfer inmates out of PVSP, or prevent their transfer to PVSP, based on their safety needs pursuant to Title 15, sections 3379(a)(4), 3379(a)(9), 3379(a)(9)(F)(2) and 3379(a)(9)(G)(1), and to adopt

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

policies and procedures to avoid threats to inmate safety, and his failure to implement such policies, he exhibited deliberate indifference to inmates' risk of contraction of Valley Fever.

894. On information and belief, Warden Frauenheim was well aware of the Valley Fever problem before he assumed the position of acting warden in 2013 and he was also aware that all inmates at PVSP, including persons that fall outside the traditional definitions of "high risk" (e.g. African-Americans, Filipinos, etc.) were still liable to contract the disease at a significantly higher rate than the surrounding area, and yet he did not take ameliorative steps to minimize these continuing cases of contraction.

895. Warden Frauenheim had the ability to exclude inmates as they were transferred to his facility and he personally participated in the decision not to do so during his tenure as Warden from 2013-present.

896. Warden Frauenheim also personally participated in the continuing decision to not install ground cover or implement other remedial measures at the prison. Throughout his tenure as PVSP warden, he could have installed ground cover and implemented remedial measures. He was given this power pursuant to a November 20, 2007 policy memorandum. However, like his predecessors, he has failed to implement adequate remedial measures.

897. Warden Frauenheim personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at PVSP from when he ascended to the post, in approximately the Fall of 2013 forward, including Plaintiffs specified below.

**JAMES HARTLEY**

898. Defendant James Hartley was the warden of Avenal State Prison (ASP) from 2007 through part of 2014.

899. As Warden, Mr. Hartley was responsible for the policies and practices of the prison as well as for its operational decisions, and had direct authority over every employee at ASP.

900. On information and belief, as of 2007, he knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of his position and responsibilities at the time of his knowledge, including his own eyewitness observation of the mass contraction occurring at his place of work, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

901. The sources of his knowledge include the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons, and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by the warden of PVSP, Mr. James Yates, which considered whether to at least relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem,



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

referenced "high risk inmates" and which directed PVSP prison officials at the time to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations and was directed to all wardens at the time; and various lawsuits against Warden Hartley personally from 2007 onward in which inmates of every color and creed legitimately described themselves as at excessive risk of contraction.

902. However, despite the multiple sources of information that he received, Warden Hartley, as head of ASP, not only acquiesced to the state's narrow 2007 exclusion policy, which left hundreds of inmates to catch the disease, he refused to exercise his independent authority as warden to transfer inmates for their safety. Based on his independent power to transfer inmates out of ASP, or prevent their transfer to ASP, based on their safety needs pursuant to Title 15, sections 3379(a)(4), 3379(a)(9), 3379(a)(9)(F)(2) and 3379(a)(9)(G)(1) and to adopt policies and procedures to avoid threats to inmate safety, and given Warden Hartley's failure to implement such policies, he failed to protect inmates, whether "high risk" or not, from the risk of contraction of Valley Fever.

903. Consequently, Warden Hartley was aware of the Valley Fever problem in general when he assumed the position of Warden in 2007 and he was also aware that certain groups were at higher risk of suffering more serious complications from it.

904. Warden Hartley personally participated in decisions not to exclude the vast majority of inmates. He oversaw and implemented the narrow exclusion policy for approximately 7 years, during his tenure from 2007-2014.

905. Warden Hartley also personally participated in the decisions not to install ground cover and implement other remedial measures that would have protected inmates.

906. Warden Hartley personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at Avenal State Prison from 2007 onward, including Plaintiffs as specified below.

907. Defendant Hartley is liable to all Plaintiffs named herein that contracted Valley Fever at ASP during his tenure from approximately 2004-2014.

**SUSAN L. HUBBARD**

908. Defendant Dr. Susan L. Hubbard is the former director of the Division of Adult Institutions, having served in that capacity at least through 2007 – 2009.

909. As the former director of DAI, Dr. Hubbard was responsible for the policies and practices of the organization as well as for its operational decisions, and had authority over all employees in this Division.

910. On information and belief, by 2007, Hubbard knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of Hubbard's position and responsibilities at the

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

time of his knowledge, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that she would not have had this knowledge.

911. The sources of her knowledge include: the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, and which referenced "high risk inmates" and which directed prison authorities to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the widely-circulated June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; and the November 11, 2007 policy memorandum she personally authored, which discusses the various CDHS recommendations from the January 2007 memorandum.

912. However, despite her central role in the activity and recommendations that led up to her policy memorandum, Hubbard adopted the narrow 2007 exclusion policy, which left hundreds of susceptible inmates exposed to the disease at the hyper-endemic prisons. She failed to act to otherwise protect all inmates from this risk.

913. When, in 2007, Hubbard so-authored the CDCR policy, which on information and belief was approved by Defendant Kernan as head of DAI, that policy identified only a limited set of immune-compromised persons as high-risk. Hubbard knowingly disregarded all of the reports, medical literature, findings, studies and



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

general knowledge about Valley Fever showing that other groups were at high risk, such as African-American, Filipino, Latinos, Indians, and other races, and persons over 55 years old, and also ignored the incidence rates, which revealed that all inmates were facing an unacceptable risk of contraction.

914. Dr. Hubbard was aware of the Valley Fever epidemic from the January, 2007 CDHS report, among other documents noted herein; she was aware that certain groups were at higher risk of suffering more serious complications from it; she personally participated in the decision not to protect these high risk inmates in the 2007 policy, which ignored the CDHS recommendation to exclude high-risk inmates; she also personally participated in the decision not to install ground cover, which would have protected all inmates, by not expressly mandating this protocol in the 2007 policy memorandum she authored.

915. Hubbard's failure to establish in 2007 a policy excluding all inmates, or at least all higher-risk inmates, from the hyper-endemic prisons caused all such inmates subsequently housed at those facilities to face an increased risk of infection.

916. Hubbard personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by all inmates who contracted Valley Fever at any of the hyper-endemic prisons from 2007 onward, including Plaintiffs as specified below.

917. Ms. Hubbard is liable to all named Plaintiffs that contracted the disease based on the inadequate policies and practices of the State from 2007 forward. All plaintiffs name Defendant Hubbard.

**DEBORAH HYSEN**

918. Defendant Deborah Hysen is the current Director of CDCR's Office of Facility Planning, Construction and Management (FPCM). Hysen was the Chief Deputy Secretary of FPCM from at least 2006 until 2014.

919. Hysen, first as the Deputy Chief and then as the senior executive of Facilities and Construction for CDCR, had the ability to act no later than 2007 to implement the recommended remedial measures at PVSP, ASP, or any of the hyper-endemic prisons but did not do so until 2013, when minimal soil-stabilization was finally attempted.

920. On information and belief, by no later than 2007, Hysen knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by all inmates, including ones in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever to all inmates, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.

921. The sources of her knowledge include: the January, 2007 California Department of Health Services memorandum, widely circulated for "the record," which recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, and which referenced "high risk inmates" and which directed prison authorities to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

widely-circulated June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further risk and harm to all inmates; and the November 11, 2007 policy memorandum she personally authored, which discusses the various CDHS recommendations from the January 2007 memorandum.

922. Defendant Hysen announced publically that her department was designing and implementing a full suite of remedial measures to protect all inmates at the hyper-endemic prisons including PVSP and ASP from infection by Valley Fever. Hysen was quoted in public news media regarding both the Valley Fever epidemic and her department's plans to address it. Hysen, however, along with Defendant Meyer, failed to implement any of those remedial measures until at least 2013, after multiple court orders, and has yet to complete implementing the recommended measures.

923. Hysen, knowing that all inmates were at elevated risk of infection, and that certain identified groups were at even more extraordinary risk, declined to implement the recommended remedial measures.

924. Hysen personally participated in the failure to protect all inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at any of the hyper-endemic prisons from 2006 onward, including Plaintiffs as specified below.

925. Ms. Hysen is liable to all named Plaintiffs that contracted the disease based on the inadequate policies and practices of the State from 2006 forward. All plaintiffs name Defendant Hubbard.

**DR. FELIX IGBINOSA**

926. Defendant Dr. Felix Igbinosa is the former medical director of Pleasant Valley State Prison and served in that capacity from approximately 2005-2013.

927. On information and belief, as of 2005, Dr. Igbinosa knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever for all inmates, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of Dr. Igbinosa's position and responsibilities at the time of his knowledge, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

928. In and before November 2007, but after the prevalence of Valley Fever was well known to officials of the CDCR, including Defendant Igbinosa, inmates were issued protective masks from medical staff at PVSP upon request. However, by in or about late 2007, Defendant Igbinosa implemented a policy restricting the issuance of masks to a limited group of inmates, and denying masks, even to inmates who requested one, to inmates who did not meet certain criteria. Thereafter, inmates who did not fit the stated criteria were not able to obtain protective masks, even for use in windy and dusty outdoor conditions at PVSP. Dr. Igbinosa's decisions with respect to issuing masks reveals that he had the authority to take precautionary measures to prevent disease, although he did not exercise it for the benefit of inmates.

929. Defendant Igbinosa implemented this narrow policy for the issuance of protective masks even though the policy was in deliberate disregard of the significant medical needs of the ethnic, racial and immune-compromised groups identified by the



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

California Department of Public Health and Safety as Valley Fever at-risk groups particularly susceptible to contracting coccidioidomycosis or suffering more severe consequences from it.

930. Upon information and belief, Defendant Igbinosa made weekly visits to PVSP's various facilities, as required by California Code of Regulations, Title 15, section 3384, and noticed the vast areas of open dirt, blowing dust, and inmates walking around without protective masks, including the named PVSP Plaintiffs. Yet, Defendant Igbinosa deliberately failed to modify the PVSP policy denying protective masks to inmates upon request unless they satisfied the limited policy criteria, and he generally took no steps or measures to reduce what was a prison wide epidemic at PVSP, as the person entrusted to look after the medical health and welfare of PVSP's entire population.

931. Defendant Igbinosa was charged by Defendant Winslow on or about January 16, 2007, with "ensuring health care staff [at PVSP] are trained in and comply with DCHCS [Division of Correctional Health Care Services] policy for identifying, confirming, and reporting symptomatic or disseminated Coccidioidomycosis and be provided the reporting forms." [D. Winslow, January 16, 2007, Memo to, *inter alia*, Chief Medical Officers, entitled "Coccidioidomycosis (Valley Fever) Identification and Reporting," at p. 2.] Winslow further stated that the training was "mandatory," and required that the training "must be conducted by Thursday, February 16, 2007." [*Ibid*.] On information and belief, Defendant Igbinosa failed to adequately train PVSP staff in a timely fashion as directed.

932. Defendant Igbinosa was personally involved in denying relief to inmates, including Plaintiffs, seeking relief (e.g., transfer out of PVSP) for Valley Fever. As the Medical Director at PVSP, he was the official who generally decided the Second Level Response to appeals from inmates, including ones relating to Valley Fever, and in particular requests for transfer out of PVSP, which were authorized to be granted pursuant to Title 15, section 3084.1(a), which permits relief for any condition



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

that has a "material, adverse effect upon [an inmate's] health, safety or well being." As he had the general right to decide second level 602's, which had the effect of giving him authority over every inmate at PVSP (separate and apart from the authority granted to him as chief medical officer or any regulatory authority), he effectively had the right to set preventative or precautionary policies at PVSP to protect inmate health, safety and well-being, including but not limited to, excluding incoming inmates (in general based on the extraordinary risk at that prison or for particular susceptibility), excluding existing inmates generally or at least ones with particular susceptibility to Valley Fever, or taking other measures such as environmental remediation.

933. The sources of Dr. Igbinosa's knowledge about the Valley Fever problem include the substance of the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the January, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a September 9, 2007 news article in the Sacramento Bee, which reflected his statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations; and over a dozen



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

lawsuits against Dr. Igbinosa personally from 2007 forward in which inmates of every creed and color, high risk or not, documented their contraction of the disease and sought formal legal relief.

934. However, despite the multiple sources of information he received, Dr. Igbinosa, as head medical officer of PVSP, not only acquiesced to the state's narrow 2007 exclusion policy, which left hundreds of inmates of every type to catch the disease, he refused to exercise his authority as chief medical officer to transfer one or all for their safety. Based on his power to act to protect inmate health, safety and well-being, to adopt policies and procedures to avoid threats to inmate health, safety and well-being, and given Dr. Igbinosa's failure to implement such policies, he failed to protect all inmates from the risk of contraction of Valley Fever.

935. Based on his independent power as PVSP's chief medical officer to act within the scope of his job to protect inmate health, safety and well-being, to adopt policies and procedures to avoid threats to inmate health, safety and well-being, and given Dr. Igbinosa's failure to implement such policies, he failed to protect all inmates from the risk of contraction of Valley Fever.

936. Dr. Igbinosa further failed to act to implement recommended remedial measures. One of the recommendations that would have protected all inmates was for prison officials to implement ground cover throughout the affected institutions.

937. Dr. Igbinosa knew at that time that remedial measures existed that could have been implemented at reasonable cost, and that implementing those measures would reduce the risk to inmates who were housed at PVSP or any of the hyper-endemic prisons, as reflected for example by the observation that such cover had reduced the incidence rates from one-half to two-thirds when employed at a military base.

938. Consequently, Dr. Igbinosa was acutely aware of the Valley Fever problem as witnessed before him at the institution where he practiced, and he was

aware that certain groups were more susceptible to contracting it, and some were at higher risk of suffering serious complications from it.

939. Dr. Igbinosa knew that hundreds of inmates were continuing to contract Valley Fever before and after the 2007 policy, and he had an obligation as a medical officer entrusted to him to minimize health threats. He observed the 2007 policy to not work to stem the tide of Valley Fever infections, yet he failed to protest the policy, seek to change it, recommend the expansion of the exclusion criteria. He also had an obligation to affirmatively refuse to obey it on the grounds that it was unconstitutional and constituted a derogation of his duties to adhere to it; he could not blindly follow an illegal policy that caused harm to inmates in contravention of his responsibilities as chief medical office of the prison.

940. Dr. Igbinosa personally participated in decisions not to exclude these high risk inmates despite his power and right, as chief medical officer over many years at PVSP, to take a variety of steps to ameliorate the problem. During this long interval, Dr. Igbinosa was named as a defendant in numerous lawsuits by inmates in which they protested their contraction of Valley Fever. Yet, he continued to neither intervene, nor review, nor reconsider the narrow exclusion policy, nor implement his own policies or protective measurs to minimize the health threat, such as by transfer inmates out under his various sources of authority as CMO of PVSP or under California regulations. It did not require a medical license for him to have this authority, nor did he need to treat VF patients to take the precautionary steps noted herein; he had been entrusted by CDCR to maximize inmate health and health safety and this empowered him to take precautions, without regard (and excluding herein) any separate conduct he may have engaged in by actually treating patients once they did contract the disease.

941. Dr. Igbinosa acquiesced in the failure to protect inmates from Valley Fever despite having the ability and responsibility as Chief Medical Officer of PVSP for many years to protect all inmates from the unacceptable Valley Fever risks that they faced. Yet, he did not adopt protective or precautionary policy to interrupt the mass

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

contraction of the disease suffered before his very eyes. He did not authorize transfers on request, though it was within his power as chief medical officer. And he failed to take sufficient steps, such as providing masks to all who needed or requested them, to reduce the incidence rate. Accordingly, given all these facts and factors, he was deliberately indifferent to the health and safety of inmates in relation to the risk of contracting Valley Fever, including Plaintiffs as specified below.

942. Dr. Igbinosa is named as a defendant with respect to all Plaintiffs that contracted Valley Fever at PVSP during his tenure, which was from approximately 2005-2013. He is named by all PVSP plaintiffs infected during his tenure.

**J. CLARK KELSO**

943. Defendant J. Clark Kelso serves as the Receiver of the California Correctional Health Care Services (CCHCS). Kelso became Receiver in early, 2008.

944. Plaintiffs are suing Defendant Kelso by first asking for a declaratory relief judgment pursuant to 28 U.S.C. § 2201, as formalized in Claim III, *infra*. Plaintiffs seek clarification as to whether the Receiver's office, under Kelso's supervision as of his appointment, had legal authority to intervene in the Valley Fever crisis, as the grant of the Receiver's authority in 2005 was to rehabilitate the State's medical care system and may not have extended to a duty to keep the prisons safe from health threats. If and only if he did have authority to intervene, and notwithstanding any other allegations in this complaint, Plaintiffs name him as a defendant with respect to Claims I and II, for violation of 42 U.S.C. § 1983 and negligence, respectively.

945. On October 3, 2005, federal judge Thelton Henderson issued an order creating the Receivership. In relevant part, it states that, "On June 30, 2005, after six days of evidentiary hearings, this Court ruled from the bench that it would establish a Receivership to take control of the delivery of medical services to all California state prisoners confined by the California Department of Corrections and Rehabilitation." It then indicated it would select a professional to "bring[] the level of medical care provided to California's 165,000 inmates up to constitutional standards."

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

946. Thereafter, on February 14, 2006, the Court issued a second order in which it outlined the Receiver's authority and responsibilities. "The Receiver shall provide leadership and executive management of the California prison medical health care delivery system with the goals of restructuring day-to-day operations and developing, implementing, and validating a new, sustainable system that provides constitutionally adequate medical care to all class members as soon as practicable. To this end, the Receiver shall have the duty to control, oversee, supervise, and direct all administrative, personnel, financial, accounting, contractual, legal, and other operational functions of the medical delivery component of the CDCR."

947. Similarly, "The Receiver shall exercise all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation, and financing of the California prison medical health care system."

948. "The Receiver shall have the power to hire, fire, suspend, supervise, promote, transfer, discipline, and take all other personnel actions regarding CDCR employees or contract employees who perform services related to the delivery of medical health care to class members. The Receiver shall have the power to establish personnel policies and to create, abolish, or transfer positions related to the delivery of medical health care to class members."

949. The Receiver had direct responsibility for the delivery of medical care to inmates but also had supervisory responsibility over all CDCR personnel who "performed services related to" health care.

950. As so defined, the Receiver may or may not have had authority to require the State to take measures to make the prisons safe from health threats, such as the instant disease. Plaintiffs are explicitly not alleging respondeat superior liability, but if the Receiver had knowledge of the Valley Fever epidemic and authority to act, and did not, he may be found to have acquiesced in a constitutionally violative policy.

951. As such, there is a substantial, live controversy between the Plaintiffs, Mr. Kelso, and the other Defendants, as to whether the Receiver's office, and

specifically its acting Receiver Mr. Kelso, had authority to protect California's inmates, and specifically Plaintiffs named herein, from the health threat of Valley Fever as described herein, such as, for example, requiring or adopting protective policies to exclude vulnerable inmates from the most dangerous prisons or by requiring the prisons to implement remedial or protective measures to address the epidemic.

952. This controversy is of sufficient immediacy to warrant the issuance of a declaratory judgment, because it can determine whether Mr. Kelso must defend substantively against Plaintiffs' claims and Defendants' allegations which have suggested that responsibility is the Receiver's exclusively, as, per Defendants' allegations, he was the authority obligated to impose the preventative health care measures at issue in this case.

953. Plaintiffs request a declaration of the parties' rights as to whether or not the Receiver had authority under the 2005 Receivership to have intervened in the Valley Fever epidemic, either through his policy-making authority or via the Receiver's court-ordered authority over specified CDCR personnel.

954. In the event the Court declares that Receiver Kelso may be liable to Plaintiffs based on the grant of authority contemplated by the Receivership, Plaintiffs allege the same two causes of action they maintain against the other Defendants in terms of Mr. Kelso's authority, knowledge of the problem and failure to act to prevent the health threat at issue, as detailed in Claims I and II.

955. Thus, and respecting the declaratory relief request, Plaintiffs alternatively allege that, as Receiver, Kelso was responsible for directing CCHCS to establishing operational policies to combat Valley Fever. He was also responsible for CCHCS' continuing failure to adequately address the Valley Fever epidemic in the prison health system, and by acquiescence in the known ineffective policies, for his failure to have compelled medical personnel under his authority to have acted.

956. On information and belief, the Receiver could have established policies to prevent prisoners at increased risk from Valley Fever from being assigned to hyper-

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

endemic prisons or to identify such prisoners already located there and transfer them away once identified. Defendant Kelso was apprised of the risk to Plaintiffs[47] but failed to establish policies to protect them and was grossly negligent in supervising subordinates who shared this responsibility. As Receiver, Mr. Kelso is named in his official capacity.

957. On information and belief, and no later than 2007, Mr. Kelso knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of Mr. Kelso's position and responsibilities at the time of the 2005-2006 epidemic, and in light of the information known throughout the community of individuals addressing prison health care issues, it is implausible that he would not have had this knowledge.

958. The sources of his knowledge include: the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed

---

[47] *See, e.g.*, information sources such as, "*Coccidioidomycosis in California's Adult Prisons 2006-2010*," CCHCS Public Health and Quality Management Units, April 16, 2012.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

persons, and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, and which referenced "high risk inmates" and which directed prison authorities to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the widely-circulated June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; and the November 11, 2007 policy memorandum, which discusses the various CDHS recommendations from the January 2007 memorandum.

959. However, despite Mr. Kelso's central role as Receiver of California's medical delivery system, the agency tasked with correcting the serious health issues in the California prison system, CCHCS did not timely act, which left hundreds of inmates to catch the disease. Kelso failed to act to otherwise protect inmates from this risk.

960. Defendant Kelso further failed to act to implement recommended remedial measures. Kelso knew at that time that remedial measures existed that could have been implemented at reasonable cost, and that implementing those measures would reduce the risk to inmates who were housed at PVSP or any of the hyper-endemic prisons.

961. However, on information and belief, Receiver Kelso declined to adopt this recommendation and disregarded the CDHS's recommendations for these remedial measures.

962. When, in late 2007 or early 2008, and continuing thereafter, Kelso allowed the policy to exclude only certain medically immune-compromised persons as high-risk, he knowingly disregarded reports, medical literature, findings, studies and

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

general knowledge about Valley Fever that included other high risk groups, such as African-American, Filipino, Latinos, Indians, and other races, and persons over 55 years old, and further failed to implement any of the other recommendations to help minimize the risks of infection.

963. Mr. Kelso was aware of the Valley Fever problem in general by his receipt of the November, 2007 policy, among other documents noted herein; and he was aware that certain groups were at higher risk of suffering more serious complications from it.

964. Mr. Kelso personally participated in the decisions not to exclude these high risk inmates by virtue of his central oversight role of the medical health care system, which ignored the CDHS recommendation to exclude high-risk inmates. As Receiver, he was in a position based on his title to influence and control the policy governing inmate medical safety at the prisons.

965. Mr. Kelso also participated in the decision not to install ground cover, which would have protected all inmates, by not mandating this protocol in the 2007 policy memorandum authored by James Yates to DAI.

966. Mr. Kelso acquiesced in the failure to protect inmates from Valley Fever despite having central responsibility as the person entrusted to directly oversee the California health care system, and he failed in his duty to protect inmates from the unacceptable Valley Fever risks that they faced. Accordingly, due to his central position in the issue and policies at stake, and based on his oversight decision not to implement policies that protected inmate safety, he was deliberately indifferent to the health and safety of inmates in relation to the risk of contracting Valley Fever, including Plaintiffs as specified below.

967. Mr. Kelso is named as a defendant with respect to all Plaintiffs that contracted Valley Fever during his tenure as receiver, which started in approximately January, 2008 to the present. He is identified as a defendant by all plaintiffs.

968. Plaintiffs do not seek punitive damages against Mr. Kelso.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

**SCOTT KERNAN**

969. From 2007 to an unknown date, Defendant Scott Kernan was the Chief Deputy Secretary of Adult Institutions (DAI) for CDCR. Before becoming Chief Deputy Secretary he was the Deputy Director and Acting Director of DAI.

970. DAI is responsible for the operation of California's adult prisons.

971. On information and belief, by no later than 2007 Mr. Kernan knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of Kernan's position and responsibilities at the time of his knowledge, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

972. The sources of Kernan's knowledge include: the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons, and also recommended ground cover throughout affected prison properties; a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover;

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, and which referenced "high risk inmates" and which directed prison authorities to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the widely-circulated June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and recommended environmental mitigation measures to minimize further harm to all inmates; and the November 11, 2007 policy memorandum Kernan was personally provided, which discusses CDHS's recommendations from the January 2007 memorandum.

973. Kernan was aware of the Valley Fever problem in general and was aware that certain groups were at greater risk of suffering more serious complications from the disease.

974. Kernan was the direct superior of Hubbard, co-author of the 2007 policy, and knew that that policy was deficient, but Kernan failed to act to protect susceptible inmates from the known risk, and all inmates for that matter.

975. Kernan further failed to act to require the hyper-endemic prisons to implement recommended remedial measures. Kernan merely suggested wardens consider such steps, even though he knew at that time that the remedial measures could have been implemented at reasonable cost, that implementing those measures would reduce the risk to all inmates who were housed at PVSP or any of the hyper-endemic prisons, and that making those remedial measures optional for the prisons was unlikely to result in their implementation.

976. When, in 2007, Kernan approved implementation of the policy to exclude from the hyper-endemic prisons only certain medically immune-compromised persons, he knowingly disregarded reports, medical literature, findings, studies and general knowledge about Valley Fever that all showed categorically that other groups such as African-American, Filipino, Latinos, Indians, and other races, persons over 55

years old, were also at increased risk, and further failed to implement any of the other recommendations to minimize the risks of infection for all inmates.

977. Kernan personally participated in the decision not to exclude these high risk inmates by virtue of his central oversight role of the 2007 policy, which ignored the CDHS recommendation to exclude high-risk inmates. As Chief Deputy Secretary of DAI, he was in a position to directly influence and possibly dictate the policy governing inmate safety at the prisons. Kernan was listed as a lead official in the policy document itself; it is implausible that he was not directly involved in the policy decisions reflected by the document.

978. Kernan also personally participated in the decision not to install ground cover, which would have protected all inmates, by not mandating this protocol in the 2007 policy memorandum he directly oversaw.

979. Kernan therefore personally participated in and acquiesced in the failure to protect inmates from Valley Fever despite having central responsibility as the DAI representative directly overseeing the 2007 policy memorandum authored by Director Hubbard, and as chief deputy secretary of the branch of CDCR tasked with safety of the operation of the prisons. Kernan failed to carry out his duty to protect all inmates from the unacceptable Valley Fever risks that they faced. Kernan was deliberately indifferent to the health and safety of inmates in relation to the risk of contracting Valley Fever, including plaintiffs identified herein.

980. Mr. Kernan is named as a defendant with respect to all plaintiffs that contracted Valley Fever as a result of the policies and practices implemented around 2007 and that subsequently governed the issue. He is identified as a defendant by all plaintiffs.

**CHRIS MEYER**

981. Defendant Chris Meyer was the Senior Chief of Facility Planning, Construction and Management from 2009 to 2014. In that capacity, Meyer had the authority, the ability and the means to have implemented remedial measures to reduce

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

the risk of infection to all of the Plaintiffs, and could have required construction activities at the prisons to be carried out so as to minimize risks of Valley Fever exposure. He failed to do either.

982. Mr. Meyer was deliberately indifferent to the increased risk of serious harm to one or more named plaintiffs.

983. Meyer knew that fully implemented environmental mitigation measures could have reduced the risk to all of the plaintiffs.

984. On information and belief, by 2007, Meyer knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to all inmates from the disease; (2) the elevated risk of serious complications faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever for all inmates, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.

985. The sources of his knowledge include: the January, 2007 California Department of Health Services memorandum, widely circulated for “the record,” which minimally recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS’ memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, and

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

which referenced "high risk inmates" and which directed prison authorities to respond to a recommendation to look for ways to "minimize the threat of Valley Fever" for all prisoners; the widely-circulated June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm to all inmates; and the November 11, 2007 policy memorandum Hubbard and Winslow authored, which discusses the various CDHS recommendations from the January 2007 memorandum.

986. Defendant Meyer supervised Hysen in announcing publically that the department was designing and implementing a full suite of remedial measures to protect all inmates at the hyper-endemic prisons including PVSP and ASP from infection by Valley Fever. Meyer, however, along with Defendant Hysen, decided not to implement any of the announced remedial measures.

987. Meyer, knowing that all inmates were at elevated risk of infection, declined to implement the recommended remedial measures.

988. Meyer was deliberately indifferent to the increased risk of serious harm to one or more named plaintiffs.

989. Meyer personally participated in the failure to reduce the risk to all inmates.

990. He had the means and the authority to implement those measures yet failed to do so and failed to adequately supervise Hysen who was also responsible for implementing those measures.

991. Defendant Meyer knew of the increased risks to all inmates housed at the hyper-endemic prisons, and in particular to inmates of the identified higher-risk racial, ethnic and age groups.

992. Meyer, as the senior executive of Facilities and Construction for CDCR, had the ability to act no later than 2007 to implement the recommended remedial

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

measures at PVSP, ASP, or any of the hyper-endemic prisons but did not do so until 2013, when minimal soil-stabilization was finally attempted.

993. Meyer had the authority and the means to implement these measures but failed to act to reduce the risks faced by plaintiffs specified below.

994. Meyer was deliberately indifferent to the increased risk of harm these plaintiffs faced, which caused their constitutional injuries.

995. Mr. Meyer is liable to all named plaintiffs that contracted the disease based on the inadequate policies and practices of the State from 2007 forward. All plaintiffs name Mr. Meyer.

**TANYA ROTHCHILD**

996. Defendant Tanya Rothchild is the former Chief of CDCR's Classification Services Unit (CSU) in a period of approximately 2008-2012.

997. Rothchild was aware of the epidemic of Valley Fever because, on information and belief, she received August 3, 2006 and November 20, 2007 memoranda directed at all classification and parole representatives, which discussed the problem and set the exclusion policies.

998. On information and belief, as of the beginning of her tenure at CSU, she knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to all inmates from the disease; (2) the elevated risk of serious consequences faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever for all inmates, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of Ms.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

Rothchild's position and responsibilities as the head transfer agent, and the policy memoranda that governed her job at the time, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that she would not have had this knowledge.

999. The sources of her knowledge also include the contents of the January, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property for the benefit of all inmates, and which was closely tied to the two policy memoranda circulated to all CSU agents; a January, 2007 memorandum written by James Yates, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover to protect all inmates; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at the time to respond to a recommendation to look for ways to "minimize the threat of Valley Fever" as to all inmates; and the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm to all.

1000. However, despite the multiple sources of information she received, Ms. Rothchild, as head of the CSU, not only acquiesced to the state's narrow 2007 exclusion policy, which left hundreds of inmates to catch the disease, she refused to exercise her independent authority as head of the classification services unit to significantly reduce the risk of Valley Fever. Based on her independent power to classify inmates to not be endorsed to dangerous prisons, based on their safety needs pursuant to Title 15, sections 3375(b) and to adopt policies and procedures to avoid such threats to inmate safety, and given Ms. Rothchild's failure to implement such policies, she failed to protect all inmates from the risk of contraction of Valley Fever.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1001. Ms. Rothchild was aware of the Valley Fever problem in general before she became the head of the CSU and she was also aware that certain groups were at even higher risk of suffering serious complications from it.

1002. Ms. Rothchild personally participated in decisions not to endorse inmates away from dangerous prisons by considering the dangerousness of the prisons with respect to all prisoners, or the high risk vulnerability to Valley Fever of certain inmates during the classification process during her tenure. During this interval, Ms. Rothchild at all times stood in a position of authority over the transfer process, and she had the legal right and power to reverse, adjust or expand the classification criteria so as to protect inmates from the contraction of lifelong diseases.

1003. She created and continued policies that authorized the transfer of high-risk and other inmates to the hyper-endemic prisons, without regard to those inmates' susceptibility to infection and without regard to the dangerousness of the prison she was sending them to.

1004. She further failed to adequately supervise subordinates who were responsible for individual classification and transfer decisions that exposed inmates to the risk of infection by virtue of transfer to hyperendemic prisons.

1005. Consequently, Rothchild had the authority and the means to protect inmates by implementation of transfer policies that minimized exposure to dangerous prisons, but she failed to act to reduce the risks faced by plaintiffs specified below and was therefore deliberately indifferent to the increased risk of harm these plaintiffs faced, which caused their injuries.

1006. Ms. Rothchild is liable to all named plaintiffs that contracted the disease based on the inadequate transfer policies and practices of the State from 2008 forward. All plaintiffs name Rothchild.

**TERESA SCHWARTZ**

1007. Defendant Teresa Schwartz is the former Associate Director of Adult Institutions at CDCR and held this position as of January, 2007 when the

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

recommendations and policy decisions about the Valley Fever epidemic were being made. Before then, she was a warden at Vacaville in 2004 and an Associate Director of Reception at CDCR from 2005-2006.

1008. On information and belief, by January 2007, Schwartz knew about: (1) the elevated risk of infection faced by all inmates, including ones in various ethnic and racial groups such as African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (2) the need for remedial measures to address and reduce the risk of Valley Fever for all inmates, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of Schwartz's position and responsibilities at the time of her knowledge, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that she would not have this knowledge.

1009. The sources of her knowledge include the January, 2007 California Department of Health Services memorandum, widely circulated, which minimally recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons, and also recommended ground cover throughout the prison property for the protection of all inmates; the January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover written directly to her; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, and which referenced "high risk inmates" and which directed prison authorities to respond to a

recommendation to look for ways to "minimize the threat of Valley Fever" for all inmates; Dr. Winslow's widely-circulated June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm to all inmates; and the November 11, 2007 policy memorandum she was provided as an associate director, which discusses the various CDHS recommendations from its January 2007 memorandum.

1010. In Warden Yates' memo, Mr. Yates ignored CDH's request to exclude certain racial groups and instead only commented that "PVSP has identified inmates that are high risk due to pulmonary conditions and heavily immunosuppressed patients." Thus, although Ms. Schwartz was aware that CDH had made recommendations about exclusion for high risk inmates, and on information and belief, possessed its memo about it, she adopted Warden Yates' recommendation to only exclude based on certain medical criteria, which was a much narrower policy, and left hundreds of inmates at PVSP to catch the disease. She thus failed to act to protect all inmates from the disease by adopting the overly narrow policy.

1011. Defendant Schwartz further failed to act to implement recommended remedial measures by CDH. One of the recommendations that would have protected all inmates was for Schwartz to implement ground cover throughout the prison property, CDH's recommendation number 3 in its January 2007 memorandum, as discussed in Warden Yates' January, 2007 memorandum to her.

1012. She knew at that time that remedial measures existed that could have been implemented at reasonable cost, and that implementing those measures could reduce the risk to inmates who were housed at PVSP or any of the hyper-endemic prisons, as reflected for example by the possible solutions in this memorandum.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1013. However, Ms. Schwartz declined to adopt this recommendation and disregarded the CDH's recommendation on ground cover and remedial measures, for the benefit of all inmates.

1014. Consequently, Schwartz was aware of the Valley Fever problem in general by her receipt of Yates' January 2007 memo; and she was aware that certain groups were at higher risk of suffering more serious complications from it based on its discussion of CDH's underlying recommendations at that time, as well as from other sources.

1015. Ms. Schwartz personally participated in the decision not to exclude high risk inmates by virtue of her decision to ignore the CDHS recommendation to exclude high-risk inmates and instead adopt Yates' recommendation which only addressed high-risk *medical* inmates. As Associate Director of DAI, she was in a direct position to challenge Mr. Yates' decision that ignored exclusion criteria based on high risk categories tracing to race and national origin, and if she so desired, to overrule his decision in order to carry out her fundamental purpose to guarantee the safety of the prisons and all persons housed and employed within them.

1016. Ms. Schwartz similarly personally participated in the decision not to install ground cover, which would have protected all inmates and staff, by rejecting this option as did Mr. Yates. As the party that Mr. Yates directly advised with his positions on the CDH recommendations, and as an Associate Director of DAI, she held a position and title to correct Mr. Yates' assertion that ground cover was not an option. She had the authority to overrule his decision. Yet, she acquiesced to his position in this regard, despite the encouraging statistics reported by CDHS about the effectiveness of ground cover at a military base, and thereby failed to protect all inmates from Valley Fever.

1017. As an Associate Director of the Department of Adult Institutions, she was given the ability, and charged with the responsibility, to protect all inmates from the unacceptable health risks that they faced. However, she did not act to intervene in



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

this life threatening emergency, because, based on all of the above circumstances reflecting her knowledge of the problem, and her lack of action, to assure inmate safety, she was deliberately indifferent to the health and safety of inmates at PVSP, and all hyperendemic prisons, including plaintiffs as specified below.

1018. Ms. Schwartz is named as a defendant with respect to all plaintiffs that contracted Valley Fever as a result of the policies and practices implemented around 2007 and that subsequently governed the issue. She is identified as a defendant by all plaintiffs.

**ARNOLD SCHWARZENEGGER**

1019. Defendant Arnold Schwarzenegger is the former Governor of California, having acted in that position from 2003 through 2011.

1020. As Governor, Mr. Schwarzenegger was ultimately responsible for the policies and practices of the State of California, and had direct authority over every state employee.

1021. On information and belief, as of 2007, former Governor Schwarzenegger knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, such as landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of Gov. Schwarzenegger's position and responsibilities at the time of his knowledge, being the state's top leader and

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

person with access to the most information and complete power to advance any safety measure, it is implausible that he would not have had this knowledge.

1022. The sources of his knowledge include, on information and belief, the substantive contents of the following documents: informational briefing from a 2005 prisoners' rights group, Prison Movement, sent directly to Governor Schwarzenegger that he would have received, describing the threat posed by Valley Fever to all inmates, and especially its threat to susceptible groups including African-Americans, Filipinos, elderly inmates and the immune-compromised; the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property for the protection of all inmates; a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates," and which directed prison officials to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm for the protection of all inmates; and the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations about exclusion and remediation.

1023. In addition, Governor Schwarzenegger announced in a 2007 press conference that the State's policy and practice of transferring inmates to serve their sentences in Pleasant Valley State Prison would continue unabated, and that he intended to house even more inmates there in the future by increasing construction pursuant to AB900. He brushed off a specific question about inmate safety due to Valley Fever when specifically asked about it by a reporter, a question phrased as:

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

"there are a lot of experts who are saying that if you go ahead with the construction program at some of these prisons, the infill construction program, it's going to lead to more inmates and staff members getting sick and possibly dying. Do you need to adjust the infill component of AB 900?" Schwarzenegger responded: "We will go ahead and build."

1024. Thus, Schwarzenegger knew that construction presented particular danger to prisoners by acknowledging the reporter's question with an answer, and by overruling those concerns with an answer that dismissed the risks posed by the reporter's question in light of the desired construction. The risks and danger that Schwarzenegger knew about, and reflected his deliberate indifference to, were not just the general risk of Valley Fever at the prisons but the risk that more construction would increase exposure to Valley Fever – the very opposite of the remedial measures recommended by experts to avoid broadcasting the spores found in the soils in the hyperendemic region.

1025. However, despite the multiple sources of information he received, Gov. Schwarzenegger, as the chief executive of the State of California, adopted or acquiesced to a narrow 2007 exclusion policy, which left hundreds of inmates to catch the disease. He failed to act to otherwise protect inmates from this risk, including by acquiescing to the failure to install ground cover and remedial measures.

1026. Then-governor Schwarzenegger prepared and approved state budgets for 2006 through 2011. These budgets included bold new construction initiatives entailing massive expenditures at California prisons. Knowing that a Valley Fever epidemic was continuing in those prisons, and aware of the risks that construction posed as the very opposite of remedial measures, Schwarzenegger failed to request, budget or appropriate a single dollar for Valley Fever prevention and remedial measures at the prisons and instead pressed forward with construction projects that created an unacceptable risk to Plaintiffs. These additional and continuing acts of deliberate indifference further increased the excessive risk faced by these Plaintiffs.

1027. Thus, Schwarzenegger either personally ratified or personally acquiesced in the failure to protect inmates from Valley Fever despite having the ability and responsibility as Governor to protect state residents, including inmates, from the unacceptable health risks that they faced. Accordingly, he was deliberately indifferent to the health and safety of inmates in relation to the risk of contracting Valley Fever, including Plaintiffs as specified below.

1028. Former Governer Schwarzenegger is named as a defendant with respect to all Plaintiffs that contracted Valley Fever as a result of the policies and practices implemented around 2007 and that subsequently governed the issue until 2013. He is identified by all plaintiffs as a defendant.

**DR. DWIGHT WINSLOW**

1029. Defendant Dwight Winslow, M.D. was the former Chief Medical Director for CDCR from approximately 2005 through 2014.

1030. On information and belief, Dr. Winslow received the 2004 Kanan Memo and was familiar with its conclusions that inmates of identified ethnic, racial, age, and medical status were at increased risk from Valley Fever.

1031. Dr. Winslow was informed of the epidemic outbreak at PVSP, at least 166 cases in that year alone including 4 deaths, through the California Department of Public Health information memorandum dated January 11, 2007, to "The Record," which was copied to him. The report noted that this caused the rate at PVSP to be 600 times the rate of Fresno County and 38 times the rate in the City of Coalinga. The report advised that 37 staff had been infected, among a pool of 1,200. Along racial lines, 36% were Hispanic, 34% Black, and 41% White with symptoms of varying complexity and severity. It cited age over 40 as a risk factor, as well as belonging to African-American race, though usually associated with greater rates for disseminated CM. Facility C had the highest incidence rate, three times more likely than the next highest, and was low in terms of being locked down. The study recommended that PVSP should consider relocating high risk inmates such as African-Americans or

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

Filipinos and persons who are immunosuppressed. It suggested increasing ground cover and advising inmates to stay indoors on windy days.

1032. Dr. Winslow knew of the January recommendations because he specifically referenced them when he wrote in the 2007 CDCR policy: "The California Department of Health Services (DHS) worked with California Department of Corrections and Rehabilitation (CDCR) staff in analyzing the problem and in assisting in designing an approach to mitigate the effects of the organism that causes cocci or 'Valley Fever.' "

1033. In June, 2007, a panel of experts, including Dr. Winslow, wrote a report called, "Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California." It concluded with a series of recommendations including immediate environmental mitigation and relocating high risk inmates. Thus, Dr. Winslow was intimately familiar with the importance of excluding susceptible inmates by virtue of his receipt, among other things, of the January, 2007 CDH memo and his authorship of the June, 2007 recommendations.

1034. Yet, when Dr. Winslow formed the 2007 CDCR policy, a copy of which is included herewith as Exhibit A, he decided to divert only a certain narrowly-defined subset of medically-compromised inmates from the hyper-endemic prisons, despite the several recommendations to divert high-risk inmates, and his own recognition that racial factors – Asian, Blacks and Hispanics, notably – increased the susceptibility of these inmates to more serious forms of the disease.

1035. If the 2007 policy required further steps to be adopted as policy, they are not evident from the face of the document, which acts as a mandatory directive to subordinates and sets immediate deadlines for its compliance. It could possibly have been ratified by Winslow's superiors, but if so, such ratification was not apparent from the policy memorandum itself, and the most superior person it was noted as being copied to, Defendant Scott Kernan, was not a doctor.

1036. Dr. Winslow's 2007 policy continued to allow members of high-risk ethnic and racial groups to be housed at prisons where the risk of infection was known to be greatly increased, along with persons from the general inmate population, who also faced a dramatically increased risk of contraction. Winslow had the authority and the power as state medical director to issue a definitive policy excluding all inmates from these locations, and insisting on implementation of the recommended environmental remedial measures to further reduce the risk for all inmates. Yet his policy decision required neither of these critical precautionary steps. Dr. Winslow did not adopt as policy the vast majority of his own recommendations from the June, 2007 report.

1037. Winslow knew that this policy would expose virtually all inmates including the plaintiffs in this action to an increased risk of harm, and he had the ability and the means to have reduced or prevented that risk, but chose not to do so. Winslow was deliberately indifferent to inmate medical health and welfare, despite being the person specifically charged with it through his powers are prison medical director.

1038. Although Winslow knew and acknowledged that dust control measures would reduce Plaintiffs' risk of contracting Valley Fever, his 2007 policy suggested only that prisons "consider increasing ground cover throughout their property." Winslow, as co-author of the policy, could have made these measures mandatory and thereby reduced the risk of infection for all inmates, but he chose not to do so.

1039. Dr. Winslow personally participated in the decision not to mandate the installation of ground cover or other dust control measures at the prisons, measures which would have protected all inmates resident at those facilities from 2007 onward. Winslow was deliberately indifferent to the risks of infection faced by prisoners including plaintiffs as specified below.

1040. Furthermore, thereafter, Dr. Winslow did nothing for the next 6 years in terms of adjusting his overly narrow exclusion policy, upon subsequent information that it had failed to stem the tide of new infection cases. In the ensuing years after the

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

policy was implemented, Winslow did not expand the exclusion criteria, impose the environmental measures or otherwise react to events on the ground, which reflected that incidence rates were still at epidemic proportions. At all times, he had the authority and position to adjust his policy, but he declined to make any changes in spite of continuing evidence of its inefficacy, which further reflects his deliberate indifference to the significantly elevated risk of contraction of Valley Fever faced by the inmate population, including the Plaintiffs named herein.

1041. Former medical director Winslow is named as a defendant with respect to all plaintiffs that contracted Valley Fever as a result of the policies and practices implemented around 2007, his failure to correct them, and that subsequently governed the issue through at least 2013, when the federal court intervened. (Today, there are exclusion criteria, but remediation of the grounds is not believed to have occurred in any meaningful way, thus continuing to expose inmates to the disease.) Dr. Winslow is identified by all plaintiffs as a named defendant and the conduct alleged herein was a matter of his duties emanating as a prison administrator, not the treatment of patients.

**CARL WOFFORD**

1042. Defendant Carl Wofford was the acting warden of Avenal State Prison (ASP) from 2013 to approximately December 20, 2013, when he was appointed warden of Avenal.

1043. As warden, Mr. Wofford is responsible for the policies and practices of the prison as well as for its operational decisions, and has direct authority over every employee at ASP.

1044. On information and belief, by 2013, Mr. Wofford knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease, particularly at ASP, where he was being assigned; (2) the elevated risk of serious infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; (3) the significantly elevated risk to any inmate of contraction of this incurable virus given the incidence rates at ASP; and (4) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, proper ventilation, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went outside under adverse conditions. Indeed, in light of his position and responsibilities at the time of his knowledge, and in light of the widespread information known throughout the community of individuals who served as prison officials and prison medical staff/officials about the Valley Fever problem by 2013, it is virtually impossible that he would not have had this knowledge.

1045. The sources of his knowledge include the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of high-risk groups, such as African-Americans, American Indians, and Asians as well as immune-compromised/immune-suppressed individuals and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by the warden that immediately preceded him, Mr. James Yates, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at the time to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm for the protection of all inmates; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

recommendations and was directed to all wardens at the time; the October 2012 CCHCS report which assembled various reports and studies to comprehensively publicize the extent of the Valley Fever problems; the June, 2013 detailed federal court order specifically directed at PVSP and ASP; and numerous other lawsuits, media reports and other public outlets from 2009 forward in which inmates of every color and creed filed suit, and protested in the media, their contraction of the disease at Avenal and PVSP, the two prisons with the highest incidence of the disease in California.

1046. However, despite the multiple sources of information that he received, Warden Hartley, as head of ASP, not only acquiesced to the state's narrow 2007 exclusion policy, which left hundreds of inmates to catch the disease, he refused to exercise his independent authority as warden to transfer inmates for their safety. Based on his independent power to transfer inmates out of ASP, or prevent their transfer to ASP, based on their safety needs pursuant to Title 15, sections 3379(a)(4), 3379(a)(9), 3379(a)(9)(F)(2) and 3379(a)(9)(G)(1) and to adopt policies and procedures to avoid threats to inmate safety, and given Warden Wofford's failure to implement such policies, he failed to protect inmates from the continuing risk of contraction of Valley Fever.

1047. Warden Wofford was aware of the Valley Fever problem when he assumed the position of acting warden in 2013.

1048. Warden Wofford personally participated in continuing decisions not to exclude all inmates, including ones not deemed high risk, even though they are equally likely on average to contract the virus and may still, and often do, have serious consequences from it.

1049. Warden Wofford also personally participated in the continuing decisions not to install ground cover or implement other remedial measures that would have protected all inmates.

1050. Warden Wofford personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of

contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at Avenal State Prison from his ascension to the post of acting warden, from 2013 forward, including plaintiffs as specified below.

**JAMES A. YATES**

1051. Defendant James A. Yates is the former warden of Pleasant Valley State Prison and is believed to have occupied that position from at least 2005 until 2011.

1052. Yates was aware of the epidemic of Valley Fever occurring at his prison throughout this time, or at least since August 2006 – and perhaps as early as 2003 when rates at PVSP started to spike -- because he was copied on and received at the time an August 3, 2006 memorandum directed at all wardens which discussed the problem and which set the original exclusion policy.

1053. Mr. Yates was minially and directly apprised of the need to exclude high risk inmates by virtue of his receipt of a January 12, 2007 California Department of Health memorandum, which recommended that high risk groups, such as African-Americans and Filipinos, be excluded from the area, because he responded to it.

1054. However, in responding to that memo, Mr. Yates ignored the request to exclude certain racial groups and instead only commented that "PVSP has identified inmates that are high risk due to pulmonary conditions and heavily immunosuppressed patients." He ignored the issue of exclusion by other criteria, such as by racial composition.

1055. Despite knowing the susceptibility of high-risk inmates given his possession of the CDH memorandum, Yates failed to adopt policies or practices to avoid the transfer of inmates to the prison or to protect such inmates located there, during his tenure and afterward, though he had the power to do so pursuant to Title 15, § 3375(b), which allowed him to consider risk to an inmate's health, among other considerations, in accepting an inmate for transfer.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1056. Defendant Yates further failed to act to implement recommended remedial measures at PVSP. One of the recommendations that would have protected all such inmates was ground cover throughout the prison property,

1057. Yates failed to implement this recommendation.

1058. Yates was aware of the Valley Fever problem since the start of his tenure at Warden; he was aware that certain groups were at higher risk of suffering more serious complications from it no later than January 2007; he personally participated in the decision not to exclude these high risk inmates; he also personally participated in the decision not to install ground cover, which would have protected all inmates. Taken together, the facts show that he was deliberately indifferent to the health and safety of all inmates at PVSP, including the plaintiffs below.

1059. On information and belief, by 2013, Mr. Yates knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to all inmates from the disease; (2) the elevated risk of serious infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; (3) the significantly elevated risk to any inmate of contraction of this incurable virus given the incidence rates at PVSP; and (4) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, proper ventilation, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went outside under adverse conditions. Indeed, in light of his position and responsibilities at the time of his knowledge, and in light of the widespread information known throughout the community of individuals who served as prison officials and prison medical staff/officials about the Valley Fever problem, it is impossible that he would not have had this knowledge.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1060. The sources of his knowledge include reports of the greatly increased number of infections at PVSP beginning in 2003; the 2005-2006 intervention of various third parties during the CSH construction; the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of high-risk groups, such as African-Americans, American Indians, and Asians as well as immune-compromised/immune-suppressed individuals and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by himself, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at the time to respond to a recommendation to look for ways to "minimize the threat of Valley Fever" but did not mandate anything; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations and was directed to all wardens at the time; the October 2012 CCHCS report which assembled various reports and studies to comprehensively publicize the extent of the Valley Fever problems, a problem he knew about since at least 2005; the June, 2013 detailed federal court order specifically directed at PVSP and ASP; and numerous other lawsuits, media reports and other public outlets from 2005 forward in which inmates of every color and creed filed suit, and protested in the media, their contraction of the disease at PVSP, the prison with the singularly highest incidence of the disease in California.

1061. Despite the multiple sources of information that he received, Warden Yates, as head of PVSP, not only acquiesced to the state's narrow 2007 exclusion policy, which left hundreds of inmates to catch the disease, he refused to exercise his

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

independent authority as warden to transfer inmates for their safety. Based on his independent power to transfer inmates out of ASP, or prevent their transfer to ASP, based on their safety needs pursuant to Title 15, such as sections 3379(a)(4), 3379(a)(9), 3379(a)(9)(F)(2) and 3379(a)(9)(G)(1) or other sections, and to adopt policies and procedures to avoid threats to inmate safety, and given Warden Yates' failure to implement such policies, he failed to protect inmates from the continuing risk of contraction of Valley Fever.

1062. Warden Yates personally participated in continuing decisions not to exclude all inmates, including ones not deemed high risk, even though they are equally likely on average to contract the virus and may have serious consequences from it.

1063. Warden Yates also personally participated in the continuing decisions not to install ground cover or implement other remedial measures that would have protected all inmates.

1064. Warden Yates personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at PVSP, including plaintiffs, during his tenure.

1065. Former PVSP Warden Yates is named as a defendant with respect to all Plaintiffs that contracted Valley Fever at PVSP from 2007 to the present, as his prison policies continue to affect inmates transferred to PVSP even after his departure in or about 2012.

**B. Defendants Failed to Disclose Known Risks**

1066. Each Defendant responsible for CDCR-wide or facility-level inmate operations had the ability to disclose to Plaintiffs essential facts regarding the risks from Valley Fever, the increased risk that each Plaintiff faced, and the fact that those increased risks, and Plaintiffs' resulting injuries, were caused by Defendants' actions, but instead purposely failed to disclose those facts.

1067. Specifically, Defendants failed to disclose to Plaintiffs the risk factors for the disease, the likelihood of exposure, the common symptoms and progress of the disease, the seriousness of the injuries it causes, the dangerous local conditions that increased Plaintiffs' likelihood of contracting the disease, and the fact that Defendants themselves were responsible for the increased risk that Plaintiffs faced.

1068. Defendants Brazelton, Yates, Igbinosa and Frauenheim had a duty and could have disclosed those facts but instead failed to disclose them to each Plaintiff who contracted the disease at PVSP during those Defendants' respective tenures or thereafter.

1069. Defendant Hartley and Wofford, similarly, had a duty and could have disclosed those facts but instead failed to disclose them to Plaintiffs who contracted the disease at ASP during their tenure.

1070. Defendants Beard, Cate, Hubbard, Kelso, Schwartz, Schwarzenegger, and Winslow had a duty and could have disclosed those facts but instead failed to disclose them or to set policy or take action to require that disclosure, to all plaintiffs within CDCR at all times during these defendants' tenure and thereafter.

1071. Defendants failed to disclose these facts, even in purported "educational" materials that they belatedly provided to some inmates at some of the prison locations, which intentionally minimized the disclosures to each inmate.

1072. Because these defendants affirmatively failed to disclose these facts from plaintiffs, plaintiffs were not fully aware of the increased risks they faced at their locations of confinement, or, as applicable, that plaintiffs were particularly susceptible to those risks, or that defendants' wrongful conduct had caused them to be exposed to those increased risks.

1073. Plaintiffs relied on defendants to provide such information and to adequately educate plaintiffs about those risks and the nature of plaintiffs' injuries, and defendants intended that plaintiffs should so rely.

1074. Plaintiffs, for whom any appreciable interval elapsed between the onset of symptoms potentially attributable to Valley Fever and the date that those plaintiffs initiated administrative or legal action with respect to Valley Fever, did not bring such actions sooner because of those defendants' deliberate failure to disclose all the essential facts necessary for plaintiffs to understand their injuries and attribute their injuries to defendants' conduct. Such failure to disclose the risks was unconscionable.

## VII.
## EACH PLAINTIFF SEEKS RELIEF ONLY AGAINST CERTAIN DEFENDANTS IDENTIFIED BELOW AND ONLY AS TO CERTAIN CLAIMS

1075. On information and belief, and throughout their tenure in their offices described above in paragraphs 19-38, Defendants Cate, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow all knew of the increased risk of Valley Fever in the hyperendemic prisons, particularly at PVSP and ASP, knew that recommended measures could reduce that risk, and had the ability, means and authority to implement measures, including policy measures, throughout their tenure to ameliorate the problem. None did so. As such, these defendants are sued by all plaintiffs for creating or contributing to the policies and practices that created the Valley Fever problem, or failing to implement a solution after the initial epidemic, with respect to California prisoners.

1076. On information and belief, and throughout their tenure in their offices described above in paragraphs 19-38, Defendants Igbinosa, Yates, Brazelton and Frauenheim also knew of the increased risk of Valley Fever at Pleasant Valley State Prison, knew that recommended measures could reduce that risk, and had the ability, means and authority to implement such measures throughout their tenure. None did so. As such, these defendants are sued by all plaintiffs who contracted VF at PVSP for knowingly disregarding serious health risks to inmate health. If a given plaintiff contracted VF before 2012, he names only Messrs. Igbinosa and Yates; if he contracted in 2012-2013, he adds Mr. Brazelton; if in 2013 or 2014, he also includes Mr. Frauenheim.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1077. On information and belief, and throughout his tenure in his office described above in paragraphs 22 and 34, defendants former warden James Hartley and current warden Carl Wofford also knew of the increased risk of Valley Fever at Avenal State Prison, knew that recommended measures could reduce that risk, and had the ability, means and authority to implement such measures throughout his tenure. They did not do so. As such, Messrs. Hartley and Wofford is sued by all plaintiffs who contracted VF at Avenal from 2005-2013 and Mr. Wofford from 2013-2014, for knowingly disregarding a serious health risk to them.

1078. On information and belief, and throughout his tenure in his office described above in paragraph 20 beginning in 2013, Defendant and CDCR Secretary Jeffrey Beard knew of the increased risk of Valley Fever in the hyperendemic prisons, particularly at PVSP and ASP, knew that recommended measures could reduce that risk, and had the ability, means and authority to implement these measures throughout his tenure. He did not do so, except to a certain extent by acquiescence to a federal court order. As such, Secretary Beard is named as a defendant by plaintiffs who contracted Valley Fever in 2013 and thereafer, for failing to protect all inmates from serious health risks.

1079. Accordingly, the following plaintiffs are asserting claims against only the following defendants and assert only the corresponding state law negligence claim ("state claim") or federal civil rights claim ("federal claim") or both, as set forth below in the remaining paragraphs of this particular section.

1080. Marlon Altamirano brings a state and federal claim.

1081. Infected at PVSP in 2013, Plaintiff Altamirano brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

1082. Derrico Aubrey brings a federal claim.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1083. Infected at PVSP in 2010, Mr. Aubrey brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

1084. Myrick Banks brings a state and federal claim.

1085. Infected at PVSP in 2012, Plaintiff Banks brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

1086. Paul Blevins brings a state and federal claim.

1087. Infected at ASP in 2014, Plaintiff Blevins brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Wofford, and Beard.

1088. Antone Brodis brings a state and federal claim.

1089. Infected at ASP in 2013, Plaintiff Brodis brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Wofford and Beard.

1090. Derick Brown brings a state and federal claim.

1091. Infected at PVSP in 2012, Plaintiff Brown brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

1092. Mr. Larry Caballero brings a federal claim.

1093. Infected at PVSP in 2011, Mr. Caballero brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

1094. Corey Campbell brings a federal claim.

1095. Because he became infected at NKSP in late 2010, Campbell brings claims against Defendants Cate, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.

1096. Clifford Chaney brings a federal claim.

1097. Because he became infected at Corcoran in 2011, Chaney brings claims against Defendants Cate, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.

1098. Jose Chavez brings a federal claim.

1099. Infected at ASP in 2011, Chavez brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, and Winslow.

1100. Mr. Ebert Consuegra brings a federal claim.

1101. Infected at PVSP in 2011, Mr. Consuegra brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

1102. Barry Cook brings a federal claim.

1103. Because he became infected at PVSP in 2012, Cook brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1104. Elmer DeLeon brings a state and federal claim.

1105. Because he became infected at ASP in 2013, De Leon brings claims against Defendants Beard, Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow. These Defendants knew inmates like De Leon were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

1106. Roy Doss brings a federal claim.

1107. Infected at ASP in 2010, Plaintiff Doss brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.

1108. Dennis Dunham brings a federal claim.



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1109. Because he became infected at ASP in 2011, Dunham brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.

1110. Gonzalo Escoto brings a federal claim.

1111. Infected at ASP in 2011, Mr. Johnson brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, and Winslow.

1112. Jerome Felder brings a federal claim.

1113. Infected at PVSP in 2011, Plaintiff Felder brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1114. Joseph Ferris brings a federal claim.

1115. Infected at PVSP in late 2010, Plaintiff Ferris brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1116. Andra Foster brings a federal claim.

1117. Infected at PVSP in 2011, Plaintiff Foster brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1118. Stephen Franklin brings a federal claim.

1119. Because he became infected at PVSP in 2010, Franklin brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1120. Ruben Gaeta brings a federal claim.

1121. Infected at PVSP in 2011 Plaintiff Gaeta brings a claim against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothschild, Schwarzenegger, Winslow, and Yates.

1122. Aubrey Galloway brings a federal claim.

1123. Because he became infected at PVSP on or about 2010, Galloway brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1124. Manuel Gamboa brings both a state and federal claim.

1125. Because he became infected at CCI in 2013, Gamboa brings claims against Defendants Cate, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.

1126. Justin Garrett brings a state and federal claim.

1127. Because he became infected in 2012 while at Avenal, Garrett brings a claim against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothschild, Schwartz, Schwarzenegger, and Winslow.

1128. Luis Guzman brings a federal claim.

1129. Infected at PVSP in 2010, Plaintiff Guzman brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1130. Sinohe Hercules brings a state and federal claim.

1131. Because he became infected at PVSP in 2012, Hercules brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1132. Victor Herrera brings a federal claim.

1133. Infected at PVSP in 2011, Mr. Herrera brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

1134. Curtis Jackson brings a federal claim.

1135. Infected at Pleasant Valley in 2011, Mr. Jackson brings claims against Defendants Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1136. Mandaz Johnson brings a state claim.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1137. Infected at PVSP in 2013, Plaintiff Johnson brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

1138. Edward Jones brings a state and federal claim.

1139. Because he became infected at PVSP in 2012, Jones brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1140. Albert Lee brings a federal claim.

1141. Infected at ASP in 2011, Mr. Lee brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, and Winslow.

1142. Mikhiel Leinweber brings a federal claim.

1143. Infected at PVSP in 2011, Leinweber brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

1144. Cleofas Lewis brings a state and federal claim.

1145. Because he became infected at PVSP in 2012, Cleofas Lewis brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1146. Michael Madeira brings a state and federal claim.

1147. Diagnosed at ASP in 2013, Plaintiff Madeira brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Beard, and Wofford.

1148. Robert Maeshack brings a federal claim.

1149. Because he became infected at PVSP in 2010, Maeshack brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1150. Daniel Masushige brings a state and federal claim.

1151. Because he became infected at WSP in 2012, Masushige brings claims against Defendants Cate, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.

1152. Enrico Mellon brings a federal claim.

1153. Because he became infected at PVSP in 2012, Mellon brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1154. Lich Nguyen brings a federal claim.

1155. Infected at PVSP in 2011, Plaintiff Nguyen brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

1156. Mr. James Ortega brings a federal claim.

1157. Infected at PVSP in 2012, Ortega brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

1158. Mack Page brings a state and federal claim.

1159. Infected at PVSP in 2013, Page brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

1160. Tyejahn Parker brings a federal claim.

1161. Infected at ASP in 2011, Mr. Parker brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, and Winslow.

1162. Marvin Pierce brings a state and federal claim.

1163. Because he became infected at PVSP in 2012, Pierce brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1164. Carlos Quintanilla brings a state and federal claim.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1165. Infected at PVSP in 2013, Mr. Quintanilla brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

1166. Earl Randle brings a federal claim.

1167. Because he became infected at PVSP in 2012, Mr. Randle brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1168. Jay Roach brings a federal claim.

1169. Because he became infected at PVSP in 2010, Roach brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1170. David Robinson brings a federal claim.

1171. Because he became infected at PVSP in 2011, Robinson brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1172. Antonio Robles brings a state and federal claim.

1173. Infected at PVSP in 2012, Plaintiff Robles brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

1174. Anthony Rodriguez brings a federal claim.

1175. Infected at PVSP in 2011, Mr. Rodriguez brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

1176. Johnny Sanchez brings a state and federal claim.

1177. Because he became infected at PVSP in 2012, Sanchez brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1178. Tyrone Sanders brings a state and federal claim.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1179. Because he became infected at PVSP in 2012, Sanders brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1180. Adrian Sepulveda brings a state and federal claim.

1181. Because he became infected at PVSP in 2012, Sepulveda brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1182. Charles Singleton brings a federal claim.

1183. Infected at ASP in 2011, Plaintiff Singleton brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, and Winslow.

1184. Manuel Tejeda brings a federal claim.

1185. Infected at PVSP in 2011, Plaintiff Tejeda brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

1186. Michael Wells brings a federal claim.

1187. Because he became infected at PVSP in 2012, Wells brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

1188. Carter Williams brings a federal claim.

1189. Infected at ASP in 2011, Plaintiff Williams brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, and Winslow.

1190. Finley Wimbley brings a state and federal claim.

1191. Infected at PVSP in 2013, Plaintiff Wimbley brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, Winslow, Yates, and Beard.

1192. Richard Woodard brings a federal claim.

1193. Because he became infected at PVSP in 2012, Woodard brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

## VIII.

## FIRST CLAIM FOR RELIEF – VIOLATION OF THE EIGHTH AMENDMENT (42 U.S.C. § 1983)

### A. Defendants Knew of Serious Health Risks to Plaintiffs and Decided Not to Act and Protect Plaintiffs

1194. Plaintiffs incorporate the allegations of paragraphs 1-1193, as if these allegations were fully set forth herein.

1195. This claim is brought by all Plaintiffs that identified, within the section entitled "EACH PLAINTIFF SEEKS RELIEF ONLY AGAINST CERTAIN DEFENDANTS IDENTIFIED BELOW AND ONLY AS TO CERTAIN CLAIMS," that they are asserting a federal claim.

1196. Each respective Plaintiff asserting a federal claim seeks relief only against those Defendants that each respective Plaintiff identified in the section entitled "EACH PLAINTIFF SEEKS RELIEF ONLY AGAINST CERTAIN DEFENDANTS IDENTIFIED BELOW AND ONLY AS TO CERTAIN CLAIMS." Notwithstanding the above, Plaintiffs asserting a federal claim only assert this claim against Defendant Kelso in the event that he is deemed to have had authority to have intervened in the Valley Fever crisis, pursuant to Plaintiffs' cause of action for declaratory relief with respect to him, Claim III.

1197. Each plaintiff is a human being.

1198. Each plaintiff had a federally-protected Eighth Amendment right to be free from cruel and unusual punishment, a right secured by the United States Constitution under 42 U.S.C. § 1983.

1199. Defendants acted under color of state law in that Defendants are state employees, operate the state prisons, and carry out the policies and practices described



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

herein under the authority of California statute, regulation, and policy, to control Plaintiffs' lives, prison housing location and prison housing conditions.

1200. The Eighth Amendment prohibits inhumane methods of punishment and inhumane conditions of confinement.

1201. When the State takes a person into its custody and holds him against his will, the Constitution imposes upon it a corresponding duty to assume a responsibility for his safety and general well-being. When the State fails to provide for the needs of a confined individual, including appropriate medical attention and reasonable safety, it transgresses the substantive limits on state action set by the Eighth Amendment.

1202. An Eighth Amendment violation is stated when officials can be shown to have known of and disregarded a substantial risk of serious harm to prisoners.

1203. It is cruel and unusual punishment under the Eighth Amendment to expose inmates to adverse environmental toxins that cause serious harm.

1204. Each Defendant was aware that inmates housed at the hyper-endemic prisons faced a significantly elevated risk of serious harm from infection by the coccidoides spores known to be present at elevated levels there, and knew that the risk at specific prisons and for specific groups was even greater. Each of the Defendants had the authority, the ability and the means to reduce the risk of infection but each was deliberately indifferent to those risks and failed to take action to prevent or reduce the risk, causing Plaintiffs' constitutional injuries.

1205. Further, each Defendant's actions and failure to act as alleged herein – which occurred throughout their tenure set forth in the section entitled "THE DEFENDANT PARTIES" – proximately and substantially caused significantly increased risk to each Plaintiff who later became infected. Each Defendant's failure to implement protective remedial measures throughout their tenure set forth in the section entitled "THE DEFENDANT PARTIES," as well as at any time after their tenure and prior to the dates each Plaintiff herein became infected, allowed the dangerous conditions at the prison to continue unabated and proximately and substantially caused

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

those Plaintiffs to be exposed to a significantly greater risk of exposure at all times subsequent. Had each Defendant acted during their tenure set forth in the section entitled "THE DEFENDANT PARTIES" but prior to the date of injury, then Plaintiffs' risks of contracting Valley Fever would have been significantly reduced.

1206. Similarly, the failure by each Defendant with policy-making responsibility to establish and implement a policy during their tenure (set forth in the section entitled "THE DEFENDANT PARTIES") that would have excluded at-risk inmates or higher-risk inmates from the hyper-endemic prisons at any time before a Plaintiff became infected, thereby proximately and substantially caused that Plaintiff to be present at a hyper-endemic prison and to be exposed to an increased risk of infection leading to their injury.

1207. Defendants knew there was a serious, epidemic level of risk of harm to Plaintiffs and all prisoners that faced incarceration in hyper-endemic prisons.

1208. Defendants had actual knowledge of the serious risk of harm to the Plaintiffs but nevertheless ignored the risks and exposed and continued to expose Plaintiffs to an unacceptably high risk of contracting Coccidioidomycosis by failing to adopt an exclusion policy that protected these high risk inmates.

1209. Defendants' failure to adopt an appropriate exclusion policy, and each Defendants' actions and omissions in connection with the incarceration of inmates, including Plaintiffs, at hyper-endemic prisons, and each Defendants' failure to take the required remedial actions to make those prisons safer for all inmates, including in particular PVSP and ASP, caused Plaintiffs' injuries.

1210. Defendants' knowing, reckless, unlawful policies created and maintained an unacceptably high risk to prisoners. Defendants are liable for these unconstitutional policies and practices and negligent decisions because they personally participated in the promulgation, adoption, passage, continuation, or supervision of them.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1211. Through the policies and practices they adopted, promulgated, followed, and executed, Defendants knew or recklessly ignored the fact that they would cause the unconstitutional deprivation of Plaintiffs' rights.

1212. Specifically, under these policies and practices, subordinate officials did not transfer inmates away from the most dangerous prisons, did not identify inmates at high risk in the classification process, and consequently, continued sending inmates including Plaintiffs to endemic and hyper-endemic prisons without regard to susceptibility or risk, either of the person or the prison.

1213. Furthermore, Defendants failed to authorize and implement measures to reduce the risk at these prisons by providing ground cover, implementing soil stabilization, installing protective ventilation systems and other measures, or even warning inmates about the danger they faced.

1214. Defendants as supervisors knew with substantial certainty that these failures would cause inmates including Plaintiffs to contract Valley Fever, and that their failure to properly train and supervise subordinate prison authorities would cause the deprivation of Plaintiffs' right to safety under the Eighth Amendment.

1215. Defendants, as supervisors, did nothing to prevent subordinate prison authorities from causing Plaintiffs' greatly increased risk of contracting Valley Fever.

1216. Defendants have engaged in a pattern and practice of conduct since at least 2006 which they knew would place and keep California prison inmates including Plaintiffs incarcerated at locations of unreasonable risk of personal injury.

1217. Despite numerous, repeated and explicit warnings about the serious danger of Valley Fever to inmates at the hyper-endemic prisons, and most especially to those identified as high-risk persons with enhanced susceptibility for disseminated cocci disease, Defendants failed to take the reasonable, obvious steps needed to protect those involuntarily in their charge.

1218. Defendants continued their practice and policy to transfer and house inmates in the hyper-endemic prisons, including those individuals known by them to be

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

at heightened risk for contracting disseminated cocci disease, and as a result, caused Plaintiffs to contract a disease that is incurable, inflicts long-term suffering, and will likely play a part in the inmates' early death.

1219. Defendants knowingly and recklessly promulgated or continued a policy or practice of transferring inmates to unreasonably dangerous prisons without regard to their health.

1220. Defendants knowingly and recklessly promulgated or continued a practice and policy that failed to take any steps to protect those inmates transferred to hyper-endemic prisons.

1221. Defendants knowingly and recklessly promulgated or continued a practice and policy of failing to employ mitigation measures at the dangerous prisons, such as paving, landscaping or planting grass to minimize the spread of the spores, or implementing appropriate measures with respect to ventilation systems to prevent spores from entering the interior of the facilities.

1222. Defendants knowingly and recklessly promulgated or continued the practice and policy of failing to warn inmates about the dangers of prisons to which they were involuntarily and forcibly transferred.

1223. These actions, including knowing transfer to dangerous prisons, failure to warn inmates about the dangers within those prisons, and the failure to take any action to protect inmates from the dangers within those prisons, particularly Pleasant Valley State Prison, were taken by the Defendants pursuant to the State's practice and policy, which they personally participated in adopting, promulgating, executing or continuing.

1224. Those practices and policies, as well as the subsequent ministerial actions and inactions described herein, actually and proximately and substantially caused Plaintiffs' harm.

1225. Defendants had the power and the obligation to make policies, and implement practices, that would have reduced the risk of infection by Valley Fever.

1226. Defendants acted with a conscious disregard for human life in deciding to transfer prisoners to hyper-endemic areas and defied the many recommendations, input, advice, reports, expert suggestions, in-house studies, outside reports, generally-available academic material, as well as other credible and authoritative information sources that warned them of the dire risks and consequences they imposed on Plaintiffs by their inaction with respect to the spread of cocci.

1227. Each Plaintiff asserting a federal civil rights claim under section 1983 knew or should have known, only within 4 years of filing his original complaint, that the harm he suffered was caused by wrongful conduct.

**B. Defendants' Conduct Justifies an Award of Punitive Damages**

1228. Defendants have engaged in a pattern and practice since at least 2006 that has placed and kept Plaintiffs in situations of unreasonable risk of substantial personal harm.

1229. Despite numerous, repeated and explicit warnings about the danger of Valley Fever at the hyper-endemic prisons, and especially the danger to those individuals identified as higher-risk for the disseminated disease, Defendants failed to take any of the reasonable and obvious steps needed to protect those in their charge.

1230. Defendants took no action to mitigate Plaintiffs' exposure to Valley Fever at their prisons until 2011 when, after multiple court orders, they finally took the minimal and incomplete action of applying a two-year sealant to the soil at PVSP.[48]

1231. Not until March 2013 did Defendants test and later install minimal dust control devices – only air filters and door sweeps – in some of the prison facilities.[49]

---

[48] *See* Deborah Hysen Declaration, May 6, 2013, ¶ 3**.**

[49] *See* Hysen Declaration ¶¶ 4-5.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1232. After similar delays, Defendants only posted incomplete warning signs about the symptoms of Valley Fever and provided limited educational materials and training to prison medical staff.[50]

1233. Notably absent from the posted signs and the Defendants' educational materials were the critical facts that Valley Fever is incurable and can be fatal, that certain individuals such as African-Americans, Hispanics, Filipinos and other Asians or those with immune-compromising conditions are at a much higher risk of becoming seriously ill and dying from Valley Fever, and that inmates should avoid exposure to soil, dust, and windy conditions.[51]

1234. Defendants knew that Valley Fever has no cure and requires a lifetime of medical management. They knew that inmates had died from Valley Fever that they contracted while in custody, and that certain identifiable groups of people suffer the severe form of the disease at much higher rates.[52] Yet Defendants took no action other than posting misleadingly incomplete signs and distributing similar leaflets, which downplayed or omitted the crucial information about risk groups -- and more importantly, did nothing to address the causes or the results of exposure to the disease.

1235. As Dr. Galgiani stated, "In my opinion, the incidence of Valley Fever in [PVSP and ASP] is unacceptably high from a public health standpoint, and avoidable inmate deaths are occurring as a result."[53]

---

[50] *See*, e.g., Declaration of Michael Stainer, May 6, 2013 [Exhibits C, D and E].

[51] See, e.g., Stainer Declaration, Exhibits C, D and E.

[52] Kanan Memo, p. 3 ["The risk and incidence of disseminated disease are highest in American Indians, Asians, Blacks, and immunocompromised individuals, including those taking chronic steroids."]; *see also*, CDCR October 27, 2006 Memo; Smith, Pappagianis, et al, *Human Coccidioidomycosis*, Bacteriology Reviews (September, 1961), 25(3), at p. 314, and fns. 5, 27.

[53] Galgiani Declaration, April 25, 2013 [Docket 2598], ¶ 2.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1236. Defendants admitted in pleadings in *Plata* that they took no steps to mitigate the threat of harm posed to prisoners in the hyper-endemic prisons, apart from inadequate educational materials and a policy that protected immune-compromised inmates but ignored the risk to the high-risk racial and ethnic groups, between the years 2006 and 2011, and beyond.[54] Defendants took no action to protect Plaintiffs even though were aware "that Valley Fever presents a serious risk to inmate health."[55]

1237. Defendants declined to implement any kind of ground cover or other soil stabilization, as recommended by the California Department of Health, on the purported basis it was "too costly" even though ground cover "was demonstrated to be effective at reducing airborne spores by military operations during World War II."[56] Instead they waited until compelled by court order in 2011, and even then, deployed a minimal soil sealant with an estimated two-year life span.[57]

1238. In April 2012, the Receiver completed a study with several grim findings. Because of Defendants' years-long pattern and practice of ignoring the known heightened risk of disease to certain groups of inmates, at least 355 prisoners required hospitalization due to Valley Fever infection from 2008-2010, and 27 prisoners lost their lives to the disease between 2006 and 2010.[58]

---

[54] *See* Defendants' Opposition brief in *Plata*, May 6, 2013, Docket 2618, pp. 3-4.

[55] *Id*., at pp. 13.

[56] *Plata* order, June 24, 2013, Docket 2661, p. 5:18-23; *see also* Starr, "*Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California*," CDCR Memorandum June, 2007 [internal page 1, recommendation 1].

[57] *See* Deborah Hysen Declaration, ¶ 3.

[58] *See "Coccidioidomycosis in California Department of Corrections and Rehabilitation Institutions,"* CCHCS Report, October 10, 2012, p. 2.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1239. Dr. Gil Chavez, California's State Epidemiologist and the Deputy Director of Infectious Diseases within California's Department of Public Health, stated, "[a] factor that probably contributed to the high rates in [PVSP and ASP] is housing populations of inmates at risk for severe cocci disease, such as African-Americans and persons with diabetes and other chronic diseases."[59]

1240. The rate of deaths due to cocci among African-American inmates was eight times the death rate among African-Americans in California generally, and twice the death rate due to cocci among non-African-American inmates in California.[60]

1241. The court-appointed Receiver managing the California State prison system's health care program issued his "*Recommendations for Immediate Response to Coccidioidomycosis in CDCR Prisons*" in November 2012.[61] Included among the Receiver's recommendations, formed in consultation with court-appointed medical experts, was the direction to cease transferring African-Americans, persons with diabetes and those with no HIV test results to PVSP and ASP.[62]

1242. On April 11, 2013, the Receiver's public health staff presented him with an analysis and report concerning the Valley Fever epidemic in the PVSP and ASP facilities.[63] This report found that African-Americans were at 90% higher risk for disseminated cocci disease than their fellow white inmates, and "other race" categories

---

[59] April 4, 2013 letter from Dr. Chavez to Acting CDCR Secretary for Operations Martin Hoshino, p. 1, ¶ 2.

[60] Id., pp. 5-6 ["For the year 2006-2007, African-American inmates were eight times more likely … to die of coccidioidomycosis than African-American men in the California population"].

[61] *Plata* order, June 24, 2013, p. 9 [Docket 2661].

[62] *Id*.

[63] Kelso, "Notice Of Filing Of Report And Response Of Receiver Regarding Plaintiffs' Motion Re Valley Fever," *Plata v. Brown*, Eastern District California No. 01-1351 [May 1, 2013, Docket 2601].

(e.g., perhaps Asian, Native-American) were at 100% increased risk; inmates over 55 years old bore an increased risk of at least 60%. *Ibid*.

1243. With such analyses in hand, the Receiver still had to issue yet another directive to the defiant CDCR on April 29, 2013, amended on May 1, 2013, as the Defendants continued to refuse to exclude from the hyper-endemic prisons those inmates with clearly-identified high-risk attributes, including African-Americans and those potentially at risk due to medical conditions or lack of medical data.[64]

1244. In their May 23, 2013 report, the medical experts appointed by the District Court in the *Plata* case found that 36 inmate deaths were caused by Valley Fever between 2006 and 2011. Of those deaths, 70% were African-American and 76% had a concurrent immune-compromised condition such as HIV or diabetes.[65]

1245. Those same medical experts underscored the importance of excluding from PVSP and ASP "all populations that meet the American Thoracic Society criteria for increased risk of severe cocci disease (e.g., African-Americans, Filipinos) … [as well as] individuals whose HIV status is unknown[.]" [66] They also concluded that, "if measures taken do not reduce cocci rates to near local community rates, [CDCR] should close PVSP and ASP."

1246. Despite the Receiver's specific instructions and the court-appointed medical experts' opinions, and evidencing the continuing deliberate indifference by Defendants, there was a continued "refus[al] to exclude the other inmates covered by

[64] *See* Kelso Report, pp. 9-11.

[65] *See* Plata v. Brown, ED 01-1351 [Judge Henderson Order, citing Court Medical Expert Report, "Cocci. in California State Prisons," p. 5 [Docket 2661, "Henderson Order"].

[66] Henderson Order, p. 12 [Docket 2661].



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

the Receiver's policy – most notably, diabetics and African-American and Filipino inmates[.]"[67]

1247. Defendants continued to defy the Receiver's explicit instructions, complaining that the policy was "vague" and "premature."[68]

1248. According to Dr. Galgiani, "[t]he incidence of Valley Fever at these two prisons is at a level indicating a public health emergency.… and prison officials should be, but apparently are not, acting in a manner consistent with a situation where the lives of individuals are at substantial risk."[69]

1249. Galgiani concluded that, as a result of the California prison system's inadequate handling of the Valley Fever epidemic among inmates, "needless suffering and death were inflicted on these men."[70]

1250. In spite of repeated warnings, expert opinions including those of their own staff, and Federal court orders, Defendants continued to send high-risk prisoners to the hyper-endemic facilities and declined to implement at those facilities any of the recommended remedial measures to protect inmates.[71]

---

[67] Henderson Order, citing Court Medical Expert Report, "Cocci. in California State Prisons," p. 11.

[68] Declaration of Diana Toche, May 6, 2013, ¶¶ 11-14 [Docket 2615]; Declaration of Warren George, pp. 5-6 [email thread with relevant commentary by Deputy Attorney General Benjamin Rice dated May 3, 2013]; May 8, 2013 letter from Dr. Diana Toche to J. Clark Kelso.

[69] Galgiani Declaration, ¶ 15.

[70] Galgiani Declaration, ¶ 19.

[71] See, e.g., Dovey "*Inmate Patients at High Risk*," [CDCR Memo August 3, 2006]; Hubbard & Winslow, "*Exclusion of Inmate-Patients* [CDCR Memo November 20, 2007]; *Plata* order, p. 5, June 24, 2013, Docket ["Notably, although CDPH observed the increased risk for African-Americans and Filipinos, PVSP did not transfer these inmates out."]



BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1251. In fact, Defendants not only failed to implement remedial measures to reduce Plaintiffs' risk of infection, they persisted in practices that increased that risk.

1252. Although Defendants knew that construction activities that disturbed the soil would mobilize cocci spores and increase the risk to those exposed, they continued to carry out such construction at the hyper-endemic prisons without taking commonly-known precautions to minimize infection.

1253. Inmates and outside experts observed continuing construction, at PVSP and ASP at a minimum, taking place without any precautions to prevent inmates' exposure to cocci. Inmates including Bruce Koklich and observers from the Centers for Disease Control noted excavation and construction taking place in the D yard at PVSP, and other construction projects at PVSP and ASP including excavation, disking of bare soil, dust-producing grounds maintenance and other construction activities without any dust control or precautions to reduce soil disturbance or cocci mobilization, let alone all the remedial measures recommended years before.

1254. These ongoing construction activities at hyper-endemic prisons all exacerbated the risk of inmates' exposure to cocci spores and the increased risk of contracting Valley Fever.

1255. The *Plata* Court found that: "The experts [all] agree that the factors for increased risk of severe cocci are well-known and undisputed, and that screening out high-risk inmates is an appropriate response. … Defendants are unwilling to exclude [certain] inmates whom they know are at an increased risk of severe disease, which may lead to death. Defendants have therefore clearly demonstrated their unwillingness to respond adequately to the health care needs of California's inmate population[.] In the absence of a court-ordered exclusionary policy, inmates will continue to suffer unnecessary and unreasonable harm, thus presenting the most recent example of how

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

Defendants lack 'the will, capacity, and leadership to maintain a system of providing constitutionally adequate medical health care services . . . ."[72]

1256. The *Plata* Court noted that "the recommendation to exclude inmates at higher risk of severe cocci was first specifically made to Defendants over six *years* ago."[73] Remedial measures at the prisons and efforts to control soil disturbance and cocci mobilization were similarly recommended many years previously, but still not observed by these Defendants.

1257. Defendants' deliberate failure to take any action to protect Plaintiffs, who were known to be at elevated risk of contracting the severe, disseminated form of Valley Fever, in the face of a duty to act, constituted a reckless indifference to Plaintiffs' 8th Amendment rights.

1258. For all the reasons stated herein, Defendants' indifference to Plaintiffs' suffering has been willful and with conscious disregard of the rights or safety of others.

### C. Defendants Do Not Have Qualified Immunity

1259. Defendants were subjectively aware of a significantly risk of harm from coccidioidomycosis, but deliberately elected to expose Plaintiffs to that risk even though the risk could have been avoided.

1260. Defendants deliberately violated the Eighth Amendment's prohibition against cruel and unusual punishment, and are accordingly denied the protection of qualified immunity.

1261. For qualified immunity purposes, exposure to adverse environmental toxins is a well-established risk under the state's obligation to keep inmates safe.

---

[72] *Plata* order, p. 24 [Northern District Judge Thelton Henderson, filed June 24, 2013, Docket 2661].

[73] *Plata* order, p. 20 [emphasis added].

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1262. It is irrelevant that some early cases in the Eastern District involving contraction of Valley Fever may have found against self-represented inmates, as those plaintiffs did not plead their cases correctly, were not decided on qualified immunity ground, or did not adequately allege that the defendants herein knew they were exposing inmates to a significantly elevated risk of exposure to a serious disease, like Valley Fever.

1263. Defendants were on notice that it was a constitutional violation to expose inmates to a significantly elevated risk of exposure to a serious disease, as this principle had been firmly established by the United States Supreme Court many years before the incidents in and around 2007 occurred.

1264. Defendants may not claim they were just following orders, as they were in the position to give orders.

1265. Defendants knew that they were exposing Plaintiffs to a life-threatening, permanent ailment and that ready alternatives and protective measures were available. Defendants ignored these risks and they took no action. Therefore, Defendants are not entitled to qualified or any other immunity.

## IX.

## SECOND CLAIM FOR RELIEF – STATE LAW NEGLIGENCE CLAIM

1266. Plaintiffs incorporate the allegations of paragraphs 1-1193 and 1228-1258 as if these allegations were fully set forth herein.

1267. This claim is brought by all Plaintiffs that identified, within the section entitled “EACH PLAINTIFF SEEKS RELIEF ONLY AGAINST CERTAIN DEFENDANTS IDENTIFIED BELOW AND ONLY AS TO CERTAIN CLAIMS,” that that they are asserting a state claim.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1268. Each respective Plaintiff asserting a state claim seeks relief only against those Defendants that each respective Plaintiff identified in the section entitled "EACH PLAINTIFF SEEKS RELIEF ONLY AGAINST CERTAIN DEFENDANTS IDENTIFIED BELOW AND ONLY AS TO CERTAIN CLAIMS." Notwithstanding the above, Plaintiffs asserting a state claim only assert this claim against Defendant Kelso in the event that he is deemed to have had authority to have intervened in the Valley Fever crisis, pursuant to Plaintiffs' cause of action for declaratory relief with respect to him, Claim III.

1269. All times pertinent to this action, Defendants had both a regulatory and a common law duty to exercise reasonable care to keep the inmates and the prison environments reasonably safe, and to address known dangerous conditions at those prisons that created unreasonable risk of harm.

1270. Defendants also had a special relationship with Plaintiffs, as their jailors, that required Defendants to protect Plaintiff from known and foreseeable harms.

1271. Defendants were aware or should have been aware that, without adequate protective measures addressing the known highly-elevated presence of *Coccidioides immitis* spores at the hyper-endemic prisons, Plaintiffs would be subject to greatly increased exposure to the fungal spores and would therefore be at greatly increased risk of contracting Valley Fever.

1272. Defendants negligently failed to take even the rudimentary steps described herein, that were identified and recommended by their own experts, to make the prison safer for Plaintiffs.

1273. In failing to implement those protective measures, those Defendants who had non-discretionary responsibilities for inmate and facility safety were negligent in their ministerial decisions, acts and omissions, causing Plaintiffs' injuries.

1274. In addition, these Defendants who had supervisory responsibilities with respect to inmate and facility safety were negligent in failing to adequately supervise their subordinates committing such negligent ministerial decisions, acts and omissions.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1275. Defendants' negligence in failing to make the hyper-endemic prison safe, in the face of known dangerous conditions, was a substantial factor and proximate cause of each Plaintiff's contraction of Valley Fever that has resulted in substantial damage to Plaintiffs.

1276. Defendants are liable for the damages their negligence actually and proximately caused.

1277. Each Plaintiff asserting a state negligence claim knew or should have known, only within 2 years before the filing of his original complaint, that the harm he suffered was caused by wrongful conduct.

1278. Ordinarily, pursuant to Government Code section 900, et seq., a party pursuing a state cause of action must file a claim with the Victims Compensation Board and receive an adverse decision before filing suit, under certain timeframes.

1279. Plaintiffs asserting a state claim are relieved of the obligation to have filed such a claim based on information alleged herein.

1280. The mechanics of Government Code sections 900, 905.2, 950.2 and 825 reveal that a VCB claim by a prisoner against a public employee defendant is not required, because the state is not mandatorily liable to pay such a claim; therefore as a public defendant can only enforce the presentment requirement for cases of mandatory indemnity, the presentment requirement cannot be enforced in this situation.

## X.
## THIRD CLAIM FOR DECLARATORY RELIEF AGAINST DEFENDANT KELSO

1281. Plaintiffs incorporate paragraphs 943-953, as if fully set forth into this cause of action.

1282. As explained above in the Defendant section pertaining specifically to Defendant Receiver Clark Kelso, incorporated herein, Plaintiffs seek a declaratory relief ruling with respect to Defendant Kelso to clarify whether he did or did not have authority as Receiver of the health care system to require precautions to protect inmates from the unsafe prisons where Plaintiffs were housed and contracted Valley Fever. If

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

and only if he did, Plaintiffs include him as a defendant pursuant to the 1983 and state negligence claims documented above as Claims I and II. If he did not, then Plaintiffs do not name him with respect to these Claims.

## XI.

## PRAYER FOR RELIEF

*Wherefore*, Plaintiffs request on the first Claim for Relief the following:

(i) economic damages in an amount to be proven at trial to compensate plaintiffs for the ongoing cost of antifungal medical care (estimated at $10,000/year) and medical monitoring of the disease (estimated at $1,000/year), for the expected cost of periodic hospitalizations due to its flare-ups (estimated to cost about $100,000 per hospitalization)[74] to cover the cost of severe illness brought upon by dissemination or other aggravation of the disease (which ranges from the tens of thousands to hundreds of thousands dollars in medical care, depending on the severity of the injuries), and the resulting loss in the inmate's ability to work and earn money upon his release, which varies depending on the degree of debilitation of a given inmate;

(ii) non-economic damages in an amount to be proven at trial for the pain, suffering and misery associated with the experience of the disease and its associated management, the loss of health and enjoyment of life attributable to management of a serious disease, the fear, depression and demoralization associated with the consequences of having a life-long disease, and the risk, and reality, of its disseminated form resulting in severe health consequences up to and including an early and painful death;

(iii) punitive damages (except as to Defendant Kelso);

(iv) reasonable attorney's fees pursuant to 42 U.S.C. §§ 1988 and 1997(e) at the maximum allowable rate by statute .

[74] "Valley Fever Costs Mount for Patients and Taxpayers," USC Annenberg, November 2, 2014.

.

(v) costs of suit including the expense of experts;

(vi) interest; and

(vii) such other relief as the Court deems just and proper.

Plaintiff requests on the Second Claim for Relief, the following:

(i) economic damages in an amount to be proven at trial to compensate plaintiff for the ongoing cost of antifungal medical care (estimated at $10,000/year) and medical monitoring of the disease (estimated at $1,000/year), for the expected cost of periodic hospitalizations due to its flare-ups (estimated by the State to cost about $100,000 per hospitalization) to cover the cost of severe illness brought upon by dissemination or other aggravation of the disease (which ranges from the tens of thousands to hundreds of thousands dollars in medical care, depending on the severity of the injuries), and the resulting loss in the inmate's ability to work and earn money upon his release, which varies depending on the degree of debilitation of a given inmate;

(ii) non-economic damages in an amount to be proven at trial for the pain, suffering and misery associated with the experience of the disease and its associated management, the loss of health and enjoyment of life attributable to management of a serious disease, the fear, depression and demoralization associated with the consequences of having a life-long disease, and the risk, and reality, of its disseminated form resulting in severe health consequences up to and including an early and painful death;

(iii) costs of suit including the expense of experts;

(iv) interest;

(v) punitive damages (except as to Defendant Kelso); and

(vi) such other relief as the Court deems just and proper.

Date: April 17, 2015 PAVONE & FONNER, LLP

/s/ Benjamin Pavone
Benjamin Pavone, Esq.
Attorneys for Plaintiffs

Date: April 17, 2015 AFFELD GRIVAKES ZUCKER LLP

/s/ Gregg Zucker
Gregg Zucker, Esq.
Attorneys for Plaintiffs

Date: April 17, 2015 LAW OFFICES OF DAVID ELLIOT

/s/ David Elliot
David Elliot, Esq.
Attorneys for Plaintiffs

Date: April 17, 2015 BURNS & SCHALDENBRAND

/s/ Edward Burns
Edward Burns, Esq.
Attorneys for Plaintiffs

Date: April 17, 2015 LAW OFFICES OF MATTHEW B. PAVONE

/s/ Matthew Pavone
Matthew Pavone, Esq.
Attorneys for Plaintiffs

## XI.
## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand trial by jury.

Date: April 17, 2015 PAVONE & FONNER, LLP

/s/ Benjamin Pavone
Benjamin Pavone, Esq.
Attorneys for Plaintiffs

Date: April 17, 2015 AFFELD GRIVAKES ZUCKER LLP

/s/ Gregg Zucker
Gregg Zucker, Esq.
Attorneys for Plaintiffs

Date: April 17, 2015

LAW OFFICES OF DAVID ELLIOT

/s/ David Elliot
David Elliot, Esq.
Attorneys for Plaintiffs

Date: April 17, 2015

BURNS & SCHALDENBRAND

/s/ Edward Burns
Edward Burns, Esq.
Attorneys for Plaintiffs

Date: April 17, 2015

LAW OFFICES OF MATTHEW B. PAVONE

/s/ Matthew Pavone
Matthew Pavone, Esq.
Attorneys for Plaintiffs

# EXHIBIT A

(NOVEMBER 20, 2007 POLICY)

BURNS | ELLIOT | B. PAVONE| M. PAVONE | SPIESS | ZUCKER

# Memorandum

Date : NOV 2 0 2007

To : Wardens
Health Care Managers/Chief Medical Officers
Directors of Nursing
Classification and Parole Representatives
Correctional Counselor IIIs, Reception Centers
Classification Staff Representatives

Subject : **EXCLUSION OF INMATE-PATIENTS SUSCEPTIBLE TO COCCIDIOIDOMYCOSIS FROM HIGHEST RISK (HYPERENDEMIC) AREA INSTITUTIONS**

The following memorandum provides direction on the transfer process of inmate-patients that meet coccidioidomycosis (cocci) susceptibility exclusion criteria from highest risk (hyperendemic) area institutions. This memorandum supersedes the August 3, 2006 memorandum titled, *INMATE-PATIENTS AT HIGH RISK OF VALLEY FEVER EXCLUDED FROM SPECIFIC CENTRAL VALLEY INSTITUTIONS.*

In calendar year 2005, two San Joaquin Valley institutions, Pleasant Valley State Prison and Avenal State Prison, identified significant increases in the number of inmate-patients presenting with cocci, with deaths attributed to this disease. The California Department of Health Services (DHS) worked with California Department of Corrections and Rehabilitation (CDCR) staff in analyzing the problem and in assisting in designing an approach to mitigate the effects of the organism that causes cocci or "Valley Fever."

This approach includes identifying those inmate-patients most susceptible to developing severe or disseminated cocci and implementing strategies to prevent these susceptible inmate-patients from being housed in the hyperendemic area. Movement of these inmate-patients shall begin immediately. ***It is not necessary to transfer inmate-patients that have already been infected with cocci.***

The following institutions are located in the hyperendemic area:

Avenal State Prison
California Correctional Institution
California State Prison-Corcoran
California Substance Abuse Treatment Facility and State Prison at Corcoran
Kern Valley State Prison
North Kern State Prison
Pleasant Valley State Prison
Wasco State Prison

Inmate-patients requiring dialysis may continue to be housed at Kern Valley State Prison, California Substance Abuse Treatment Facility and State Prison at Corcoran, Wasco State Prison, and Security Housing Unit inmate-patients at Corcoron.

Human Immunodeficiency Virus (HIV)-infected inmate-patients that require Sensitive Needs Yard (SNY) placement shall be housed at the Richard J. Donovan Correctional

Facility. HIV-infected inmate-patients with Level IV placement scores who are not appropriate for Level III housing or are sentenced to Life Without the Possibility of Parole, and/or have an active Security Housing Unit Term, shall be housed at the California State Prison, Sacramento.

Based on DHS recommendations we are implementing the following plan, which includes:

1. Identifying susceptible inmate-patients in the institutions located in the hyperendemic area.
2. Transferring identified inmate-patients out of the hyperendemic area.
3. Developing a methodology as part of the Reception Center (RC) Intrasystem transfer process that includes identification and classification of inmate-patients at the highest risk of developing severe or disseminated cocci disease so that they are not transferred to an institution within the hyperendemic area.
4. Selecting environmental controls consistent with recommendations provided by DHS at institutions in the hyperendemic area.

It is imperative custody, classification, and health care staff closely collaborate to ensure effective and efficient implementation.

**IMPLEMENTATION PROCEDURES – HEALTH CARE**

The following clinical criteria, which define susceptible inmate-patients for morbidity related to cocci, will be used by health care staff to identify inmate-patients who cannot be housed at institutions within the hyperendemic area.

Criteria a. All identified HIV infected inmate-patients
Criteria b. History of lymphoma
Criteria c. Status post solid organ transplant
Criteria d. Chronic immunosuppressive therapy (e.g. severe rheumatoid arthritis)
Criteria e. Moderate to severe Chronic Obstructive Pulmonary Disease (COPD) requiring ongoing intermittent or continuous oxygen therapy
Criteria f. Inmate-patients with cancer on chemotherapy

[redacted]

The sources used to identify the above inmate-patients include:

1. Chronic disease lists
2. Pharmacy medication lists
3. Nursing input
4. Specialty clinic list
5. Return from a higher level of care, i.e., Hospital
6. Triage and treatment log

A CDCR physician will review the Unit Health Records (UHR) derived from the above sources and identify inmate-patients by name and CDCR number who will require transfer out of the current institution. The physician shall complete a CDCR Form 128-C, Medical Chrono, and forward a copy to the Classification and Parole Representative's (C&PR) office within three days of the UHR review. The CDCR Form 128-C shall indicate that the inmate-patient, due to environmental conditions (Valley Fever organism), (enter the criteria code, i.e. a-f), present at (enter prison name here), and the inmate's current health condition, must be transferred out of the hyperendemic area. The CDCR Form 128-C shall indicate whether inmate-patients are appropriate for general population housing.

When an inmate-patient's level of care dictates placement in a medical bed the Health Care Placement Unit (HCPU) shall be contacted to facilitate the endorsement transfer process, which shall include a Chief Medical Officer (CMO) to CMO agreement. In all other cases, CMO to CMO notification is required to ensure continuity of care. A copy of this CDCR Form 128-C shall be sent to the C&PR for classification action to be taken within seven days. The inmate-patient must be endorsed for transfer and the transfer must be coordinated with the receiving C&PR, and it must be expedited.

No later than December 15, 2007, at all institutions, the Receiving and Release (R&R) Registered Nurse (RN) shall review all scheduled transfers out of the institution via the CDCR Form 7343, Medical Advance Transfer Notice, and determine if any transferring inmate-patients meet the cocci susceptibility exclusion criteria listed above. If the answer is "Yes", the RN shall determine if the inmate-patient is endorsed for transfer to an institution within the hyperendemic (affected) area. The case records office shall notify the medical department of any changes to the CDCR Form 7343. The Health Care Manager (HCM) or designee shall place a medical hold on the inmate-patient's transfer after notification by the RN. The R&R RN shall complete a CDCR Form 128-C indicating that due to environmental conditions (Valley Fever organism), (enter the criteria code, i.e. a-f), present at (enter prison name here), and the inmate's current health status, he must be re-endorsed to an institution out of the hyperendemic area. The CDCR Form 128-C shall indicate whether inmate-patients are appropriate for general population housing.

[redacted]

When an inmate-patient's level of care dictates placement in a medical bed the HCPU shall be contacted to facilitate the endorsement and transfer process, which shall include a CMO to CMO agreement. A copy of this CDCR Form 128-C shall be sent to the C&PR for referral to a classification committee for endorsement by the Classification and Staff Representative (CSR) to an alternate institution outside the hyperendemic area. The transfer must be expedited.

For inmates arriving at institutions located within the hyperendemic area, the R&R, RN shall review new arrivals to determine if they meet the cocci susceptibility exclusion criteria. If the answer is "Yes", the R&R, RN shall complete a CDCR Form 128-C indicating that due to environmental conditions (Valley Fever organism), (enter the criteria code, i.e. a-f), present at (enter prison name here) and the inmate's current health status, he must be transferred out of the hyperendemic area. The CDCR Form 128-C shall indicate whether inmate-patients are appropriate for general population housing.

When an inmate-patient's level of care dictates placement in a medical bed the HCPU shall be contacted to facilitate the endorsement and transfer process, which shall include a CMO to CMO agreement. A copy of this CDCR Form 128-C shall be sent to the C&PR for referral to a classification committee for endorsement by the CSR to an alternate institution. The inmate-patient must be endorsed for transfer and the transfer must be expedited. Additionally, as inmate-patients' health care needs change, i.e. require chemotherapy, these inmate-patients are to be referred for transfer out of the hyperendemic area as described above. In all cases, common sense must be applied. Patients should not be transferred in a manner that will lead to interruptions in essential treatment.

**IMPLEMENTATION PROCEDURES – CUSTODY/CLASSIFICATION**

Institution C&PRs/RC Correctional Counselors (CC) III within the hyperendemic area are to receive the CDCR Form 128-C within three days of the inmate-patient being identified as meeting the exclusion criteria. The C&PR/ RC CC III is to ensure that the inmate-patient is referred to the CSR for endorsement to an alternate institution by a classification committee or appropriate RC process. Every attempt will be made to transfer the inmate-patient within 60 days of the date of the CDCR Form 128-C. If an RC inmate-patient is not processed and transferred within the 60-day timeframe, the RC CC III shall coordinate the transfer of the inmate-patient to the California State Prison, Los Angeles County to complete the processing. The HCPU is to be notified of any delayed transfers and will work collaboratively with Classification Services Unit (CSU) towards resolution.

C&PRs/RC CC IIIs shall continue to be familiar with the list of institutions within the cocci hyperendemic area. Upon receipt of the CDCR Form 128-C documenting preclusion of endorsement to institutions within the hyperendemic area and the medical hold, the C&PR/RC CC III's office shall ensure the case is reviewed immediately by a classification committee for appropriate action.

The CSR staff must be familiar with the list of institutions located within the hyperendemic area in order to avoid the inappropriate placement or transfer of susceptible inmate-patients. Prior to endorsing a case, the CSR shall ensure inmates meeting the above exclusion criteria are not endorsed to institutions located in the hyperendemic area. Additionally, the CSR shall document the following in the CDCR Form 128-G, Classification Chrono, "Inmate meets the cocci susceptibility exclusion criteria, see CDCR Form 128-C dated_____; therefore, this inmate should not be retained or transferred into the hyperendemic or affected areas unless there is a change in his medical condition."

For difficult to place inmate-patients (i.e., Bulldogs, SNY, wheelchair dependent), a case conference with HCPU, CSU, a headquarters health care clinician, and the sending institution C&PR staff will take place in order to identify an appropriate institution for transfer or potential retention at the current institution if no reasonable alternative can be identified. If retention at the current institution is the decision, the inmate-patient will be provided with environmental safeguards; i.e., protective mask when outside.

**IMPLEMENTATION PROCEDURES -- ENVIRONMENTAL CONTROLS**

Institutions within the hyperendemic area shall implement the DHS recommended environmental controls, including:

1. Continue to provide educational material to medical and custody staff and to inmate-patients regarding cocci disease.
2. Consider planting ground cover or grass on open dirt areas within the prison grounds.
3. When digging, use a protective mask and wet the ground prior to digging.

[redacted]

Thank you in advance for your compliance. Should you require additional information regarding classification issues, please contact Eric Arnold, Chief, CSU, at (916) 323-3660. For questions regarding medical concerns, please contact your respective Regional Medical Director.

SUZAN L. HUBBARD
Director
Division of Adult Institutions

DWIGHT WINSLOW, M.D.
Statewide Medical Director
*Plata* Support Division

cc: Scott Kernan, Chief Deputy Secretary, Adult Operations
Robin Dezember, Chief Deputy Secretary, Correctional Health Care
Nadim Khoury, M. D., Chief Deputy, Clinical Services, Plata Support Division (PSD)
Terry Hill, M. D., Chief Medical Officer, California Prison Health Care Receivership
Associate Directors-DAI
Regional Medical Directors, PSD
Regional Administrators-DCHCS
Tim Rougeux, *Plata* Implementation Project Manager, PSD
Janet Rodriguez, Chief, Case Records Services, DAI
Rick Johnson, CC III, HCPU, Division of Correctional Health Care Services (DCHCS)
Eric Arnold, Chief, CSU, Division of Adult Institutions (DAI)
Regional Director of Nursing, PSD
CSU Facility Captains
CSU CC IIIs
CSU CC IIs
HCPU CC IIIs